**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHELLY BENSON and LISA CAPARELLIL, individually and on behalf of all others similarly situated, | Case No.: 1:19-cv-06836 (RAG/YBK) |
| Plaintiffs, | The Honorable Ronald A. Guzman |
| vs. | Magistrate Judge Young B. Kim |
| NEWELL BRANDS INC. and NUK USA LLC, | |
| Defendants. | |

**DECLARATION OF EDWIN J. KILPELA, JR. IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Edwin J. Kilpela Jr., declare as follows:

1.      I am an attorney duly admitted to practice before this Court. I am a partner at the firm of Carlson Lynch, LLP ("CL"), one of the law firms representing Plaintiffs Shelly Benson and Lisa Caparelli and the proposed Class in this case. CL associated with Pearson, Simon & Warshaw, LLP in this action (together with CL, "Class Counsel").

2.      I submit this declaration in support of Plaintiffs' Motion for Class Certification ("Motion"). I am one of the attorneys principally responsible for the handling of this matter for CL. I am personally familiar with the facts set forth in this declaration. If called as a witness I could and would competently testify to the matters stated herein.

3.      CL has the experience, resources and ability to adequately represent the Plaintiffs and Class members in this class action lawsuit. A complete profile of CL's attorneys and summary of the numerous litigations in which they have obtained successful results is set forth in CL's firm resume attached hereto as **Exhibit 1**.

4.      I have more than 15 years of experience litigating class-action matters and other complex litigation matters. Among other matters, I currently lead and have lead efforts for plaintiffs in several consumer fraud matters regarding false labeling and false advertising. *See Seegert v. Rexall Sundown, Inc*., No. 3:17-cv-01243 (N.D. Ill.) (class of millions of consumers certified); *Yamagata v. Renkitt Benckiser LLC*, No. 3:17-cv-03529 (N.D. Cal.); *Snarr, et al. v. Cento Fine Foods, Inc.*, No. 4:19-cv-02627 (N.D. Cal.); *Rael v. Children's Place, Inc*., No. 3:16-cv-370 (S.D. Cal.); *Marino v. Coach, Inc*., No. 1:16-cv-01122 (S.D.N.Y.). Furthermore, I was appointed co-lead counsel in *Powell v. Subaru of America, Inc.*, 1:19-cv-19114 (D.N.J.) and am leading *Nunez v. Subaru of America, Inc., et al*., 1:19-cv-18303 (D.N.J.).

5.      In the last several years, Carlson Lynch attorneys, including myself, have led and worked on some of the largest MDL class-action matters in the country. *See In re Equifax, Inc. Customer Data Security Breach Litig*., MDL 2800 (N.D. Ga.) (co-lead counsel); *In re: Home Depot, Inc., Customer Data Security Breach Litig*., MDL No. 2583 (N.D. Ga.) (co-lead counsel); *First Choice Federal Credit Union v. The Wendy's Co., et al*., No. 2:16-cv-0506 (W.D. Pa.) (co-lead counsel); *In Re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, (N.D. Ala.) (Carlson

Lynch appointed to Litigation Committee); *Drennen v. Certain Underwriters at Lloyd's of London*, No. 15-01025 (Bankr. S.D.N.Y) (seeking insurance coverage for more than $300M for certified class of borrowers in connection with the bankruptcy proceedings of GMAC ResCap, Inc., one of the largest bankruptcy proceedings in the history of the United States).

6.      In this District, my firm and I have lead several class actions. *See Seegert v. Rexall Sundown, Inc.*, No. 3:17-cv-01243 (N.D. Ill.) (class of millions of consumers certified); *Albrecht v Oasis Power, LLC*, No. 1:18-cv-01061 (N.D. Ill.) (data breach class action); *Greater Chautauqua Federal Credit Union, et al. v. Kmart Corp., et al.*, No. 15-cv-02228 (N.D. Ill.) (Carlson Lynch attorneys served on  the plaintiffs' executive committee and as liaison counsel, in this consolidated case in which financial institutions were seeking recovery for losses sustained as a result of a 2014 data breach at one of the nation's largest discount retail chains).

7.      The background and experience of the attorneys at CL, our efforts to investigate and develop the allegations in this case, and our clients' stake in this litigation give my firm and me a solid foundation by which we can continue to prosecute this case efficiently and expeditiously.

8.      Class Counsel have spent many of hours diligently and passionately pursuing the instant matter on behalf of Plaintiffs and the proposed Class. The Court is well-aware of the procedural history of the instant action, but in summary Class Counsel have represented Plaintiffs and the proposed Class through dispositive motion briefing, extensive discovery involving voluminous document production, depositions, and significant expert work.

9.      CL has no known conflicts which would prevent them from adequately representing the proposed Class.

10.      As set forth in Plaintiffs' Motion, there is extensive evidence in the record to support granting class certification in this case. This evidence, including documents produced in the litigation, depositions taken to date and expert reports, represents only a small portion of the evidence supporting Plaintiffs' claims in this case.

11.      The exhibits cited in support of Plaintiffs' Motion are set forth in the chart below. True and correct copies of these exhibits are attached hereto. All depositions referenced have been

limited to the relevant portions cited in support of the Motion. As required by the Agreed Confidentiality Order (ECF No. 57), and further set forth in the concurrently-filed motion to seal, any exhibits that have been designated as Confidential or Highly Confidential will be filed under seal and are denoted as such in the chart below.

| EXHIBIT NUMBER | DESCRIPTION/BATES NO. | CONFIDENTIAL DESIGNATION |
|---|---|---|
| 2 | Excerpts from the Deposition Transcript of Melissa Wolf taken on September 11, 2020 | Yes |
| 3 | Exhibit 5 to Deposition Transcript of Melissa Wolf | Yes |
| 4 | Expert Report of Professor Jean-Pierre H. Dubé | Yes |
| 5 | Excerpts from the Deposition Transcript of Shelly Benson taken on September 30, 2020 | No |
| 6 | Excerpts from the Deposition Transcript of Lisa Caparelli taken on September 29, 2020 | No |
| 7 | Excerpts from the Deposition Transcript of Nicholas Wolter taken on September 11, 2020 | Yes |
| 8 | Exhibit 15 to Deposition Transcript of Nicholas Wolter | Yes |
| 9 | Expert Report of Dr. Michael Dennis | Yes |
| 10 | Expert Report of Dr. Michael Dennis (Response) | Yes |
| 11 | Expert Report of Professor Jean-Pierre H. Dubé (Response) | Yes |
| 12 | Expert Report of Dr. Denise Martin | Yes |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 14, 2021, in Pittsburgh, Pennsylvania.

/s/ Edwin J. Kilpela, Jr.

_____

Edwin J. Kilpela, Jr.

# EXHIBIT 1

# CARLSON
# LYNCH

## FIRM RESUME
## JULY 2021



## FIRM SUMMARY

With offices in Pittsburgh, San Diego, Los Angeles, Philadelphia, and Chicago, Carlson Lynch is a national firm specializing in complex class and collective actions and is involved in several high-profile multidistrict litigation proceedings. The attorneys of Carlson Lynch LLP ("Carlson Lynch") have litigated complex class-action matters involving financial fraud (including securities fraud, derivative actions, and mortgage fraud), data breach, privacy, consumer fraud, labor and employment, antitrust, civil rights, and wage and hour laws, in federal and state courts throughout the country. Litigation prosecuted by Carlson Lynch has resulted in substantial monetary recoveries and injunctive benefits on behalf of class members, described in more detail below. In addition, Carlson Lynch cases have generated seminal legal authority in both trial and appellate courts.

Carlson Lynch was founded in 2004 by Bruce Carlson and Gary Lynch, who started the firm to merge and build upon their collective experiences litigating complex class action matters. In 2015, the firm expanded to the west coast with the addition of its San Diego office, managed by Todd Carpenter. Continuing its growth, in 2019, the firm added an office in Chicago, managed by Katrina Carroll, and its Los Angeles office, managed by Eddie (Jae) K. Kim. In 2020, the firm opened an office in Philadelphia, managed by Edward Ciolko.

In October 2020, Carlson Lynch was named Litigation Department of the Year in Pennsylvania by *The Legal Intelligencer*.

## NOTABLE CASES[1]

### WAGE AND HOUR LITIGATION

***Verma v. 3001 Castor Inc.***, (E.D. Pa.). As co-class counsel, Carlson Lynch won a $4.5 million jury verdict in 2018 for misclassified workers at a Philadelphia nightclub. The claims were brought under the FLSA and Pennsylvania Minimum Wage Act. The trial verdict was fully affirmed by the Third Circuit in August 2019.

***Wintjen v. Denny's, Inc.*** (W.D. Pa). In February 2021, Plaintiff Juli Wintjen was awarded summary judgment on her tip credit claims against Denny's, Inc. The Honorable Christy Criswell Wiegand agreed with Carlson Lynch and its co-counsel's argument that employers must provide the five pieces of information required by 203(m)'s notice requirement.

***Gardner v. Country Club, Inc.*** (D.S.C.). Carlson Lynch served as class counsel for a class of

---

[1]     This Firm Resume is intended to be representative and is not comprehensive.  Carlson Lynch has prosecuted, and continues to prosecute, many substantial cases that are not identified here.



nightclub workers who were misclassified as independent contractors, subjected to deductions from their tip income, and denied wages. Carlson Lynch won two significant dispositive motions, obtaining a ruling that the workers were legally employees, and a legal opinion determining as a matter of first impression under South Carolina wage laws that tip income was protected from employer deductions. The case then settled for a total of $1.5 million, and final approval was granted in 2019.

***Herron v. Investment Professionals Inc.*** (W.D. Pa.). Carlson Lynch secured a $450,000 settlement for 12 financial advisors who were misclassified by a financial services company and consequently did not receive overtime compensation. The settlement was approved in February 2018.

***Herzfeld v. 1416 Chancellor Inc.*** (E.D. Pa.). Carlson Lynch is class counsel for a litigation-certified Rule 23 class and FLSA collective of more than 100 nightclub entertainers alleging misclassification and violations of the FLSA and Pennsylvania wage and hour laws. A settlement for a total amount of $415,000 was reached and granted preliminary approval in January 2018. Final approval was granted following a fairness hearing in June 2018.

***Correll v. One Three Five, Inc.*** (W.D. Pa.). Carlson Lynch was class counsel for a class of several hundred nightclub performers who alleged that they were misclassified by the club's owner as independent contractors, resulting in violations of the Fair Labor Standards Act and Pennsylvania state wage laws. A class settlement was granted final approval in 2016 and provided $815,000 in total relief for the class.

***Genesis Healthcare v. Symczyk*** (U.S. Supreme Court). Gary Lynch served as Counsel of Record before the United States Supreme Court in an appeal addressing the application of mootness principles in a putative collective action filed under Section 216(b) of the Fair Labor Standards Act. When defendant served Carlson Lynch' client with a Rule 68 offer of judgment for "make whole" relief, the district court dismissed the case as moot. Gary Lynch successfully argued the appeal in the United States Court of Appeals for the Third Circuit, which held that the FLSA collective action did not become moot upon the plaintiff's receipt of a Rule 68 offer of judgment for full satisfaction of her individual claim. The Supreme Court reversed in a 5-4 opinion, with Justice Kagan writing a strong dissent on behalf of Carlson Lynch' client—a position which was subsequently adopted by the majority of the Court in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Carlson Lynch's position before the Supreme Court was supported by the United States as Amicus Curiae.

***Gualano v. Abercrombie & Fitch Stores, Inc.*,** (W.D. Pa). Carlson Lynch was co-lead counsel in this wage and hour litigation alleging that defendant retail clothier was violating federal and state minimum wage laws. Following the fairness hearing in early 2005, where a multi-state settlement was presented to the Court for approval, the Court entered Findings of Fact and Conclusions of Law addressing lead counsels' adequacy as follows:

> "The Court finds the plaintiffs' counsel, Bruce Carlson and Gary Lynch, are experienced class counsel and that they have met all of the requirements of Rule

2



23(g)(1)(B) and (C). Consistent with the underlying purpose of Fed. R. Civ. P. 23, plaintiffs' counsel have achieved, with utmost efficiency, a quality result for the entire class and are commended for the diligence and effective advocacy they have displayed on behalf of their clients."

***Pasci v. Express, LLC***, (W.D. Pa.). This case was similar to the *Abercrombie* case discussed above and proceeded to a fairness hearing in November 2004, where a multi-state settlement was presented to the Court for approval. Regarding the adequacy of Carlson Lynch, the Court issued Findings and Conclusions stating:

> "With respect to the adequacy of counsel, the Court finds that class counsel have capably and vigorously represented the class. Bruce Carlson and Gary Lynch have substantial experience in class-based litigation involving consumer fraud and employment claims . . . . Class counsel achieved an efficient and excellent result on behalf of the class."

***Ellis v. Edward Jones,*** (N.D. Ohio). Carlson Lynch chaired the Plaintiffs' Leadership Committee in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. After Defendant filed an answer and after significant discovery wherein Defendant produced in excess of 500,000 pages of documents and hundreds of videotapes, the parties commenced mediation to pursue a potential global settlement. The first mediation, which occurred in Atlanta in March 2007, was unsuccessful. Ultimately, the parties participated in a second mediation in San Francisco, at which the parties arrived at the basic terms of a proposed settlement pursuant to which class members from multiple states received in excess of $19,000,000. After a fairness hearing on January 5, 2009, the Court granted final approval of the settlement.

***Byers v. PNC Financial Services Group, Inc.,*** (W.D. Pa.). Carlson Lynch was lead plaintiff's counsel in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. A multi-state settlement was approved following a fairness hearing in June 2008.

***Steen v. A.G. Edwards, Inc***., (S.D. Cal.). Carlson Lynch was co-class counsel for plaintiff in this wage and hour litigation alleging that defendant stock brokerage company violated federal and state overtime laws. A mediated national class-based settlement has been reached and preliminary approval has been granted. A fairness hearing was held on August 31, 2009 in Los Angeles, after which the Court entered an Order granting final approval of the settlement.

***Meola v. AXA Financial, Inc.,*** (N.D. Cal.). Carlson Lynch was co-class counsel for plaintiff in this wage and hour litigation alleging that defendant financial services company violated federal and state overtime laws. A mediated national class-based settlement was negotiated in this matter, and final approval was granted following a fairness hearing in the fall of 2009.

***In re St. Francis Health System,*** (C.P., Allegheny County Pennsylvania). Carlson Lynch was counsel for the class in connection with this wage and hour litigation on behalf of certain former

3



employees of the St. Francis Health System in Pittsburgh. Plaintiff asserted that the class was deprived of severance benefits when St. Francis Health System was acquired by another hospital group in Western Pennsylvania. Prior to the disposition of Plaintiff's class certification motion, the parties engaged in extensive mediation before reaching a class-based settlement.

*Haag v. Janney Montgomery Scott,* (E.D. Pa.). Carlson Lynch was a member of the three firm Executive Committee in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. After protracted litigation and two separate mediations, the parties reached a multi-state settlement. A fairness hearing was conducted in Philadelphia on June 30, 2009, where Gary Lynch appeared on behalf of the class. Following the hearing, the Court granted final approval of the settlement.

*Steinberg v. Morgan Stanley & Co.,* (S.D. Cal.). Carlson Lynch was co-class counsel for plaintiff in this wage and hour litigation alleging that defendant stock brokerage company violated federal and state overtime laws. A mediated national class-based settlement was reached, and final approval of the settlement was granted.

*Ramsey v. Ryan Beck, Inc.* (S.D.N.Y.). Carlson Lynch was co-class counsel in this wage and hour class action alleging that defendant stock brokerage company violated federal and state overtime laws. After protracted litigation, the parties reached a multi-state settlement, and final approval was granted in June 2010.

*Kniess v. Heritage Valley Health Systems, Inc.,* (C.P., Allegheny County, Pennsylvania). Carlson Lynch was lead counsel in this wage and hour class action alleging that the defendant hospital system failed to pay overtime compensation to its nurse practitioners and physician's assistants. The parties reached a mediated class settlement whereby class members received the majority of the back pay alleged by Carlson Lynch.

*Leadbitter v. The Washington Hospital, Inc.,* (W.D. Pa.). Carlson Lynch was lead counsel in this wage and hour class action alleging the defendant hospital system failed to pay overtime compensation to its nurse practitioners and physician's assistants. The parties reached a mediated class settlement whereby class members will be eligible to receive the majority of the back pay alleged by Carlson Lynch, and the settlement has received final approval from the Court.

*Career Education Corporation Misclassification Litigation,* (W.D. Pa.). In early 2011, Carlson Lynch filed a putative collective action on behalf of admissions representatives employed by culinary schools operated by Career Education Corporation. Carlson Lynch alleged that these individuals were misclassified and improperly denied overtime benefits. A class settlement was negotiated and final approval of the settlement was granted in December 2011.

*Atrium Centers, LLC Automatic Meal Break Deduction Litigation,* (N.D. Ohio). Carlson Lynch was lead counsel in this collective action on behalf of hourly health care workers (primarily nurses) alleging improper pay practices in connection with automatic meal break deductions. After the court granted Plaintiffs' motion for conditional certification of a collective action under the FLSA, extensive discovery ensued. Following the close of discovery in the fall of 2012, the Parties



engaged in mediation with a former United States Magistrate Judge and reached an agreement to settle the case on a collective basis. The settlement was approved by the court in December 2012, and the settlement proceeds have been distributed.

***Northwestern Memorial Healthcare Automatic Meal Break Deduction Litigation,*** (N.D. Ill.), Carlson Lynch was lead counsel in this collective/class action on behalf of hourly health care workers (primarily nurses) alleging improper pay practices in connection with automatic meal break deductions. After extensive discovery and the denial of Defendant's motion for summary judgment, the Parties reached a mediated class settlement in the fall of 2012. In December 2013, the Court granted final approval of the settlement, and the settlement proceeds have been distributed to the class.

***Crozer-Keystone Health System Overtime Litigation,*** (E.D. Pa.), Carlson Lynch filed a putative collective action against Crozer-Keystone Health System in the Eastern District of Pennsylvania. The Complaint challenged pay practices related to nurse practitioners and/or physicians' assistants. The plaintiffs in these cases allege that they were illegally being denied overtime compensation by their employers. After discovery, the Parties filed cross motions for summary judgment. In a widely reported opinion issued on January 4, 2011, the Court granted Plaintiffs' motion for summary judgment, holding that Defendant had misclassified individuals in Plaintiff's job positions. Defendant's motion for reconsideration of the federal court's summary judgment decision was denied in a twenty-one page opinion and order issued on August 15, 2011. Following mediation, the settlement of this case was approved in August 2012.

### PAYMENT CARD DATA BREACH LITIGATION WITH ICBA / CUNA MEMBERS

***In re Equifax, Inc. Customer Data Security Breach Litig.***, MDL 2800 (N.D. Ga.). Gary Lynch was appointed co-lead counsel for financial institution plaintiffs in multidistrict litigation related to the notorious 2017 Equifax data breach, which is potentially the largest and most damaging data breach of all time. More than 400 lawsuits filed by consumers and financial institutions were consolidated in the MDL. The court granted preliminary approval to a proposed class action settlement on June 5, 2020.

***In re Home Depot Customer Data Breach Litig.***, 1:14-md-02583, MDL 2583 (N.D. Ga.). Carlson Lynch represents five different financial institutions in litigation related to the major data breach at the retailer which continued for almost six months in 2014 and resulted in the compromise of approximately 56 million payment card accounts. Gary Lynch was appointed by Judge Thrash to be one of three lead counsel managing the financial institution track of the litigation. Over forty financial institutions and seventeen credit union associations filed a consolidated complaint in May 2015. Judge Thrash denied the majority of Home Depot's motion to dismiss on May 18, 2016. In September 2017, the Court granted final approval to a comprehensive settlement that provides over $27 million in relief to the class.

***In re Target Corporation Customer Data Breach Litig.***, 0:14-md-02522, MDL 2522 (D. Minn.).



Carlson Lynch represents nine different financial institutions in consolidated multidistrict litigation related to the massive data breach that occurred in late 2013. Gary Lynch is on the five-member Plaintiffs' Executive Committee that is managing this litigation on behalf of all Plaintiffs. A settlement agreement which provides $10 million to affected individual customers was granted final approval in November 2015. A separate settlement providing approximately $39 million in relief to plaintiff financial institutions was given final approval in May 2016.

***First Choice Federal Credit Union v. The Wendy's Company et al***, 2:16-cv-0506, (W.D. Pa.). Gary Lynch was appointed co-lead counsel in a group of consolidated cases brought by financial institutions against the Wendy's fast food chain in the aftermath of a late 2015 data breach that exposed customers' credit card information. Magistrate Judge Maureen P. Kelly recommended the denial of Wendy's motion to dismiss in February 2017, and that report and recommendation was adopted by District Judge Nora Barry Fischer in March 2017. The case ultimately settled for $50 million, which received final approval in 2019.

***Greater Chautauqua Federal Credit Union et al v. Kmart Corporation et al***, No. 15-cv-02228 (N.D. Ill.). Gary Lynch served as a member of the plaintiffs' executive committee, and Katrina Carroll served as liaison counsel, in this consolidated case in which financial institutions were seeking recovery for losses sustained as a result of a 2014 data breach at one of the nation's largest discount retail chains. A settlement was reached and approved in June 2017.

### Other Privacy/Data Breach

***In re Marriott International Customer Data Security Breach Litigation,*** MDL No. 2879 (D. MD.). Gary Lynch was appointed to the Plaintiffs' Steering Committee in this multidistrict litigation related to the data breach involving Starwood guest information dating back to at least 2014. The MDL includes more than 100 cases and is in pretrial litigation.

***Dittman et al v. UPMC d/b/a The University of Pittsburgh Medical Center and UPMC McKeesport***, (Allegheny Cty., Pa. No. GD-14-003285). Carlson Lynch is representing several employees of the health care group UPMC in a class action stemming from a breach of UPMC's personnel files. Hundreds of employee files were compromised, and numerous fraudulent tax returns were filed using the stolen data. On November 21, 2018 the Pennsylvania Supreme Court vacated and remanded a dismissal of this case, finding that employers have a duty to exercise reasonable care to safeguard employees' sensitive data and the claims from negligence can be brought by employees when an employer's internet-accessible computer systems are breached. In addition, the Court held that Pennsylvania's economic loss doctrine does not prohibit a negligence claims where the plaintiff can establish breach of a duty arising under common law.

***In re Anthem, Inc. Customer Data Security Breach Litig.***, No. 5:15-md-02617, MDL 2617 (N.D. Cal.). Carlson Lynch represented customers of a national health insurer which experienced a data breach involving the personal information, including social security numbers, of up to an estimated 80 million customers. The case was consolidated and transferred to the Northern District of California in June 2015. Carlson Lynch participated in discovery related to Highmark, the Pennsylvania-based member of the Blue Cross Blue Shield Association and a co-defendant in the



MDL. The parties reached a settlement valued at $117 million, which was approved by the Court.

*In re Community Health Systems, Inc., Customer Data Security Breach Litigation*, 2:15-cv-00222, MDL 2595 (N.D. Ala.). Gary Lynch served as a member of the plaintiffs' steering committee in consolidated multidistrict litigation stemming from a 2014 data breach involving one of the nation's largest hospital chains. The breach affected over 200 hospitals and the sensitive personal information of approximately 4.5 million patients was compromised.

*In re SuperValu, Inc. Customer Data Security Breach Litig.*, 0-14-md-02586, MDL 2586 (D. Minn.). In April 2015, Ed Kilpela of Carlson Lynch was appointed as interim co-lead counsel in this consolidated case. The litigation stems from a 2014 data breach that compromised the sensitive personal and financial information of customers of approximately 1,000 grocery stores operating under a variety of brand names in over a dozen states.

*In re Ashley Madison Customer Data Security Breach Litig.*, MDL No. 2669 (E.D. Mo.). In this well-publicized data breach case, Katrina Carroll, prior to joining Carlson Lynch, represented individuals whose highly sensitive account information was leaked from a social media company. The case was consolidated and transferred to the Eastern District of Missouri in December 2015. A class settlement for $11.2 million was given final approval in November 2017.

*In re Vizio, Inc. Consumer Privacy Litig.*, MDL No. 2693 (C.D. Cal.). Carlson Lynch represented individuals who purchased Vizio "Smart TVs," which contained software that collected information about the users in a manner that allegedly violates numerous consumer protection statutes. The case was consolidated and transferred to the Central District of California in April 2016, and Gary Lynch was appointed to the Plaintiffs' Steering Committee. In March 2017, District Judge Staton granted in part and denied in part a motion to dismiss, leaving the most significant claims intact and granting plaintiffs leave to re-plead the dismissed counts. After plaintiffs filed a second consolidated amended complaint, a second motion to dismiss was denied in July 2017. Vizio's attempt to certify an interlocutory appeal was denied in October 2017. The case was settled as a class action and received final approval in 2019.

*Storm et al. v. Paytime, Inc.*, No. 1:14-cv-011380-JEJ (M.D. Pa.). Carlson Lynch represented individuals whose sensitive personal and financial information was stolen from the systems of a Pennsylvania payroll processing company. The case was appealed to the Third Circuit and settled on a class basis while the appeal was pending.

*Sullivan v. Wenner Media LLC*, No. 1:16-cv-960 (M.D. Mich.). Carlson Lynch was co-lead counsel for plaintiffs who brought claims against the publisher of *Rolling Stone* magazine. Plaintiffs allege that *Rolling Stone* sold subscriber information to marketing partners without the subscriber's consent, in violation of Michigan state privacy laws. The parties reached a proposed settlement including a $1.1 million settlement fund and alternative forms of relief. The settlement was approved in May 2018.



*Lewert v. PF Chang's China Bistro, Inc.*, No. 1:14-cv-04787 (N.D. Ill.): Katrina Carroll served as Court-appointed Co-Lead counsel representing P.F. Chang's customers who had their personal financial information compromised in a 2014 security breach. This matter was one of the first data breach cases on record. Ms. Carroll oversaw all of the appellate briefing in ultimately obtaining a landmark ruling in the Seventh Circuit on Article III standing, hailed by Law360 as one of the "top privacy cases" of 2016.

*Salam v. Lifewatch, Inc.*, No. 1:13-cv-09305 (N.D. Ill.):  In this hard-fought litigation, Carlson Lynch partner Katrina Carroll is currently involved as court-appointed Co-Lead Counsel on behalf of a certified class in this privacy matter brought under the Telephone Consumer Protection Act ("TCPA"). Ms. Carroll has been directly involved in all aspects of litigation, including discovery and motion practice which culminated in a total victory for plaintiffs in contested class certification.

*Bakov v. Consolidated World Travel Inc.*, No. 1:15-cv-02980 (N.D. Ill.):  Katrina Carroll serves as court-appointed Co-Lead Counsel in this TCPA litigation on behalf of a certified class of consumers.

*Additional Data Breach/Privacy Cases.* In addition to the foregoing, Carlson Lynch represents plaintiffs in several other similar pending or settled data breach and privacy-related actions, including:

- *Friske v. Bonnier Corp.*, 2:16-cv-12799 (E.D. Mich.)
- *In re Arby's Restaurant Group*, 1:17-mi-55555 (N.D. Ga.)
- *Veridian Credit Union v. Eddie Bauer LLC*, 2:17-cv-356 (W.D. Wash.)
- *In re Premera Blue Cross Customer Data Security Breach Litig.*, No. 3:15-md-2633-SI, MDL 2633 (D. Or.)
- *Miracle-Pond, et al. v. Shutterfly, Inc.*, 2019-CH-07050 (1st Dist. Cook County, Ill.)
- *Holm v. Presence Health Network*, 2017-L-012793 (1st Dist. Cook County, Ill.)
- *Viverette, et al. v. Infusion Management Group, Inc. D/B/A the Signature Room at the 95th*, 2019-CH-05660 (1st Dist. Cook County, Ill.)
- *Albrecht v Oasis Power, LLC*, No. 1:18-cv-01061 (N.D. Ill.)

### CONSUMER PROTECTION/PRODUCTS LIABILITY

*Morrow v. Ann Inc.*, 16-cv-3340 (S.D.N.Y.). Carlson Lynch was co-class counsel in a case alleging deceptive pricing practices by a major national retail chain. After plaintiffs overcame a motions to dismiss, the case settled for $6.1 million worth of class benefits. The settlement was approved in April 2018.

*Luca v. Wyndham Hotel Group, LLC*, 2:16-cv-746 (W.D. Pa.). Carlson Lynch was co-lead counsel in a class action against the Wyndham hotel companies for violations of New Jersey consumer protection statutes. Plaintiffs alleged that Wyndham's websites deceptively masked the resort fees charged at certain hotels and forced patrons to agree to illegal terms and conditions. In



2017, plaintiffs defeated a motion to dismiss filed by two of the primary operating subsidiaries. A class settlement worth up to $7.6 million was reached in 2019 and approved later that year.

***Robert Brown, et al. v. Electrolux Home Products, Inc., d/b/a Frigidaire***, No. 15-11455 (11th Cir.). In July 2015, Carlson Lynch attorneys co-authored a brief on behalf of Public Justice, P.C.; the National Association of Consumer Advocates; U.S. PIRG (United States Public Interest Research Group); Consumer Action; and the Consumer Federation of California, appearing as *amici curiae* to the Eleventh Circuit and arguing in support of affirmance of a district court's certification of a class of purchasers of defective washing machines.

***Kobylanski v. Motorola Mobility, Inc., et al.***, No. 2:13-cv-1181 (W.D. Pa.). Carlson Lynch represented purchasers of MOTOACTV wearable fitness devices who alleged that the devices, although marketed as "sweat-proof" and "rain-resistant," were in fact susceptible to damage from even slight amounts of moisture. A settlement was reached which provided for full refunds for class members who had previously submitted a claim for water damage to Motorola but were denied a repair or replacement, and additional forms of relief for class members who had not previously complained of water damage. The settlement was approved in October 2014.

***Quinn et al. v. Walgreen Co., Wal-Mart Stores, Inc., Supervalu, Inc., and Perrigo Company of South Carolina, Inc.***, No. 7:12-cv-8187 (S.D.N.Y.). Carlson Lynch served as co-lead counsel on behalf of purchasers of glucosamine/chondroitin products manufactured by Perrigo and sold by various retailers. A settlement was reached in 2014 which provided for a total settlement fund of $2.8 million and provided for full or partial refunds to class members who submitted valid claims. Final approval was granted in March 2015.

***In re Nutramax Cosamin Marketing and Sales Practices Litigation* – MDL No. 2498,** (D. Md.). Carlson Lynch represented several plaintiffs in nationwide litigation regarding Nutramax's false and misleading marketing of glucosamine/chondroitin supplements, which multiple studies have determined to be without efficacy for the conditions they purport to treat. After the cases were consolidated for pre-trial proceedings, Carlson Lynch partner Ed Kilpela was appointed to the Executive Committee overseeing the litigation.

***In re Wireless Phone Equipment Replacement Insurance Litigation***, (C.P. Allegheny County, Pennsylvania). Carlson Lynch was lead counsel in this national litigation alleging consumer fraud in connection with wireless phone equipment replacement insurance. In November 2004, the Court approved a class settlement and entered Findings of Fact and Conclusions of Law which commented on the adequacy of Carlson Lynch as lead counsel as follows:

> "Class counsel have abundant experience as lead counsel in consumer class action litigation. Indeed, class counsel have frequently appeared before this Court. Other courts have routinely recognized class counsels' adequacy . . . . This Court readily agrees with these other courts, and finds that Bruce Carlson and Gary Lynch are more than adequate counsel, and indeed are capable and diligent class action attorneys."



*Mednick v. Precor, Inc.*, No. 14-cv-03624 (N.D. Ill.): Katrina Carroll served as court-appointed Co-Lead Counsel in this products liability matter concerning the heart rate monitoring feature on Precor fitness machines. Due to Ms. Carroll's efforts, the plaintiffs defeated a contested class certification motion and obtained class certification for a multi-state consumer class. Ms. Carroll was instrumental in negotiating a class settlement providing meaningful relief for class members shortly thereafter, for which the Court recently issued final approval.

*Bishop et al. v. Behr Process Corp. et al.*, No. 1:17-cv-4464 (N.D. Ill.): Carlson Lynch partner Katrina Carroll currently serves as court-appointed Co-Lead Counsel in this national products liability class action matter relating to defective deck paint. Together with her co-counsel, Ms. Carroll obtained a substantial settlement for the class, which has been finally approved by the Court and is currently being administered.

*In re Rust-Oleum Restore Marketing, Sales Practices and Prods. Liab. Litig.* No. 1:15-cv-1364 (N.D. Ill.): In this sprawling products liability MDL relating to defective deck resurfacing products, Katrina Carroll was instrumental in negotiating a $9.3 million settlement providing meaningful relief to consumers, which received final approval in March of 2017 by the Honorable Amy J. St. Eve of the United States District Court for the Northern District of Illinois, now a sitting Judge of the Court of Appeals for the Seventh Circuit. Over the course of the litigation, among other things, the court resolved an extremely challenging motion to dismiss substantially in plaintiffs' favor, issuing a sixty-page opinion, oft-cited in warranty and consumer fraud class actions across the country. Ms. Carroll oversaw the plaintiffs' briefing on that motion.

### FINANCIAL FRAUD / LENDING PRACTICES

*In re: FedLoan Student Loan Servicing Litigation* – **MDL No. 2833,** (E.D. Pa.). Carlson Lynch serves as court-appointed co-lead counsel on behalf of student loan borrowers and federal grant recipients in this multidistrict litigation. The claims relate to widespread and systemic failures on the part of a student loan servicer and the U.S. Department of Education to adequately service the programs and advise its participant. A consolidated complaint was filed in November 2019.

*Rescap Bankruptcy,* (S.D.N.Y. Bkr.). On November 27, 2013, the Bankruptcy Court in the Southern District of New York granted final approval of a class settlement on behalf of in excess of 45,000 residential mortgage borrowers. Carlson Lynch is co-lead counsel for the class. The settlement is for an allowed claim amount of $300 million dollars. There is a guaranteed payout of approximately $36 million dollars. The debtor assigned its insurance rights to the class and insurance will potentially cover the difference between the $36 million dollar guaranteed payout and the allowed claim amount of $300 million. Upon signing the Order granting final confirmation of the bankruptcy plan, the judge stated that this was the most factually and legally complex matter that he had presided over since taking the bench.

*CitiMortgage SCRA Litigation,* (S.D.N.Y.). Carlson Lynch was tri-lead counsel in this class action against CitiMortgage on behalf of Sergeant Jorge Rodriguez in the Southern District of New York. This case alleges that CitiMortgage improperly foreclosed upon Mr. Rodriguez's home (and



the homes of similarly situated individuals) while he was serving his country in Iraq, in violation of the Servicemembers Civil Relief Act. The case settled on a class basis, securing a total recovery of $38.2 million. Court granted final approval of the settlement in October 2015.

*Pitts v. NovaStar Home Loans, Inc. et al.*, (S.D. Ga.). Carlson Lynch was co-lead counsel for plaintiffs in this national RESPA class action. The Southern District of Georgia was the MDL court for this litigation. After the Court denied defendant's motion to dismiss, after the Court denied defendants' motion for summary judgment and granted plaintiffs' motion for class certification in a related Maryland state court action – where Carlson Lynch was also co-lead counsel -- and after extensive discovery including the video depositions of several of defendants' top executives, the parties participated in multiple mediation sessions and ultimately arrived at a national cash settlement on behalf of class members for $17.3 million.

*In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Secondary Mortgage Loan Litigation*, (W.D. Pa./3d Cir.). Carlson Lynch was co-lead class counsel in this national litigation on behalf of second mortgage borrowers under the Real Estate Settlement Procedures Act. The class was certified by the district court and affirmed by the Third Circuit, 795 F.3d 380 (2015). A class settlement was finalized in early 2017 and obtained a total recovery of $24 million.

*Kahrer v. Ameriquest Mortgage Co.,* (W.D. Pa./MDL N.D. Ill.). Carlson Lynch was counsel for plaintiff in connection with this consolidated group of class actions alleging the existence of a kick-back scheme in violation of RESPA, along with numerous other unfair lending practices. The specific case being handled by Carlson Lynch created new law under RESPA. Specifically, Carlson Lynch filed this action as a test case to challenge what they viewed as a negative trend in the law regarding how federal trial courts were determining whether a consumer has standing to sue under RESPA, as well as the manner in which damages are calculated under RESPA. Every prior federal trial court to consider these issues had sided with defendants. In opposing the Ameriquest motion to dismiss that was filed in this case, Carlson Lynch argued that these other federal trial courts had fundamentally misinterpreted the legislative history of RESPA in their decisions to dismiss the prior cases. In a seminal decision, the United States District Court for the Western District of Pennsylvania departed from the holdings issued by these other federal courts and agreed with the arguments of Carlson Lynch, denying the motion to dismiss. *See Kahrer v. Ameriquest Mortgage Co.*, 418 F.Supp.2d 748 (W.D. Pa. 2006) (Hay, J.). Multiple federal courts of appeal have adopted the *Kahrer* reasoning, including at least the Sixth and Third Circuits. This case was ultimately settled as part of MDL proceedings against Ameriquest in the Northern District of Illinois, and final approval of the settlement was granted.

*Bannon v. First One Lending, Inc.*, (C.P., Allegheny County, Pennsylvania). Carlson Lynch was co-lead counsel in this class action filed on behalf of Pennsylvania second mortgage loan borrowers alleging that they were charged excessive settlement fees in violation of the Pennsylvania Secondary Mortgage Loan Act. After the court denied defendant's motion to dismiss, the case ultimately settled and plaintiffs and the class were refunded 100% of the alleged overcharges.



### EMPLOYMENT DISCRIMINATION

***White v. United Steel Workers of America***, (W.D. Pa.), Carlson Lynch was co-lead counsel in this age-discrimination class action against the U.S.W.A. After overcoming a motion to dismiss on a legal issue regarding a substantial split of authority, the defendant requested mediation to explore the possibility of settlement. After extensive mediation over a one month period in June 2004, the case ultimately settled for an amount that defense counsel characterized as the highest ever paid by the U.S.W.A. in connection with civil litigation.

### ANTITRUST

***In Re Railway Industry Employee No-Poach Antitrust Litigation***, **MDL 2850,** (W.D. Pa.), Carlson Lynch represents a putative class of employees who allege defendants and their co-conspirators entered into unlawful agreements to reduce and eliminate competition among them for employees and to suppress the compensation of those employees. Chief Judge Joy Flowers Conti appointed Carlson Lynch partner Kelly K. Iverson as Liaison Counsel on behalf of the putative class.

***In Re Blue Cross Blue Shield Antitrust Litigation***, **MDL No. 2406,** (N.D. Ala.). Carlson Lynch represents healthcare subscriber plaintiffs in four states in this nationwide class action challenging the anti-competitive practices of Blue Cross/Blue Shield's nationwide network of local insurers who do not compete with each other based on geographic boundaries. In addition to Carlson Lynch's work on the individual cases, Carlson Lynch attorneys have been significantly involved in the discovery process. In November 2020, Judge Proctor preliminarily approved a $2.67 billion settlement of the Subscriber plaintiffs' claims.

### ENVIRONMENTAL

***Steward et al. v. Honeywell Int'l, Inc.***, No. 3:18-cv-01124 (S.D. Ill.) Carlson Lynch is currently involved in this property damage class action involving nuclear and non-nuclear contamination of large swaths of the City of Metropolis and the County of Massac. Carlson Lynch and co-lead counsel are prosecuting claims for injunctive relief, property damage, and medical monitoring in this extremely complicated environmental contamination case.

### CIVIL RIGHTS

***ADA (Americans with Disabilities Act) Accessibility Litigation***. Carlson Lynch is currently counsel for plaintiffs in a substantial number of putative class actions filed on behalf of disabled individuals to enforce the ADA's accessibility requirements. Over the last ten years, Carlson Lynch has represented the visually disabled in seeking improved access to ATMs, Point of Sale devices, automated retail kiosks, and websites. Carlson Lynch has also represented individuals with limited mobility in seeking elimination of architectural barriers found in parking lots, paths of entry, interior store design, and other places of public accommodation. These cases have been



prosecuted in numerous federal courts across the country. Carlson Lynch has overcome motions to dismiss in more than thirty of these cases. A substantial number of the cases have been settled, and in all of those cases, the defendants have agreed to equitable relief calculated to guarantee the accessibility to public accommodations that is required by the ADA.

Recently, Carlson Lynch was representing an individual with a mobility disability in *Egan v. Live Nation Worldwide, Inc.*, 2:17-cv-445 (W.D. Pa.). The claims involve wheelchair inaccessibility and ticket unavailability at Pittsburgh-area concert events promoted by Live Nation and ticketed by Ticketmaster. In March 2018, Judge Mark Hornak denied Live Nation's attempt to force arbitration of the potential class action. On appeal, the Third Circuit remanded the arbitration question for trial on disputed factual issues. The case settled before trial.

Moreover, in March 2021, District William S. Stickman IV of the United States District Court for the Western District of Pennsylvania granted certification of a national class of mobility-disabled individuals who were denied full and equal access to Ollie's Bargain Outlet stores due to the company's centralized policies which caused access barriers to individuals using wheelchairs. Judge Stickman appointed Carlson Lynch as counsel for the Class. Ollie's has over 350 stores across the country.



## ATTORNEYS

### R. Bruce Carlson

Bruce Carlson is from Wilkinsburg, Pennsylvania, where he attended Pittsburgh Public School. He graduated from the University of Pittsburgh School of Law in 1989, where he was the Executive Editor of the *Journal of Law and Commerce*. He also obtained his undergraduate degree from the University of Pittsburgh, graduating *summa cum laude* in political philosophy. After law school, he was employed for approximately four years at Eckert Seamans Cherin & Mellott, in Pittsburgh. Subsequently, he was a member at the Pittsburgh plaintiffs-FELA and mass tort firm previously known as Peirce, Raimond, Osterhout, Wade, Carlson & Coulter. During his five year tenure at the Peirce firm, Bruce developed and managed one of the largest, if not the largest, pediatric lead poisoning practices in the country. After his practice evolved and began to focus more on consumer class action litigation, he affiliated the practice with a prominent Pittsburgh-based plaintiffs' class action firm. During the almost four years that he was affiliated with that firm, Bruce originated and was lead counsel in more consumer class cases than any lawyer in Western Pennsylvania. These cases were filed not only in Western Pennsylvania, but in state and federal courts throughout the country. In June 2004, Bruce ended his relationship with his former firm and co-founded Carlson Lynch.

Bruce is admitted to practice in the state courts of Pennsylvania and West Virginia, the United States District Courts for the Western, Middle and Eastern Districts of Pennsylvania, the Northern and Southern Districts of West Virginia, the Northern District of Ohio, the Northern, Southern, Eastern and Western Districts of Texas, the District of Maryland, the Western District of Tennessee and the United States Courts of Appeal for the Third, Fifth, Ninth and Eleventh Circuits. He is a member of the Million Dollar Advocates Forum. He is a member of the American Association of Justice, and the Pennsylvania, Western Pennsylvania and West Virginia Trial Lawyers Associations.

### Gary F. Lynch

Gary Lynch was born and grew up in Western Pennsylvania. Gary earned his Juris Doctor in 1989 from the University of Pittsburgh School of Law, where he served as an Editor of the *University of Pittsburgh Law Review*, and his Bachelor of Science in Accounting from the Pennsylvania State University in 1986. He was admitted to the State Bar of the Commonwealth of Pennsylvania in 1989 and the State Bar of New York in 2018, and is admitted to practice in the United States Supreme Court, the United States Courts of Appeals for the First, Third, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits, and the United States District Courts for the Western, Middle, and Eastern Districts of Pennsylvania, the Northern and Southern Districts of Ohio, the Northern and Central Districts of Illinois, the Western District of New York, the Eastern and Western Districts of Michigan, and the District of Maryland. Gary has also been admitted *pro hac vice* in numerous jurisdictions nationwide.

Gary has been engaged in the practice of law for the last twenty-nine years, beginning his



legal career at Reed Smith, LLP (formerly Reed Smith Shaw & McClay). After leaving Reed Smith in 1991, Gary served as the Managing Partner of Lynch & Kunkel and Gary F. Lynch, P.C., focusing his practice on the representation of clients in employment-related matters, particularly complex litigation. Since co-founding Carlson Lynch in June of 2004, Gary has developed a nationally recognized plaintiffs' class action practice in the areas of consumer protection litigation and employee rights.

Gary has served in a leadership capacity in several MDL/class action proceedings, including many of the largest data breach cases in recent years. For example, as Co-Lead counsel representing a class of financial institution plaintiffs in *In re Equifax, Inc. Customer Data Security Breach Litigation* (N.D. Ga.); *First Choice Federal Credit Union v. The Wendy's Company* (W.D. Pa.), and *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (N.D. Ga.); as a member of the Plaintiffs' Steering Committee representing the consumer plaintiffs in *In re Marriott International Customer Data Security Breach Litigation* (D. Md.), and as member of the overall executive committee in *In re Target Corporation Customer Data Breach Litig.*, (D. Minn.).

His appointments extend beyond data breach cases, however, and in 2018, Hon. C. Darnell Jones II appointed him Co-Lead counsel representing a class of student loan borrowers in *In re: FedLoan Student Loan Servicing Litigation* (E.D. Pa.). In *Ellis v. Edward Jones* (N.D. Ohio No. 1:08-cv-00540, MDL No. 1779), he chaired the Plaintiffs' Leadership Committee in a wage and hour class/collective action, which returned more than $19 million to the class.

In 2018, Gary successfully argued before the Pennsylvania Supreme Court in *Dittman et al v. UPMC,* where the Court issued its landmark decision establishing a general duty of care to protect against data breaches and clarifying the parameters of the economic loss doctrine in the data breach context, as well as any other context where an independent legal duty is sought to be enforced for purely economic damages. Gary also served as Counsel of Record before the United States Supreme Court in the case of *Genesis HealthCare Corp. v. Symczyk.*

Gary currently serves on the Local Rules Advisory Committee for the United States District Court for the Western District of Pennsylvania. He has been rated as a "Super Lawyer" and has received Martindale Hubbell's "AV" rating. Gary is a frequent local and national Continuing Legal Education lecturer.

Gary is active in a number of community non-profit organizations, including past President and current board member of the Human Services Center, Inc. (an outpatient behavioral healthcare provider), board member of the Highland House, Inc. (a halfway home for women recovering from addiction), and former board member of the Lawrence County (Pennsylvania) Historical Society.

### Edwin J. Kilpela, Jr.

Ed Kilpela is a native of Pittsburgh and a graduate of the Pennsylvania State University and the University of Michigan Law School, where he won the prestigious Campbell Moot Court Competition while earning awards for both best brief and as the best oral advocate in the



competition. Ed lives in Mt. Lebanon with his twin sons, Devin and Graham, and his wife, Gina. Ed has litigated and tried complex class-action and mass tort matters both at Carlson Lynch on behalf of individuals and consumers and, previously, at both Williams & Connolly LLP and Wheeler Trigg O'Donnell LLP, two of the finest complex litigation firms in the country.

Mr. Kilpela's current practice focuses on consumer-oriented class actions and financial fraud matters. Currently, Ed represents a class of insurance purchasers in Western Pennsylvania, Rhode Island, and Hawaii in an antitrust conspiracy class-action alleging illegal collusion between the members of the nationwide network of Blue Cross/Blue Shield insurers, resulting in increased insurance premiums and lack of competition in the health insurance market. In addition, Ed serves as counsel for purchasers of glucosamine/chondroitin health supplements who were defrauded by multiple companies in their marketing and advertising of those supplements in which unsupported and medically false claims were made regarding joint health benefits the supplements do not provide.

A representative sample of Ed's past litigation experience includes 1) serving as counsel for a large financial institution and its officers and directors in connection with securities class action and ERISA lawsuits stemming from alleged accounting manipulation and corresponding stock losses; 2) serving as national Counsel for large multinational pharmaceutical corporation in multiple cases across the country defending against allegations that the company failed to adequately warn consumers and prescribing health providers about potential product risks; and 3) representing a large multi-national consumer goods manufacturer in multiple products liability class action matters stemming from claims regarding alleged product defects.

Ed was selected by his peers in 2011, 2012, and 2013 as a Rising Star in SuperLawyers, a distinction given to no more than 2.5% of his peers under the age of 40.

## Todd Carpenter

Todd Carpenter is a former shareholder at the Phoenix based, Bonnett, Fairbourn, Friedman & Balint, P.C. His practice focuses on consumer class action, representing plaintiff classes in major insurance fraud, unfair business practices, false and deceptive advertising, product liability cases, and anti-trust violations. Todd has represented plaintiffs in numerous class action proceedings in California and throughout the country, in both state and federal courts.

Todd, through his participation in a multidistrict litigation action before U.S. District Court Judge James Lawrence King in Miami, Florida, represented consumers in separate actions against Union Bank, N.A. and Bank of the West to recover damages stemming from alleged fraudulent overdraft fee practices. The cases resulted in favorable settlements, resulting in nearly $50 million dollars in recovered fees to customers. Todd has filed similar actions against several other banks and credit unions across the country, alleging that each institution manipulated the processing of customer debit card purchases to maximize overdraft fees.

Todd has successfully represented several plaintiff classes in recovering statutory penalties resulting from violations of California's Song Beverly Credit Card Act §1747.08. Additionally,



his efforts as part of a collaborative team of lawyers have resulted in the recovery of millions of dollars in compensation for California consumers of food and supplement products arising from misleading advertising claims made by producers and manufacturers about the safety and efficacy of the products.

Todd received his B.B.A in 1999 from the University of New Mexico, where he was awarded the University's Karen Abraham's Outstanding Service Award in 1997 and again in 1998 for his development and participation in after-school recreational leagues for underprivileged youth. He received his law degree from the University of San Diego School of Law in 2002. While in law school, Todd served as Vice President for the Democratic Student Association and garnered recognition for representing indigent litigants through the University of San Diego School of Law's Legal Clinic. Todd is a member of the California Bar and has also been admitted to practice in all Federal District Courts in the state of California.

## Katrina Carroll

Katrina Carroll is the founding partner of Carlson Lynch's Chicago office and serves as Co-Chair of the Firm's Executive Management Committee. She graduated from Northwestern University, with honors in political science in 1997, and in 2000, received her law degree from Seton Hall University. In 2018, Katrina was selected one of the top 25 class action lawyers in the State of Illinois by the National Trial Lawyers Association. She has also been named multiple times as a SuperLawyer, an honor based on extensive peer review.

Katrina devotes herself exclusively to fighting for workers, consumers and investors. Her experience includes products liability, privacy, antitrust and securities cases. Over the course of her career, she has recovered more than $1 billion for her clients. Prior to joining Carlson Lynch in 2019, Katrina was the managing partner of Lite DePalma Greenberg's Chicago office. While at Lite DePalma, Katrina served as Co-Lead counsel in *In Re: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation* (MDL; N.D. Ill.), a sprawling products liability MDL class action. During the final hearing, the Honorable Amy J. St. Eve, now a sitting justice on the Seventh Circuit, praised Ms. Carroll as a "model I wish all lawyers would follow." Katrina now serves as Co-Lead Counsel in *Bishop v. Behr Process Corporation* (N.D. Ill.), a similar national class action matter relating to defective deck paint.

Katrina is recognized nationally as an authority on topics arising in class action litigation. She has spoken at many local and national conferences, including the American Bar Association's 18th National Institute on Class Actions (2014), Perrin's Class Action Litigation Conference (2015), the American Association for Justice's Annual Convention (2016), Loyola University School of Law's Consumer Law Review Academic Symposium (2017), Practicing Law Institute's Consumer Financial Services Institute (2018), the American Bar Association's Section of Litigation Annual Conference (2018), the Class Action Mastery Program hosted by HB Litigation Conferences (2018) and Mass Torts Made Perfect (2018, 2019).

In April 2018, Katrina was honored to appear as a panelist at "May it Please the Court: Symposium on Women Lawyers in the Courtroom," a prestigious event sponsored by the United



States District Court for the Northern District of Illinois and the Chicago Bar Association.

Katrina frequently appears as a panelist on class action issues at the Chicago Bar Association. She currently serves on the Advisory Board of Loyola University School of Law's Institute for Consumer Antitrust Studies and mentors law students and young lawyers. She is a member of the Class Action Trial Lawyers Association, the Chicago Bar Association and a former member of New Jersey's John C. Lifland American Inn of Court.

**Edward W. Ciolko**

Ed joined Carlson Lynch as a partner in 2018. Ed concentrates his practice in the areas of ERISA, Antitrust, RESPA and Consumer Protection.

Prior to joining Carlson Lynch, Ed was a Partner at Kessler Topaz Meltzer & Check, LLP, where he served as counsel in a variety of nationwide ERISA breach of fiduciary duty class actions, brought on behalf of retirement plans and their participants alleging, inter alia, imprudent investment of plan assets which caused significant losses to the retirement savings of tens of thousands of workers. These cases include: *Harris v. First Regional Bancorp*, No. 2:10-cv-07164 (C.D. CA); *In re Advanta Corp. ERISA Litig.*, No. 09-CV-04974 (E.D. Pa.); In *re YRC Worldwide, Inc. ERISA Litig.*, No. 09-CV-2593 (D. Kan.); *In re R.H. Donnelley ERISA Litig.*, No. 09-CV-07571 (N.D. Ill.); *In re: SLM Corp. ERISA Litig., et al.*, No. 08-CV-4334 (S.D.N.Y.); and *In Re SunTrust Banks, Inc. ERISA Litigation*, No. 1:08-cv-03384 (N.D. Ga.).

Ed's efforts have also helped achieve a number of large recoveries for affected retirement plan participants: *In re National City ERISA Litig.*, No. 08-nc-70000 (N.D. Ohio) (settled -- $43 million recovery); *In re Sears Roebuck & Co. ERISA Litig.*, C.A. No. 02-8324 (N.D. Ill.) (settled — $14.5 million recovery); and *In re Honeywell Intern'l ERISA Litig.*, No. 03-CV-1214 (DRD) (D.N.J.) (settled — $14 million recovery, as well as significant structural relief regarding the pension plan's administration and investment of its assets).

Ed also concentrates part of his practice to the investigation and prosecution of pharmaceutical antitrust actions, medical device litigation, and related anticompetitive and unfair business practices including *In re Wellbutrin SR Antitrust Litigation*, 04-CV-5898 (E.D. Pa. Dec. 17, 2004); *In re Remeron End-Payor Antitrust Litigation*, Master File No. 02-CV-2007 (D.N.J. Apr. 25, 2002); *In re Modafinil Antitrust Litigation*, 06-2020 (E.D. Pa. May 12, 2006); *In re Medtronic, Inc. Implantable Defibrillator Litigation*, 05-CV-2700 (D. Minn. 2005); and *In re Guidant Corp. Implantable Defibrillator Litigation*, 05-CV-2883 (D. Minn. 2005).



**Eddie Jae K. Kim**

Eddie Jae K. Kim is a partner at Carlson Lynch and manages its Los Angeles office. Eddie grew up in Southern California and received an undergraduate degree in English Literature from the University of California, at Berkeley, and a law degree from Cornell Law School. He has devoted his entire career to protecting the rights of individuals and small businesses.

During law school, Eddie clerked for the Orange County Public Defender and the Neighborhood Defender Service of Harlem, where he advocated for the civil and criminal rights of indigent defendants. Upon graduation from law school, he worked and became a partner at the Southern California law firm McCune Wright Arevalo, LLP, where he played a substantial role in building a nationally-recognized consumer class action practice.

His work includes a number of significant and high profile cases, including *Gutierrez v. Wells Fargo*, which resulted in the $203 million trial verdict on behalf of one million California bank customers based on the unlawful assessment of overdraft fees. *Gutierrez* subsequently spawned a national multi-district litigation against many of the largest banks in the country that resulted in several billion dollars' worth of settlements. Eddie then managed a series of class actions against banks and credit unions throughout the country based on another unlawful overdraft fee practice, resulting in over $28 million worth of settlements.

He also worked on class actions relating to product liability, including developing the first-filed case *Espinosa v. Hyundai*, which challenged the auto manufacturer's advertisement of inflated fuel efficiency numbers and became the basis for the multidistrict litigation *In re Hyundai and Kia Fuel Economy Litigation* and the resultant $200 million settlement. He served as co-trial counsel in a class action against the boat manufacturer Correct Craft which resulted in a verdict for the class that included reimbursement of the purchase price and an injunction requiring the recall of dangerous boat showers that put people at risk of fatal carbon monoxide poisoning.

In addition to representing individual consumers, Eddie has also represented small businesses through collective action, including a series of class actions on behalf of small trucking companies in California against nine of the largest intermodal shipping companies in the world, including MOL, MSC, Evergreen, Hyundai, and Wan Hai, based on the unlawful assessment of per diem fees for the lease of cargo containers. The lawsuits resulted in restitution and cessation of the unlawful practice.

Eddie has handled successful appeals in both state court and multiple federal circuit courts that have resulted in significant rulings, including rulings banning heads-I-win-tails-you-lose indemnification provisions from home purchase contracts and finding unconscionable the intermodal shipping industry's industry-wide arbitration provision.

He served as the co-chair of the Pro Bono Committee of the Korean American Bar Association of Southern California in 2013, which assists low-income, Korean-speaking clients at



a Legal Aid Foundation clinic in Los Angeles. When he is not practicing law, Eddie enjoys hiking in the mountains and composing music.

### Kelly K. Iverson

Kelly Iverson was born and raised in Pittsburgh. She received Juris Doctor, *summa cum laude*, from Duquesne University School of Law, where she was honored with the Shalom Moot Court Award for Outstanding Trial Advocacy and an appointment to the Louis L. Manderino Honor Society for Meritorious Service to the Trial Advocacy Program. Kelly has extensive litigation experience in both state and federal courts. In 2016, she served as lead trial counsel in a medical malpractice action in federal court, receiving a verdict in her client's favor for the maximum available statutory damage award. Kelly's trial practice also includes second chair experience in both jury trials and commercial arbitration.

Kelly joined Carlson Lynch as a partner in February 2018. She prosecutes consumer protection matters with a focus on consumer fraud, data breach and privacy, and civil rights class actions. Kelly was Court appointed as co-lead counsel in *Flynn v. Concord Hospitality Enter. Co.* (W.D. Pa.), and as Plaintiffs' Liaison Counsel in *In Re Railway Industry Employee No-Poach Antitrust Litigation* (W.D. Pa.). Kelly also serves as a committee member for the leadership teams in the following multidistrict litigation proceedings: *In re Equifax, Inc. Customer Data Security Breach Litigation* (N.D.Ga.); *In Re: Marriott International, Inc., Customer Data Security Breach Litigation* (D. Md.) and *In re Arby's Restaurant Group, Inc. Data Security Litig.* (N.D. Ga.)*.* She also assisted lead counsel in prosecuting the consolidated action, *First Choice Fed. Credit Union v. The Wendy's Co.* (W.D. Pa.), which recently received final approval of a $50 million class settlement.

In 2019, Kelly was selected to SuperLawyers - Rising Stars, a distinction given to no more than 2.5% of her peers under the age of 40.

Kelly currently serves on the Board of Millvale Athletic Association, a local fastpitch softball organization. From 2010 through 2017, she served as a high school mock trial attorney advisor for Fort Cherry High School and Pittsburgh Science and Technology Academy. Kelly lives in Lawrenceville with her husband Nathan, their three children, and their dog.

### Pam Miller

Pam is the head of Carlson Lynch's Injury and Disability Group. She was born and raised in Western Pennsylvania. As the proud daughter of a railroad worker, Pam grew up with an acute awareness of the hazards and risks of personal injury which American workers constantly face. Consequently, after graduating from Westminster College, Pam obtained her law degree from the University of Pittsburgh School of Law in 1993, with the sole intent to represent injured and disabled workers.



For nearly twenty years now, Pam has tirelessly advocated for her clients before the Social Security Administration, the Pennsylvania Bureau of Workers' Compensation, and in Federal Employer Liability Act litigation in federal court. Pam has handled over one thousand claims for Social Security Disability and continues to develop her practice in this increasingly significant area of federal administrative law.

## Jamisen Etzel

Jamisen attended Duquesne University where he graduated *magna cum laude* in 2008 with a Bachelor of Arts in Political Science. He obtained his law degree from New York University School of Law in 2011. While at NYU Law, Jamisen was Managing Editor of the *Journal of Legislation and Public Policy*. During the summer of 2010, Jamisen served an internship with United States District Judge William H. Walls of the United States District Court for the District of New Jersey.

Jamisen works primarily in the firm's data breach, privacy, consumer, and employment class litigation practices, and has been involved in most of the firm's recent appellate work, securing three favorable, published opinions from U.S. Courts of Appeals in 2018 and 2019. Jamisen has been involved in most of the firm's recent data breach litigation, contributing at every stage, including initial pleadings, dispositive motions practice, discovery, settlement negotiation, and appeals.

In March 2018, Jamisen was part of a three-person trial team that obtained a jury award of $4.5 million in unpaid wages and illegally confiscated tips for class of misclassified nightclub workers in *Verma v. 3001 Castor Inc.*, 2:13-cv-3034-AB (E.D. Pa.). Jamisen then briefed and presented oral argument in the defendant's post-trial appeal to the Third Circuit, and obtained an across-the-board affirmance of Carlson Lynch's trial victory. *Verma v. 3001 Castor Inc.*, 937 F.3d 221 (3d Cir. 2019). He served as the primary briefing and arguing counsel for successful appellants in *Mickles v. Country Club, Inc.*, 887 F.3d 1270 (11th Cir. 2018), and for successful appellees in *DeGidio v. Crazy Horse Saloon and Restaurant, Inc.*, 880 F.3d 135 (4th Cir. 2018), wherein the Fourth Circuit held that an employer's mandatory arbitration agreements were unenforceable due to the employer's abusive tactics in disseminating the agreements and the employer's delay in moving to enforce the agreements in the district court proceedings.

Jamisen was also one of the primary brief writers in the *Dittman v. UPMC* appeals, leading to a groundbreaking opinion from the Supreme Court of Pennsylvania—in favor of Carlson Lynch's clients—which clarified Pennsylvania's economic loss rule and recognized that employers have a common law duty to use reasonable care when collecting sensitive employee data. 196 A.3d 1036 (Pa. 2018).

In 2019 and 2020, Jamisen was selected to SuperLawyers - Rising Stars, a distinction given to no more than 2.5% of his peers under the age of 40.

21



**Elizabeth Pollock Avery**

Elizabeth was born and raised in Buffalo, New York. After obtaining her bachelor's degree from the State University of New York at Buffalo, she attended Indiana University- Bloomington Maurer School of Law, graduating in 2012. While in law school, Elizabeth assisted indigent members of society as a law clerk at the Monroe County Public Defenders' Office and at the Indiana University Disability Law Clinic.

After graduating, Elizabeth moved to Pittsburgh and worked for a family law firm prior to joining a Plaintiff side employment litigation firm in 2013. As a plaintiff's employment litigator, Elizabeth worked to right the wrongs committed against employees in a variety of areas of employment law, including the Fair Labor Standards Act, the Family and Medical Leave Act, and litigating cases dealing with sexual harassment, gender discrimination, race, age and disability discrimination.

Elizabeth's practice is primarily split between the firm's antitrust and labor and employment practice groups, including Fair Labor Standards and state wage law. She has also completed significant work on cases involving ADA, data breach, and consumer protection.

**Kyle A. Shamberg**

Kyle is a Chicagoland native. After graduating from the Loyola Chicago School of Law, magna cum laude, Kyle moved to New York where he worked first as a Staff Attorney at the U.S. Court of Appeals for the Second Circuit and then at New York's largest asbestos litigation firm, handling complex motion practice and appeals on behalf of clients, largely former union tradesmen and military servicemen, who had developed terminal diseases from their asbestos exposures.

Since coming home to Chicago in 2014, Kyle has focused exclusively on litigating consumer class actions, representing clients for injuries ranging from identity theft and financial fraud as a result of a data breach to massive property damage caused by failing plastic plumbing systems. He joined Carlson Lynch in 2019, where he continues to advocate for consumer and privacy rights. Kyle has argued appeals in front of the Seventh and Second Circuits and the New York Appellate Division. He is the former Chair of the Chicago Bar Association's Class Action Committee.

**Nicholas R. Lange**

Majoring in English with a concentrated study in philosophy, Nicholas attended the University of Illinois at Urbana Champaign, the last six of months of which he lived abroad in East Africa, broadening his horizons while completing coursework in international law. His work there culminated in a presentation to the International Criminal Tribunal for Rwanda in Kigali, Rwanda. Nicholas returned home to graduate from the DePaul University College of Law, with honors.

During law school, Nicholas cut his teeth clerking at one of Chicago's prominent complex litigation firms. Initially after law school, his practice focused on representing condominium and



other common-interest communities— and their directors and managers— in all manners of civil litigation, including fraud, tort, breach of contract, fiduciary duties, and corporate matters, and including fights with developers, insurers, and municipalities. Since then, Nicholas has been, and continues to be, involved in a wide variety of class litigation, including some of the most complex class actions pending in the country.

## Kristin Graham

Kristy Graham is a native of Pittsburgh, Pennsylvania. She attended the University of Virginia in Charlottesville and graduated in 1998 with a bachelor's degree in environmental sciences. Before returning to Charlottesville for law school, Kristy taught English in Madrid, Spain and, later, worked as an analyst for Booz Allen Hamilton at its headquarters in Northern Virginia. Kristy graduated from the University of Virginia School of Law in 2003. While in law school, she served as an Articles Editor for the *Virginia Law Review*.

Kristy began her legal career as a commercial litigation associate with Holland & Hart, a Denver-based law firm with over 400 attorneys in 15 offices. While at Holland & Hart, Kristy was involved in all aspects of litigation in federal and state court, from preparing pleadings and conducting discovery through drafting dispositive motions and supporting briefs. Kristy was also part of a multinational energy company's defense team in a severance pay class action lawsuit stemming from one of the largest mergers in U.S. history. Prior to joining Carlson Lynch in January 2015, Kristy also practiced law with small firms in Pennsylvania and Colorado. Kristy's broad array of litigation experience includes general commercial, labor, and employment, ERISA, oil and gas, real estate, and personal injury cases. Kristy works in all aspects of Carlson Lynch's complex litigation practice.

## Robin Bolea

Robin Bolea was born and raised in Pittsburgh where she received her degree in Philosophy and Physics from Duquesne University, cum laude, and her Juris Doctor from Duquesne University School of Law, cum laude. Prior to attending law school, Robin spent six years working in banking with Citizens Bank where she handed retail clients as well as accounts for law firms and claims administrators, assisting with the funds management for class action settlements.

After law school, Robin joined a local law practice where she worked on both commercial and individual disputes and transactions. In 2016, she had the opportunity to join a large Pittsburgh based firm focused on environmental toxic torts. During this time Robin represented numerous individuals in large scale mass tort litigation brought on by corporate environmental hazards. Robin represented individuals and estates of individuals who suffered from severe injury brought on by their working conditions. Following that role, Robin began performing litigation support for national practices working closely with the litigation teams to ensure timely production of relevant discovery materials.



In 2020, Robin was given the opportunity to join Carlson Lynch and to continue her career in representing plaintiffs and expand her practice into class action litigation. She lives locally in Pittsburgh with her husband, Stephen, and their dog, Winston.

**Matthew Brady**

Matthew was born and raised in Pittsburgh, Pennsylvania. His parents are from McKeesport, Pennsylvania and he grew up in Penn Hills. Matthew joined Carlson Lynch as a professional and educator with more than twenty years of experience living and working in developing and emerging markets, designing and overseeing operations in the United States and abroad, and providing policy recommendations to key stakeholders, including US and foreign government officials.

Having lived or worked in parts of Africa, Asia, Europe, and Central and South America, Matthew's background enables him to assist corporate clients with cross-border banking and financial transactions, debt management, employment and immigration matters, grant writing, hospitality and tourism laws, nonprofit and for-profit tax matters, as well as federal and foreign audits, and US federal regulations (BIS, FAR, State Department, Treasury Department, OFAC and USAID).

He has helped non-profit and for-profit organizations from the conceptual and start-up phase to mature institutions, as well as distressed companies. His efforts have allowed organizations to increase revenue, overcome institutional challenges and grow strategically while maintaining good governance and compliance with domestic and foreign laws, including international law, bilateral agreements and multilateral treaties.

Matthew has been to the United Nations Commission on Human Rights in Geneva, Switzerland four times as part of multinational delegations, and he has raised more $14 million for projects with community groups, artivists, human rights defenders and social entrepreneurs in Europe, Latin America and the United States. He has also published articles in the *Miami Herald*, *El Nuevo Herald*, and *Huffington Post* and contributed to Freedom House's human rights publications *Freedom in the World*, *Freedom of the Press* and *Freedom on the Net*.

Since joining Carlson Lynch, Matthew has augmented his portfolio to include complex class action and multidistrict litigation in a range of areas, such as Americans with Disabilities Act (ADA) compliance, antitrust, consumer protection, data privacy and digital security, financial services and transactions, Medicaid/Medicare fraud, and fair labor standards and employment practices. He also assists individual clients with estate administration, estate planning, and individual claims.

Matthew is proficient in French, Spanish and Russian.

**Scott Braden**



Scott Braden is an associate who joined the firm's San Diego office in 2019. He received his J.D. from the University of San Diego School of Law in 2013, and received his undergraduate degree from California State University, Fresno.

**Nicholas Colella**

Nick was born and raised in Western Pennsylvania. After receiving his bachelor's degree from Penn State University, he moved to Florida to attend the University of Florida College of Law. While there, Nick became a member of the University's Alternative Dispute Resolution team where he and his partner placed top ten nationally amongst their peers.

During his time in law school, Nick worked with multiple private firms, as well as the U.S. Attorney's Office for the Middle District of Florida, gaining invaluable hands on experience in a wide array of practice areas. He was first exposed to class action litigation during his summer internship with Carlson Lynch, assisting in data breach and privacy matters. Prior to rejoining Carlson Lynch, Nick started his professional career with a boutique firm in North Florida, representing financial institutions and corporations and focusing mainly on regulatory and compliance matters, incorporating areas of securities law, corporate and banking law.

**Tom Withers (Of Counsel)**

Tom Withers became Of Counsel to Carlson Lynch in June 2008, and often provides advice and counsel to the firm regarding trial strategy. Tom graduated from the University of Georgia law school in 1984. He also received his undergraduate degree from the University of Georgia. After graduating from law school, Tom joined Oliver, Maner and Gray, in Savannah, Georgia, where he was a partner from 1988 until 1990. While at Oliver, Maner and Gray, Tom was primarily engaged in the defense of medical malpractice cases for physicians. During his six years with the firm, Tom tried approximately ten medical negligence cases to verdict, all of which resulted in verdicts for the defendants.

Thereafter, Tom joined the United States Attorney's Office in the Southern District of Georgia, where he remained for eight years. Tom initially served as an Assistant U.S. Attorney in the Criminal Section before becoming Chief of the Criminal Section in 1993. Tom also served as a Professional Responsibility Officer during his time with the United States Attorney's Office and was given the Department of Justice's Director's Award in 1997. In 1998, Tom left the United States Attorney's Office and became a founding partner of Gillen Parker & Withers (now, Gillen Withers & Lake, LLC). Tom's practice focuses on federal and state criminal defense, Medicare/Medicaid fraud, and complex civil litigation.

Tom is admitted to practice in the state courts of Georgia, the United States District Courts for the Southern and Northern Districts of Georgia, and the United States Court of Appeals for the Eleventh Circuit.

# EXHIBIT 2

## UNDER SEAL

# EXHIBIT 3

## UNDER SEAL

# EXHIBIT 4

## UNDER SEAL

# EXHIBIT 5

SHELLY BENSON                     September 30, 2020
BENSON vs NEWELL BRANDS INC.          1—4

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3                                    )
    SHELLY BENSON and LISA            )
 4  CAPARELLIL, individually and      )
    on behalf of all others          )
 5  similarly situated,               )  Case
                                      )
 6          Plaintiffs,               )  No. 1:19-cv-06836
                                      )
 7  -vs-                              )  Hon. Judge
                                      )
 8  NEWELL BRANDS, INC., and NUK      )  Ronald A. Guzman
    USA LLC,                          )
 9                                    )
            Defendants.               )
10
11
12          The deposition of SHELLY BENSON, called
13  for examination, taken pursuant to the Federal Rules
14  of Civil Procedure of the United States District
15  Courts pertaining to the taking of depositions, taken
16  before CAROLYN J. HAWKES, C.S.R. within and for the
17  County of Boone and State of Illinois, at Courtyard
18  by Marriott, 2175 Marriott Drive, West Dundee,
19  Chicago, Illinois, on the 30th day of September,
20  2020, at 1:00 p.m.
21
22
23
24
```

---

**Page 2**

```
 1  COUNSEL PRESENT:
 2      CARLSON LYNCH LLP, by:
        MR. EDWIN J. KILPELA
 3      MR. MATTHEW BRADY (Via Zoom)
        1133 Penn Avenue
 4      5th Floor
        Pittsburgh, Pennsylvania  15222
 5      412.253.4996
        ekilpela@carlsonlynch.com,
 6
            appearing on behalf of the Plaintiffs;
 7
        SCHIFF HARDIN, LLP, by:
 8      MR. MIR Y. ALI
        MR. DAVID C. SCOTT (Via Zoom)
 9      233 South Wacker Drive
        Suite 7100
10      Chicago, Illinois  60606
        312.258.5500
11      mali@schiffhardin.com,
12          appearing on behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1                  I N D E X
 2  WITNESS:                        EXAMINATION:
 3  SHELLY BENSON
 4  By  Mr. Ali                          4
 5            E X H I B I T S
 6  NUMBER:  DESCRIPTION:         MARKED FOR ID:
 7  BENSON Deposition Exhibit
 8  No. 1    Defendants' Amended Notice     27
             of Deposition of Plaintiff
 9           Shelly Benson
         2   NUK Packaging                  56
10       3   Complaint                      71
         4   Plaintiff Shelly Benson's      81
11           Objections and Responses
             to Defendants' First Set
12           of Requests for Production
             of Documents
13       5   Plaintiff Shelly Benson's      86
             Answers and Objections to
14           Defendants' First Set of
             Interrogatories
15
16
17
18
19
20
21
22
23
24
```

---

**Page 4**

```
 1          (WHEREUPON, the witness was
 2          first duly sworn.)
 3          SHELLY BENSON,
 4  called as a witness herein by the Defendants, having
 5  been first duly sworn, was examined and testified as
 6  follows:
 7          EXAMINATION
 8  BY MR. ALI:
 9  Q.  Ms. Benson, could you please state your name
10  for the record?
11  A.  Shelly Benson.
12  Q.  Could you please spell your last name?
13  A.  B-e-n-s-o-n.
14  Q.  Okay.  Ms. Benson, have you given a deposition
15  before?
16  A.  No.
17  Q.  I'll go over a few guidelines, just so you
18  understand, since this is your first deposition.
19  First of all, unique circumstances, you know, we're
20  in a tight space, so we're all wearing a mask.
21  Hopefully, you're able to hear me okay.  I think, you
22  know, the court reporter should be able to hear you
23  okay, but if anything happens, the court reporter
24  will let you know.  Obviously, she's taking a
```



SHELLY BENSON                                    September 30, 2020
BENSON vs NEWELL BRANDS INC.                              45–48

Page 45

1   her to get it and use it?
2   A. Yup.
3   Q. You had mentioned that you'd use -- I can't
4   remember if it was singing or music to help soothe
5   Alexis as well?
6   A. Yeah. Yes. Singing.
7   Q. Were there certain songs that she liked?
8   A. Yes. You Are my Sunshine.
9   Q. Old-time favorite.
10  A. Yeah. And then The Way You Are by -- I don't
11  know who.
12      MR. KILPELA: I can Google that. I have no
13      idea.
14      THE WITNESS: You know, when I see your face,
15      there's not a thing that I would change
16      because, girl, you're amazing.
17      MR. KILPELA: I'm not sure who that is.
18  BY THE WITNESS:
19  A. But, yeah, it's The Way You Are. And then I
20  don't know who sings it either, but it's --
21      THE COURT REPORTER: Wait. I'm sorry. Could
22      you repeat that?
23      MR. KILPELA: We don't need to put this on
24      the record. We're good.

Page 46

1       THE WITNESS: He wanted the songs.
2   BY MR. ALI:
3   Q. Okay. And then what about t.v.? Did you ever
4   use t.v. to kind of help calm her down?
5   A. Nope. No.
6   Q. No? What about like watching Sesame Street or
7   Disney or anything like that?
8   A. She could do that during the day, not before
9   bed.
10  Q. And what did she like? Sesame Street?
11  Disney?
12  A. I have programmed her to love Disney.
13  Q. Okay. So you like Disney as well?
14  A. Yes.
15  Q. Do you or her have a favorite Disney
16  character?
17  A. Mini Mouse.
18  Q. For both of you?
19  A. Yeah.
20  Q. And I noticed the sample pacifier that you
21  brought here had a Mini Mouse on it, so I'm assuming
22  that was a factor in purchasing that pacifier?
23  A. It was an added bonus. That one was probably
24  one of the most ones she used.

Page 47

1   Q. Was it important for you to buy a pacifier
2   that she liked?
3   A. Yes. And a pacifier I felt was safe.
4   Q. Did you ever let her choose the pacifiers that
5   you purchased?
6   A. No. I mean, it was just always the same ones.
7   Q. No, I'm saying like did you ever go to the
8   store and say hey, you can pick from, you know, this
9   Mini Mouse pacifier or, you know, this other
10  pacifier?
11  A. I mean, she got to pick which NUK pacifier she
12  wanted, but. . .
13  Q. Okay. So you would take her to the store with
14  you to purchase pacifiers?
15  A. Yes. And I would give her like two choices.
16  Q. So it sounds like you've purchased a lot of
17  Disney products at home.
18  A. Yes.
19  Q. Does she enjoy Disney music and songs as well?
20  A. Yes.
21  Q. Has Alexis ever been to an orthodontist?
22  A. No.
23  Q. Since June 2019 has she been back to see the
24  dentist?

Page 48

1   A. Yes.
2   Q. How many times?
3   A. She visited every six months, and then I can't
4   think of the month, but she went like three times
5   because she had in the back of her teeth cavities.
6   Q. Cavities.
7   A. And so I had to take her three different
8   times.
9   Q. And I think you said she had to have one of
10  her teeth pulled?
11  A. Yeah, one of her front teeth.
12  Q. When was that?
13  A. That was last summer.
14  Q. So that was the June 2019 visit?
15  A. Yes.
16  Q. Which tooth was that?
17  A. Her front tooth.
18  Q. Other than having that one tooth pulled and
19  the cavities, has she had any other dental issues?
20  A. Not as of yet.
21  Q. Has a dentist said that she is likely to have
22  future dental issues?
23  A. Yeah. They said she has gap teeth, and so we
24  have to see how her adult teeth come in to see if it



SHELLY BENSON
BENSON vs NEWELL BRANDS INC.

September 30, 2020
49–52

Page 49

1  fills in the problems or else then she has to go to
2  an orthodontist.
3    Q.  So Alexis was born in November?
4    A.  2015.
5    Q.  November 2015.  November 30, 2015, I think;
6  right?
7    A.  Yes.
8    Q.  Okay.  So in December you went out and
9  purchased your first pacifier, correct?
10    A.  I had them when she was born.  Like I already
11  had them ready for her.
12    Q.  Oh, you purchased them before Alexis was born?
13    A.  Yes.
14    Q.  And which pacifiers did you purchase before
15  she was born?
16    A.  At my shower I was given MAM pacifiers and NUK
17  pacifiers.
18    Q.  Do you remember how many pacifiers -- how many
19  MAM pacifiers you were given?
20    A.  It was just like a two-pack.  She did not like
21  them.
22    Q.  So you did try to use MAM pacifiers with
23  Alexis?
24    A.  Yes.

Page 50

1    Q.  And she did not accept them?
2    A.  Correct.
3    Q.  So how long did you use the MAM pacifiers with
4  her?
5    A.  Just for like a week.  Every time we gave her
6  one it wouldn't stay in, but then we'd give her the
7  NUK and it started to work.
8    Q.  Since receiving the MAM pacifiers as part of
9  your shower, did you receive any other MAM pacifiers
10  for Alexis?
11    A.  No.
12    Q.  Did you purchase any other MAM pacifiers for
13  Alexis?
14    A.  No.
15    Q.  So after the first couple weeks of Alexis's
16  life, you used exclusively NUK pacifiers?
17    A.  Yes.
18    Q.  Do you remember how many NUK pacifiers you
19  received from -- at your shower?
20    A.  A two-pack.  And then the rest I had
21  purchased.
22    Q.  Did whoever gifted you the NUKs pacifiers
23  recommend them --
24    A.  Yes.

Page 51

1    Q.  -- to you?  Who was that?
2    A.  My aunt.
3    Q.  And did your aunt have experience using the
4  NUK pacifiers with her children?
5    A.  No.  Just she told me that -- that they were a
6  good pacifier.  I don't know.  She bought them and
7  said try these with Alexis.  And then the person who
8  bought the MAMs was like oh, but I love MAMs, try
9  these with Alexis.  And then when Alexis liked the
10  NUK ones, I was like yay, I won.
11    Q.  But you don't know why your aunt
12  recommended --
13    A.  No.
14    Q.  -- the pacifiers?
15    A.  They didn't give any story to it.  They just
16  said try them.
17    Q.  When is the first time you purchased a NUK
18  pacifier?
19    A.  Probably January of 2016.
20    Q.  I'm assuming that was a NUK pacifier?
21    A.  Yes.
22    Q.  Do you remember what kind?
23    A.  The orthodontic.  It was Mini Mouse.
24    Q.  The same one that you brought today?

Page 52

1    A.  I mean, probably not the same pacifier, but --
2  that would have been amazing, if that was the one.
3    Q.  And was that a two-pack purchase as well?
4    A.  Yes.  It was a pink Mini and a white Mini.
5    Q.  And then after that first purchase, do you
6  remember the next time you bought NUK pacifiers?
7    A.  I switched her pacifiers out every month or
8  two.  So it would literally be every month or two
9  from January of 2016 until June of 2018.
10    Q.  Why would you switch them out every month?
11    A.  Because the -- I know the rubber on the
12  pacifiers can start to wear.
13    Q.  And when you say the rubber, are you talking
14  about the nipple itself or the shield?
15    A.  The nipple.
16    Q.  Any other reason why you switched out the NUK
17  pacifiers?
18    A.  We'd lose them.
19    Q.  Any other reason?
20    A.  No.
21    Q.  Do you remember how much you paid for that
22  first NUK pacifier in January 2016?
23    A.  It was probably about 8, 9 dollars.
24    Q.  Obviously, you didn't keep the receipt for



SHELLY BENSON                                                September 30, 2020
BENSON vs NEWELL BRANDS INC.                                            53—56

Page 53

1   that from June 20 -- January 2016?
2    A.  No, I don't have a receipt.  I looked for them
3   and did not find any.
4    Q.  So how do you remember that you paid 8 or 9
5   dollars?
6    A.  I just remember them being more money than the
7   regular pacifiers, but because they were orthodontic
8   and had all the calming words, to a first-time mom I
9   was like it's worth the extra money.
10    Q.  So you did compare the price of the NUK
11   pacifiers to others?
12    A.  Yes.
13    Q.  Where did you purchase that first pacifier?
14    A.  Walmart.
15    Q.  And is that the Walmart in Elgin?
16    A.  Yes.
17    Q.  So I just want to, to the extent you can,
18   going back to January 2016 and your purchasing
19   decision -- you had already used a NUK pacifier
20   successfully with Alexis prior to going in and
21   purchasing it, correct?
22    A.  Correct.
23    Q.  So did you go in to the Walmart with the
24   intention to purchase a NUK pacifier?

Page 54

1    A.  Yes.
2    Q.  And then the specific NUK pacifier that you
3   purchased you purchased because you wanted the pink
4   and white Mini for Alexis?
5        MR. KILPELA:  Object, misstates her prior
6     testimony.  You can answer.
7   BY THE WITNESS:
8    A.  I didn't buy it because I wanted Mini Mouse.
9   I bought it because I wanted the good brand of NUK.
10   I always felt NUK is a brand you can trust.  And I
11   saw them and it said orthodontic, so then I was like
12   okay, orthodontic, orthodontics, it'll help her
13   dental, it's not going to harm her teeth.  The fact
14   that it was Mini Mouse did not weigh into my
15   decision.  Like I said before, it was just an added
16   bonus.
17   BY MR. ALI:
18    Q.  Did you compare -- you said you paid 8 to 9
19   dollars.  Did you compare the NUK price to all of the
20   other pacifiers in Walmart?
21    A.  Yes.
22    Q.  Would it surprise you if NUK's pacifiers are
23   not the most expensive pacifiers at Walmart?
24    A.  No.

Page 55

1    Q.  Did you see any other pacifiers that were
2   advertised as orthodontic at Walmart when you went in
3   to purchase the NUK pacifier?
4    A.  I don't remember.
5    Q.  Are you aware that MAM also advertises its
6   pacifiers as orthodontic?
7    A.  No.
8    Q.  Have you ever seen any other pacifiers
9   advertised as orthodontic?
10    A.  Not that I noticed.  I always just went in
11   with the intent to buy NUKs.  But I was like -- when
12   I would buy the NUKs, I would see, you know, like
13   Walmart pacifiers are like 3 bucks, but NUKs I wanted
14   to buy because it's a brand I trust.  So like the
15   stuff like that.
16        Like I never stared at all the packaging
17   and was like oh, what other orthodontic passies can I
18   buy.  It was just more NUK is the brand I'm going to
19   buy.
20    Q.  When you first purchased that NUK pacifier in
21   January 2016, do you remember taking a look at the
22   shape of the pacifier itself?
23    A.  Yes.
24    Q.  And did you find that it was different than

Page 56

1   the other pacifiers that you compared it to?
2    A.  Yeah.  It was angled.
3    Q.  Angled.  And what about the shape of the
4   nipple itself?
5    A.  I don't remember that.  I just remember seeing
6   that it was angled.
7        MR. ALI:  Exhibit 2.
8            (WHEREUPON, a document was marked
9             as BENSON Deposition Exhibit
10             No. 2, for identification.)
11   BY MR. ALI:
12    Q.  Ms. Benson, the court reporter has handed you
13   what's been marked as Exhibit 2.  If you'll look at
14   the bottom right of each page, you'll see what we
15   call Bates numbers, and you'll see it's NUK0008277
16   and it goes all the way through NUK0008281.
17        Do you see that?
18    A.  Um-hum.  Yes, I do.
19        MR. KILPELA:  I'd just note for the record
20     it's double sided, just in case there's a
21     reproduction error.
22        MR. ALI:  Yes, it is double sided, but I
23     think each page goes sequentially.
24        MR. KILPELA:  Yeah.  Sometimes the court



SHELLY BENSON
September 30, 2020
BENSON vs NEWELL BRANDS INC.
57—60

---

Page 57

1   reporting service, they forget to scan the back
2   and then you end up with a three-page instead
3   of a five-page exhibit.  That's for the record.
4   Sorry.
5       MR. ALI:  Got it.
6   BY MR. ALI:
7   Q.  Ms. Benson, looking at Exhibit 2, this is a
8   printout of NUK packaging.  Does any of this look
9   familiar to you?
10  A.  Yes.
11  Q.  Which pages look familiar to you?
12  A.  Like the NUK number?
13  Q.  Yes.
14  A.  The NUK0008280.
15  Q.  That's the one with the dates 2015 to 2017 at
16  the top?
17  A.  Yes.  And then the one before it, the
18  NUK0008279.
19  Q.  That's the one that says early 2017 to end of
20  2017?
21  A.  Correct.
22  Q.  Okay.  Any other ones?
23  A.  No.
24  Q.  And how do those pages look familiar or why do

---

Page 58

1   those look familiar to you?
2   A.  It just reminds me of the fact of the
3   packaging that I was grabbing when I was buying her
4   her pacifiers.
5   Q.  When you purchased the pacifiers for Alexis,
6   especially the first time, did you read the packaging
7   itself?
8   A.  Yes.
9   Q.  Did you read both the front and the back?
10  A.  Yes.  And, obviously, my eyes fell to the
11  orthodontic, promotes oral healthy development, helps
12  soothe the baby.  And so I was like okay -- my
13  husband was like all she ever does is cry so this
14  will help her not cry.  And then the oral
15  development.
16      And then when she got older, I noticed
17  that the age was 18 to 36 months, so then I thought
18  in my head okay, I have a while before I have to
19  break her from the passie because these are saying
20  that they're healthy and safe to use until she's 36
21  months.
22  Q.  So I know you said the word orthodontic caught
23  your eye when you were looking at the packaging and
24  that's something you looked at?

---

Page 59

1   A.  Yes.
2   Q.  And then going to the page ending in 8280,
3   which is 2015 to 2017, if you look at the right side,
4   at the top, beneath the red NUK letters, it says
5   unique NUK orthodontic shape.  Do you see that?
6       MR. KILPELA:  You're talking about the back
7   of the packaging?
8       MR. ALI:  Yes.
9   BY MR. ALI:
10  Q.  So on the right side of the page --
11  A.  Yes.
12  Q.  -- the back of the packaging, is that
13  something you would have read?
14  A.  Yes.
15  Q.  Okay.  So do you see where it says unique NUK
16  orthodontic shape?
17  A.  Yes.
18  Q.  So do you understand that term, orthodontic,
19  to refer to the shape of the nipple?
20  A.  Yes.  And then it was saying that it's safe
21  for oral development.  And so I put the two together,
22  that I thought the shape of it wouldn't interfere
23  with her teeth development.
24  Q.  Okay.  And where do you see that it says safe

---

Page 60

1   for oral --
2   A.  It said on another one that it was -- promotes
3   oral development.  On the other one.
4   Q.  And --
5   A.  Promotes healthy oral development.
6   Q.  And which page are you looking at?
7   A.  Naturally fits baby's mouth for healthy oral
8   development.
9   Q.  I'm sorry, can you point -- read the number?
10  A.  On the bottom of it.
11      MR. KILPELA:  She's still on 8280.
12      MR. ALI:  Oh, 8280.  Okay.
13      THE WITNESS:  Ha?
14      MR. KILPELA:  Don't look at me.  You're good.
15  BY MR. ALI:
16  Q.  8280.  So you're looking at the bottom left,
17  where it says naturally fits baby's mouth for healthy
18  oral development?
19  A.  Yes.
20  Q.  So do you understand that to mean that the
21  orthodontic shape of the nipple, because it's
22  natural, supports healthy oral development?
23  A.  I had the idea that pacifiers would be safe
24  for my child, yes.

---



SHELLY BENSON
BENSON vs NEWELL BRANDS INC.

September 30, 2020
61–64

Page 61

1    Q. And going back one page, the page that ends in
2  8279, we see the same -- on the right-hand side of
3  the page we see the same unique NUK orthodontic
4  shape, correct?
5    A. Yes.
6    Q. And that's something that would have caught
7  your eye in 2017?
8    A. Yes.
9    Q. And then going back one more page to 8278 for
10  late 2017 to 2018, you see the same language, unique
11  NUK orthodontic shape; correct?
12    A. Yes.
13    Q. And that's something that would have caught
14  your eye if you purchased in late 2017 to 2018?
15    A. Yes.
16    MR. KILPELA: Are we done with this?
17    MR. ALI: Yeah, I'm done for now.
18    MR. KILPELA: Mir, whenever it's a convenient
19    time to take a quick break, I'd appreciate in.
20    MR. ALI: Sure. Do you want to go now?
21    MR. KILPELA: Sure.
22    MR. ALI: Yeah.
23        (WHEREUPON, a recess was had.)
24  BY MR. ALI:

Page 62

1    Q. Ms. Benson, I believe you had said that you
2  had stopped Alexis's pacifier use in June of 2018; is
3  that correct?
4    A. That's correct.
5    Q. And why did you stop the pacifier use then?
6    A. I interviewed at the Learning Tree, and they
7  told me that she wouldn't be able to come if she was
8  using the pacifier, and they told me how it delays
9  the development and so I had to cut her.
10    Q. Did you ever go back to using a pacifier since
11  June 2018?
12    A. No.
13    Q. How many of the pacifiers -- I know you
14  brought in two today, physical ones. How many of the
15  other pacifiers have you saved?
16    A. None. Those are the only two I could find.
17  We were throwing them in the garbage because she was
18  a big girl.
19    Q. Because she was?
20    A. A big girl. So I was like when we're a big
21  girl, they go in the garbage.
22    Q. Got it. When you purchased the NUK pacifier
23  for the first time in January 2016, did you -- you
24  noted the angled shape of the nipple, correct?

Page 63

1    A. Yes.
2    Q. Did you believe that the shape of the nipple
3  would fit Alexis's mouth better than the prior
4  pacifiers that you had used?
5    A. Better than those, yes.
6    Q. And did --
7    A. Yes.
8    Q. -- the NUK pacifier fit better than the
9  others?
10    A. Yes.
11    Q. Okay. When you were looking at pacifiers to
12  purchase at Walmart, and going back to January 2016,
13  did you notice a broad range of prices for the
14  different pacifiers?
15    A. Yes.
16    Q. Did you notice a range of prices within the
17  NUK pacifiers themselves?
18    A. Yes.
19    Q. And did you notice why the prices were
20  different even within the NUK pacifiers?
21    A. No. I just assumed that orthodontics were
22  more money because they were developed better and
23  were safer for the children and so I thought it was
24  worth it.

Page 64

1    Q. Right. So I'm specifically asking about the
2  NUK pacifiers --
3    A. Yeah.
4    Q. -- at Walmart. Did you notice a price
5  difference within the NUK pacifiers themselves?
6    A. Yes.
7    Q. And what was your understanding for why they
8  were priced differently?
9    A. I feel like we're saying the same stuff. I
10  just thought they were different because of the
11  different styles, like different styles or different
12  prices.
13    Q. So the different styles as far as like the
14  colors or the design on them?
15    A. How they were manufactured. Like some of the
16  NUK pacifiers said orthodontic, some of them didn't.
17  The orthodontic passies were more money.
18    Q. Are you aware that all of the NUK pacifiers
19  are orthodontic?
20    A. They weren't at Walmart when I first
21  purchased.
22    Q. They were not at Walmart?
23    A. No. There were some that just said NUK and
24  they did not say orthodontic on them.



# EXHIBIT 6

LISA ANGELA CAPARELLI                                    September 29, 2020
BENSON vs NEWELL BRANDS INC.                                          1—4

---

Page 1

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4
5    SHELLY BENSON and LISA        )
6    CAPARELLI, Individually and on )
7    behalf of all others similarly )
8    situated,                      )
9              Plaintiffs,          )
10       v.                         ) No. 1:19-cv-06836
11   NEWELL BRANDS INC., and        )
12   NUK USA LLC,                   )
13             Defendants.          )
14
15          The deposition of LISA ANGELA CAPARELLI,
16   called for examination, taken pursuant to the
17   Federal Rules of Civil Procedure of the United
18   States District Courts pertaining to the taking of
19   depositions, taken before KRISTIN C. BRAJKOVICH, a
20   Certified Shorthand Reporter, CSR. No. 84-3810, of
21   said state, via Zoom on the 29th day of September,
22   A.D. 2020, at 9:38 a.m.
23
24
```

Page 2

```
1    PRESENT:
2       CARLSON LYNCH,
3       (1133 Penn Avenue, 5th Floor,
4       Pittsburgh, Pennsylvania 15222,
5       1-412-322-9243), by:
6       MR. EDWIN J. KILPELA, JR.,
7       ekilpela@carlsonlynch.com, and
8       MR. MATT BRADY,
9       mbrady@carlsonlynch.com,
10         appeared via Zoom on behalf of
11         Plaintiffs;
12
13      SCHIFF HARDIN, LLP,
14      (233 South Wacker Drive, Suite 7100,
15      Chicago, Illinois 60606
16      1-312-258-5500), by:
17      MR. DAVID C. SCOTT,
18      dscott@schiffhardin.com,
19      MR. MIR Y. ALI,
20      mali@schiffhardin.com,
21         appeared via Zoom on behalf of
22         Defendants.
23
24   REPORTED BY:  KRISTIN C. BRAJKOVICH, No. 84-3810.
```

Page 3

```
1          (WHEREUPON, the witness was duly
2    sworn.)
3          LISA ANGELA CAPARELLI,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6          EXAMINATION
7    BY MR. SCOTT:
8    Q.   Good morning.
9    A.   Good morning.
10   Q.   Could you please state your name for the
11   record?
12   A.   Lisa Angela Caparelli.
13   Q.   Okay.  Could you spell your last name
14   for you us?
15   A.   C-a-p-a-r-e-l-l-i.
16   Q.   Okay.  And, Ms. Caparelli, have you
17   given a deposition before?
18   A.   Yes.
19   Q.   How many times?
20   A.   Once.
21   Q.   Once.  How long ago was that?
22   A.   I believe it was 2010.
23   Q.   Okay.  And what was the legal matter in
24   which that deposition was taken?  Just generally
```

Page 4

```
1    what was it about?
2    A.   My mother was in a car accident.
3    Q.   And you were a witness, I take it?
4    A.   I was in the car.  She was being driven
5    by a medical worker, so we sued the company.
6    Q.   Got it.  So 12 years, so I'll go back
7    over some basic ground rules for how this works.  I
8    know Mr. Kilpela has probably told you and you
9    probably remember, but just in case.
10         After you have heard the questions, you
11   have just sworn an oath to answer those questions
12   truthfully, and the court reporter here is going to
13   take everything down that you say, that I say, that
14   Mr. Kilpela might say.  Do you understand that?
15   A.   Uh-huh, yes.
16   Q.   All right.  And one important thing is
17   verbal responses are necessary, and you just
18   corrected yourself.  So you are already all over
19   that, so that is great.  Good with that?
20   A.   Yes.
21   Q.   Okay.  And so far we are doing all
22   right.  We need to take turns so she can get down
23   everything that we say.  I'll wait until you are
24   done with your answer before I ask my next
```



LISA ANGELA CAPARELLI
BENSON vs NEWELL BRANDS INC.

September 29, 2020
17–20

Page 17

1    A.   Yes.

2    Q.   On that first phone call, did you at

3   that point become a client of Mr. Fox's law firm?

4    A.   I don't remember if it happened in that

5   phone call.  I can't recall that, but it happened.

6    Q.   Okay.  And how long before -- if you

7   know, how long before the lawsuit was actually

8   filed did that happen?

9    A.   Not very long.  I can't give you dates.

10   I mean, I live a busy life.  I don't have a

11   catalog.  Sometime after.

12    Q.   Okay.  I take it from the allegations in

13   the complaint, actually that you ended up buying a

14   NUK orthodontic pacifier after you had that call

15   with Mr. Fox; is that right?

16    A.   No.

17    Q.   No?

18    A.   No.

19    Q.   When was the -- well, you were searching

20   for pacifiers to buy online, and that is how you

21   came to --

22    A.   No, that is not what I said.  That is

23   not what I said.  I just said, I could not find it

24   at the Walmart where I have been purchasing them,

Page 18

1   so I went on to find where I could find them

2   somewhere else, and that popped up online.  That is

3   what I said.

4    Q.   Apologies.  I thought that was what I

5   was recounting.  It's hard because we are not in

6   the same room?

7    A.   I get it.

8    Q.   I just ask that you be a little patient

9   with me.

10    A.   No, I'm trying.  I'm trying.

11    Q.   So when you said you were looking for

12   where you could buy the pacifier because it was not

13   at Walmart, was that -- you were looking to make a

14   purchase of a new pacifier for your son at that

15   time; is that right?

16    A.   A NUK pacifier, yes.

17    Q.   Why did you want to buy a new one for

18   him?

19    A.   Because he needed it.

20    Q.   What happened to the one -- or had he

21   been using one at the time?

22    A.   I don't know if you have children, but

23   they like to hide them.  They are tiny.  They get

24   lost, things like that.  Just to make sure that I

Page 19

1   had them on hand, things like that.

2    Q.   Absolutely.  I do have children, and I

3   know what you mean.

4    MR. KILPELA:  I just want to put on the record

5   that Matt Brady from our law firm appears to have

6   joined.  I just did not want anyone to be confused

7   about that.

8    MR. SCOTT:  Appreciate it.

9   BY MR. SCOTT:

10    Q.   And, Ms. Caparelli, did you end up

11   finding and purchasing another NUK orthodontic

12   pacifier after this interaction that we are

13   describing where you were on the website looking?

14    A.   Yes.

15    Q.   And where did you end up purchasing that

16   pacifier from?

17    A.   Walmart.

18    Q.   When you say Walmart, do you mean at the

19   brick and mortar store in Plainfield or somewhere

20   else?

21    A.   It's a super center Walmart, yes.

22    Q.   And do you remember approximately when

23   you made that purchase?

24    A.   The last purchase, June or July,

Page 20

1   probably, 2018.

2    Q.   2018, you said?

3    A.   (Nodding head.)

4    Q.   Let me try to understand the timeline of

5   your purchases.  In the complaint -- and I know you

6   have it, and I'll probably introduce that as an

7   exhibit at some point.

8      In the complaint you allege that you

9   purchased a NUK orthodontic pacifier, a two pack,

10   in December of 2018 or January of 2019.  Do you

11   recall that?

12    A.   Yes.

13    Q.   Is that accurate?

14    A.   Yes.

15    Q.   Is that the last purchase of a NUK

16   orthodontic pacifier that you made, or has there

17   been one since then?

18    A.   No, there has not.

19    Q.   So the last NUK orthodontic pacifier

20   that you purchased was either December 2018 or

21   January 2019, right?

22    A.   Yes.

23    Q.   Then walking backwards in time, when was

24   the prior purchase of a NUK orthodontic pacifier?



LISA ANGELA CAPARELLI
BENSON vs NEWELL BRANDS INC.

September 29, 2020
21—24

Page 21

1     A.   I have been buying them since my son was
2   6 months old. I believed they were good for him.
3     Q.   Just a moment ago, you told me you
4   thought in June or July of 2018 you bought -- you
5   bought another NUK orthodontic pacifier at Walmart;
6   is that right?
7     A.   I don't --
8     Q.   I guess when we were talking a moment
9   ago about when you were contacted by the law
10   firm --
11     A.   Yes.
12     Q.   -- you told me that you came to their
13   website in the process of looking for where you
14   could buy another NUK orthodontic pacifier. Do you
15   recall that?
16     A.   Yes.
17     Q.   And so -- and I asked after you had that
18   interaction with the law firm, you bought another
19   NUK orthodontic pacifier, and I thought you said,
20   yeah, you did, at Walmart. You found one at
21   Walmart, right?
22     A.   Uh-huh.
23     Q.   Yes?
24     A.   You are --

Page 22

1     MR. KILPELA: You are confused. It's okay.
2   BY THE WITNESS:
3     A.   I'm confused.
4   BY MR. SCOTT:
5     Q.   Okay. I'm trying to understand the
6   timeline of your purchases of NUK orthodontic
7   pacifiers, and your interaction with the law firm.
8   Those are kind of the two things that I'm trying to
9   understand, how they fit together.
10     THE WITNESS: May I explain myself?
11     MR. KILPELA: She wants to explain herself.
12     MR. SCOTT: That's fine.
13   BY THE WITNESS:
14     A.   From your verbiage, if you said, you
15   went out and bought -- after my contact with the --
16   I did not speak with them that day. I filled
17   out -- put my name and my e-mail. I did not speak
18   to them that day. It was not immediate.
19     So when you said you went out and
20   purchased it, I took it as you meant, like, that
21   day that I was looking for one for my son. I did
22   not mean in June or however after -- I apologize
23   that I missed what you had said.
24

Page 23

1   BY MR. SCOTT:
2     Q.   Okay. That is okay. I don't have
3   documents from you. I don't have any receipts. I
4   don't have any records, so I have no way of knowing
5   the timeline here. All I get is your testimony, so
6   that is why I'm asking these questions. I'm not
7   trying to annoy you.
8     A.   Okay. I'm not annoyed. I'm sorry. I'm
9   not annoyed. I'm sorry. It's body language
10   because you can't see me, my whole -- I'm not
11   annoyed. I'm sorry.
12     Q.   Okay. Let me just understand this
13   though, so there was a point in time when you
14   filled out the form on the law firm website, and at
15   some point after that you were contacted by the law
16   firm, right?
17     A.   Yes.
18     Q.   And so one question I have is, after
19   that -- after you were contacted by the law firm,
20   did you make another purchase of a NUK orthodontic
21   pacifier later in time?
22     A.   I don't believe so.
23     Q.   Let me just shift gears. I want to
24   focus on Necco's early years as an infant and a

Page 24

1   toddler, let's say birth to 36 months. Do you have
2   that period of time in mind?
3     A.   Yes.
4     Q.   What types of techniques did you use to
5   soothe Necco?
6     A.   Bottle feeding, pacifiers, music.
7     Q.   Any others that come to mind?
8     A.   Not right now.
9     Q.   So you mentioned pacifiers, you
10   mentioned bottle feeding. Were there any other
11   products that you would use to soothe Necco?
12     A.   Not that I can think of.
13     Q.   What types of things did Necco do to
14   self-soothe? Do you know what I mean by
15   self-soothe with a baby?
16     A.   No. You can explain that.
17     Q.   Sure. I mean things that babies do to
18   soothe themselves. For example, suck on a finger
19   or a thumb or something like that.
20     A.   No. Uhn-uhn, no.
21     Q.   Okay. You said, no, so did Necco do
22   any -- did Necco suck his thumb, I guess is the
23   question?
24     A.   No. No, he did not.



LISA ANGELA CAPARELLI                                       September 29, 2020
BENSON vs NEWELL BRANDS INC.                                            25–28

Page 25

1    Q.   And did Necco use any favorite toys or
2    stuffed animal or other things that he might suck
3    on besides a pacifier?
4    A.   No.  No.
5    Q.   Was it important to you as a mother to
6    make sure that Necco could be soothed?
7    A.   Always.
8    Q.   And you used a pacifier to soothe Necco,
9    it sounds like?
10   A.   Yes.
11   Q.   Did you use a pacifier to help get Necco
12   to sleep?
13   A.   Yes.
14   Q.   Was it important to you that the
15   pacifier that you used soothed Necco?
16   A.   Yes.
17   Q.   And was it important to you that the
18   pacifier that you used helped Necco get to sleep?
19   A.   Yes.
20   Q.   When did you start using a pacifier with
21   Necco?
22   A.   At birth.
23   Q.   And at what age did Necco stop using a
24   pacifier?

Page 26

1    A.   About four and a half.
2    Q.   So roughly the middle of 2019?
3    A.   About.
4    Q.   Approximately how many different
5    pacifiers did you use for Necco over those four and
6    a half years?  I know you probably don't remember
7    the exact number but just approximately.
8    A.   Probably two a month.  I'm confused.
9    Are you asking how many he went through?
10   Q.   Just, yeah, how many approximately did
11   he go through?
12   A.   Probably two.
13   Q.   Two a month?
14   A.   Uh-huh.
15   MR. KILPELA:  Remember, you have to say yes
16   instead of uh-huh.
17   BY THE WITNESS:
18   A.   Yes.  I'm sorry.
19   BY MR. SCOTT:
20   Q.   And you mentioned earlier that pacifiers
21   would get lost.  I get it.  Were there other
22   reasons why you would buy a new pacifier for Necco?
23   A.   Just to make sure that I had them on
24   hand.

Page 27

1    Q.   And in different bags and locations, for
2    example?
3    A.   Yes.
4    Q.   Obviously, I know you used the NUK
5    orthodontic style of pacifier.  Did you use any
6    other brands of pacifiers at any point?
7    A.   Just at birth, a green silicone one that
8    you get at the hospital.
9    Q.   Okay.  Maybe the Philips Avent round
10   silicone pacifier?
11   A.   Right.  You stick your finger in it.
12   Q.   Yes.
13   A.   Yes.
14   Q.   And you said that you got that one at
15   the hospital?
16   A.   Uh-huh.
17   Q.   Yes?
18   A.   Yes.  I'm sorry.  Sorry, yes.
19   Q.   That's okay.  Approximately how long did
20   you use the Philips Avent silicone pacifier from
21   the hospital before switching to a different one?
22   A.   Of course you can purchase them at the
23   store, so until he was about 6 months.
24   Q.   Okay.  So it sounds like -- so from

Page 28

1    birth to 6 months, Necco used the Philips Avent
2    round silicone pacifier; is that right?
3    A.   Yes.
4    Q.   And it sounds like you got one at the
5    hospital but then you also during those six months
6    maybe purchased some as well?
7    A.   Yes.
8    Q.   At about 6 months, it sounds like there
9    was a transition; is that right?
10   A.   Yes.
11   Q.   Tell me what you -- what type of
12   pacifier did you switch to at 6 months?
13   A.   6- to 18-month NUK orthodontic pacifier.
14   Q.   Okay.  And from 6 months going forward
15   to 4 1/2 years, when Necco stopped using pacifiers,
16   did you use just the NUK pacifiers throughout that
17   time period?
18   A.   Yes.
19   Q.   Apologies.  Just to be really clear, so
20   after 6 months going forward, there were not any
21   other types of pacifiers besides the NUK that Necco
22   used; is that right?
23   A.   No, he didn't.
24   Q.   No, he did not use any other type,



LISA ANGELA CAPARELLI
BENSON vs NEWELL BRANDS INC.

September 29, 2020
29–32

Page 29

1 right?

2    A.  No, he did not.

3    Q.  What -- thinking back to the 6-month age

4 when you switched from the Philips Avent round

5 silicone pacifier to a NUK 6-month to 18 months

6 orthodontic pacifier, what prompted you to make

7 that change?

8    A.  By reading the packaging, I thought it

9 was -- the way that I saw the little nipple was

10 shaped and from, I don't know, probably the way

11 that the packaging looked, from what it said on it.

12    Q.  You mentioned the shape. So the shape

13 of the NUK orthodontic pacifier is different from

14 the shape of the Philips Avent round silicone

15 pacifier, right?

16    A.  The nipple part that goes in the mouth,

17 yes.

18    Q.  And what about that shape struck you as

19 different?

20    A.  The picture.

21    Q.  Okay. And I guess I'm just trying to

22 understand what it was about the shape that

23 prompted you to choose that one instead of

24 continuing with, for example, the round one that

Page 30

1 you had been using?

2    MR. KILPELA: Objection to the extent it

3 misstates her prior testimony. You can answer.

4 BY THE WITNESS:

5    A.  I'm sorry. Can you restate the

6 question? I didn't --

7 BY MR. SCOTT:

8    Q.  Sure. So you switched from a round

9 Philips Avent nipple to the NUK orthodontic nipple,

10 right?

11    A.  Uh-huh.

12    Q.  Yes?

13    A.  He grew out of it.

14    Q.  Okay. And so let me ask this. You say

15 he grew out of it. He grew out of the Philips

16 Avent silicone one that you had been using?

17    A.  Yes.

18    Q.  Okay. And so you went to -- where did

19 you go to buy the NUK orthodontic, Walmart or

20 somewhere else?

21    A.  Back then, more than likely Walmart,

22 yes.

23    Q.  Okay. And let me just make sure that I

24 get the time period right.

Page 31

1    MR. KILPELA: Sorry.

2    THE WITNESS: I need, like, three minutes just

3 to make sure he's okay, my son.

4    MR. KILPELA: Finish your question, if you

5 want?

6    THE WITNESS: Oh, go ahead.

7    MR. SCOTT: That is okay. I was formulating

8 it, so that is okay.

9    (WHEREUPON, a recess was had.)

10    MR. SCOTT: Okay. We can go back on the

11 record, if you all are ready.

12 BY MR. SCOTT:

13    Q.  Okay. Ms. Caparelli -- Caparelli, I

14 apologize.

15    A.  That's okay.

16    Q.  We were just talking about how at around

17 6 months you switched from the Philips Avent round

18 silicone pacifier to the NUK orthodontic

19 6- to 18-month size pacifier, right?

20    A.  Yes.

21    Q.  And so I guess I want to understand any

22 other styles or sizes of pacifier that Necco used.

23 So were there -- I believe at one point you

24 purchased an 18- to 36-month size NUK orthodontic

Page 32

1 pacifier for Necco; is that right?

2    A.  Yes.

3    Q.  And do you recall at what age roughly,

4 you switched from the 6- to 18-month size to the

5 18- to 36-month size?

6    A.  Probably around 18 months. I don't

7 remember specifically, no.

8    Q.  Okay. And other than the -- those two

9 different sizes of NUK orthodontic pacifiers, the

10 6- to 18-month and the 18-month to 36-month, are

11 there any other type of pacifiers that Necco used?

12    A.  No.

13    Q.  So as I'm tracking the timeline from

14 January 2015, when Necco was born, until roughly

15 mid-2015, six months later, you used the Philips

16 Avent round silicone pacifier, right?

17    A.  Yes.

18    Q.  And then he used the pacifier for four

19 more years after that, from mid-2015 to roughly

20 mid-2019?

21    A.  Yes.

22    Q.  And during those four years, he used the

23 NUK orthodontic pacifiers, right?

24    A.  Yes.



LISA ANGELA CAPARELLI          September 29, 2020
BENSON vs NEWELL BRANDS INC.          33–36

Page 33

1   Q.   Okay. So I take it during those
2 four years, you as a mother found the NUK
3 orthodontic pacifiers were effective in soothing
4 Necco; is that right?
5   A.   Yes.
6   Q.   And the NUK orthodontic pacifiers were
7 effective in helping Necco to sleep; is that right?
8   A.   Yes.
9   Q.   And I imagine a reason -- the reason you
10 kept using the NUK orthodontic pacifiers was
11 because they worked well in soothing Necco and
12 getting him to sleep, right?
13   A.   Yes.
14   Q.   If the NUK orthodontic pacifiers had not
15 worked in soothing Necco or getting him to sleep,
16 you probably would have switched to a different
17 type, right?
18   A.   Yes.
19   Q.   So is it fair to say that the NUK
20 orthodontic pacifiers performed the function of
21 soothing and helping Necco sleep?
22   A.   Yes, yes.
23   Q.   At any point during those four years,
24 did you even consider switching to another type or

Page 34

1 brand of pacifier?
2   A.   No.
3   Q.   I take it Necco was happy with the NUK
4 orthodontic pacifier?
5   A.   Yes. I was, yes.
6   Q.   I want to go back and understand more
7 about the switch from the round Philips Avent
8 pacifier to the NUK orthodontic pacifier. Okay? I
9 want to put that time period in your mind of
10 six months when you made that switch. Okay? Do
11 you have that in mind?
12   A.   Yes, sir.
13   Q.   And I would like to -- I would like to
14 understand that decision-making process that you
15 had. Were you consulting with Necco's pediatrician
16 at the time about things like pacifiers?
17   A.   No.
18   Q.   Was there any reading that you were
19 doing in terms of what types of pacifiers to use?
20   A.   No.
21   Q.   Okay. And so was it as simple as you
22 went to the store and decided to just buy these NUK
23 orthodontic pacifiers instead of another type of
24 pacifier -- strike that. That was a bad question.

Page 35

1 I just want to understand, what made
2 you -- what factors were you thinking of that drove
3 your decision to make that switch?
4   A.   The green ones are for newborn babies,
5 and when I went to get him a different pacifier
6 because he was older, I saw the packaging and it
7 led me to believe that this was the best pacifier.
8 With many different pacifiers and the amounts of
9 money and from what this packaging said,
10 orthodontic and the reasons, that it was orally
11 better for him to have.
12   Q.   Have you seen other brands of pacifiers
13 that describe their pacifiers as orthodontic
14 pacifiers?
15   A.   No.
16   Q.   You are not aware that there are other
17 brands that have the same -- that use the same
18 word?
19   A.   No.
20   Q.   Does that surprise you?
21   A.   That there isn't?
22   Q.   No. Would it surprise you to know that
23 other brands also use the word "orthodontic" in
24 describing their pacifiers?

Page 36

1   A.   No.
2   Q.   Are you familiar with -- obviously you
3 are familiar with the round one that you got at the
4 hospital. Are you familiar with other shapes of
5 pacifier nipples?
6   A.   Yes.
7   Q.   And when you decided to -- at 6 months
8 to purchase the NUK orthodontic pacifier, did you
9 compare the shapes of the NUK orthodontic pacifier
10 nipple to other nipple shapes?
11   A.   Yes, I did.
12   Q.   And what type of comparison did you
13 make? How did that work in your mind?
14   A.   You can look at them. The other ones
15 are straighter and narrower, and the NUK
16 orthodontics had ridges, lines, and then they are
17 thicker coming out of the plastic and then rounder
18 for insertion, for the mouth.
19   Q.   And what aspects of the NUK shaped
20 pacifier were attractive to you compared to the
21 other shapes of pacifiers?
22   A.   It led me to believe it was better for
23 him.
24   Q.   The shape led you to believe that it was



LISA ANGELA CAPARELLI
BENSON vs NEWELL BRANDS INC.

September 29, 2020
37–40

Page 37

1 better for Necco than other shapes?
2    A.   Yes.
3    Q.   Have you considered -- have you
4 considered the shape, in terms of the fit, fitting
5 more naturally in Necco's mouth than, say, a round
6 one like he got at the hospital?  Have you thought
7 about how the shape works in the baby's mouth?
8    MR. KILPELA:  Object to the form of the
9 question.  You can answer.
10 BY THE WITNESS:
11    A.   I thought about what I saw on the
12 package that said it was better for his mouth.
13 BY MR. SCOTT:
14    Q.   You would agree with me that a pacifier
15 with a nipple shape that more naturally fits the
16 baby's mouth would be better and preferable to a
17 pacifier with a nipple that does not naturally fit
18 the shape of the baby's mouth?
19    MR. KILPELA:  Object to the form of the
20 question.  You can answer.
21 BY THE WITNESS:
22    A.   Like I just said, I was led to believe
23 that by reading it, that it was better, not that I
24 believed it.  I read it to be better.

Page 38

1 BY MR. SCOTT:
2    Q.   So you did not believe that it was
3 better?
4    MR. KILPELA:  Object to the form of the
5 question, asked and answered.  You can answer.
6 BY MR. SCOTT:
7    Q.   I thought that is what you just said.  I
8 just want to understand that.
9    A.   I believe I just said I was led to
10 believe.  So, yes, I did believe it was better
11 because I read it to be better, is what I said.
12 Sorry.
13    Q.   What specifically did you believe?
14    A.   That for his oral health, the shape of
15 the nipple, which is on the packaging, I believe,
16 and it says that it is better.
17    Q.   Right.  And when you go to the store and
18 look at the pacifier on the shelf in the package,
19 you can see the shape of the nipple, right?
20    A.   Yes.
21    Q.   And they are also -- I think you made
22 reference to on the packaging, there's also a
23 drawing or a visual rendition of the shape of the
24 nipple, right?

Page 39

1    A.   Yes.
2    Q.   And so that shows you how that shape is
3 designed to naturally fit in the baby's mouth; is
4 that what you are saying?
5    A.   This word naturally, I don't -- I don't
6 understand the question.
7    Q.   Okay.  Do you have an idea of what
8 naturally fitting in the baby's mouth would mean?
9    A.   Yes.
10    Q.   And what is your understanding of what
11 that would mean?
12    A.   That it would be beneficial for him the
13 way it naturally would fit in his mouth.
14    Q.   Uh-huh.  As compared to a pacifier that
15 were shaped in a way that was unnatural; is that
16 right?
17    A.   Yes.
18    Q.   Okay.  I want to look at the complaint,
19 but before I mark that, let's just mark the
20 deposition notice, just for the record, so I'll
21 mark the deposition notice as Exhibit 1.  I'll show
22 it to Ms. Caparelli.  Ms. Caparelli, I'll just ask,
23 do you understand that you are testifying today
24 pursuant to this notice of deposition?

Page 40

1    MR. KILPELA:  For the record, I just handed
2 her a clean copy of the deposition notice.
3 BY THE WITNESS:
4    A.   Yes.
5 BY MR. SCOTT:
6    Q.   Okay.  You can put that away.  Thank
7 you.
8    A.   Okay.
9    Q.   All right.  Then I would like to mark
10 the amended complaint, the first amended complaint
11 as Exhibit 2.  And I understand you have a clean
12 hard copy there as well?
13    MR. KILPELA:  Yes, and I have just handed it
14 to her.
15    MR. SCOTT:  Thank you.
16 BY MR. SCOTT:
17    Q.   Ms. Caparelli, your counsel has just
18 handed you what has been marked as Exhibit 2, which
19 is the first amended complaint of the plaintiffs in
20 this case.  Do you understand that?
21    A.   Yes.
22    Q.   Have you seen this amended complaint
23 before?
24    A.   Yes.



# EXHIBIT 7

## UNDER SEAL

# EXHIBIT 8

## UNDER SEAL

# EXHIBIT 9

## UNDER SEAL

# EXHIBIT 10
## UNDER SEAL

# EXHIBIT 11

## UNDER SEAL

# EXHIBIT 12

## UNDER SEAL