**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHELLY BENSON and LISA CAPARELLI, individually and on behalf of all others similarly situated, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 19 C 6836 |
| | ) | Judge Ronald A. Guzmán |
| NEWELL BRANDS, INC. and NUK USA LLC, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs' motion for class certification is granted for the reasons explained below.

**BACKGROUND**

This is a putative class action for consumer fraud and unjust enrichment. Plaintiffs, Shelly Benson and Lisa Caparelli,[1] allege that defendants, Newell Brands, Inc. and its subsidiary NUK USA LLC, engaged in false and misleading advertising of their NUK brand pacifiers. Before the Court is plaintiffs' motion for class certification. Plaintiffs request that this Court certify their proposed class and subclass; appoint Shelly Benson and Lisa Caparelli as class representatives; and appoint Melissa Weiner of Pearson, Simon & Warshaw, LLP and Edwin Kilpela Jr. of Carlson Lynch, LLP as class counsel.

**DISCUSSION**

To be certified, a proposed class must satisfy each requirement of Rule 23(a) as well as one of the three requirements of Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The Rule 23(a) requirements are numerosity, typicality, commonality, and adequacy of representation. *Id.* After those four requirements are satisfied, proponents of the class seeking certification under Rule 23(b)(3)—the provision on which plaintiffs rely here—must also show that (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the dispute ("superiority"). *Id.* There is also an "implicit requirement" under Rule 23 that a class must be defined clearly, with objective criteria, and in such a way that class membership does not depend on the defendant's

---

[1] In plaintiffs' original filings, this plaintiff's surname is misspelled "Caparellil." The Court will direct the Clerk's Office to amend the caption accordingly.

liability. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Plaintiffs bear the burden of showing by a preponderance of the evidence that their proposed class satisfies the Rule 23 requirements. *Messner*, 669 F.3d at 811. "Rule 23 is more than 'a mere pleading standard,' and the court must satisfy itself with a 'rigorous analysis' that the prerequisites of certification are met, even if that analysis has 'some overlap with the merits of the plaintiff's underlying claim.'" *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). This analysis involves a "peek at the merits" that is "limited to those aspects of the merits that affect the decisions essential under Rule 23." *Id.* (citation and internal punctuation omitted). "The decision whether to certify a class is one that depends on a careful assessment of the facts, of potential differences among class members, of management challenges, and of the overall importance of the common issues of law or fact to the ultimate outcome." *Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018).

Plaintiffs, who purchased defendants' pacifiers at Walmart stores located in Illinois, assert that defendants' packaging and marketing materials for their NUK pacifiers uniformly and deceptively describe the pacifiers as "orthodontic." The pacifiers are also labeled for three different age ranges: 0-6 months, 6-18 months, and 18-36 months, the second and third of which correspond to a progressively larger, but similarly shaped, pacifier. Plaintiffs allege that defendants' use of the term "orthodontic" falsely conveys to consumers that NUK pacifiers are beneficial for oral development and alignment, and the age-based labels falsely convey to consumers that the pacifiers are beneficial for the dental health of children over the age of 24 months. Furthermore, plaintiffs allege that defendants deceptively omitted in their advertising the material fact that prolonged pacifier use by children over the age of 24 months significantly increases the risk of developing dental malocclusions (misalignments). Defendants assert that plaintiffs' theory cannot be proven on a class-wide basis. Defendants' position is that the term "orthodontic" "describes *the shape* of NUK's pacifier nipple, which differs from round pacifiers," and the age labels "refer[] to *the size* of the pacifier." (ECF No. 116, Defs.' Opp'n Pls.' Mot. at 1.) According to defendants, their market research "shows that consumers broadly understood these things as well." (*Id.*)

Plaintiffs' remaining claims in this action are for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and unjust enrichment. They seek to represent a class of consumers who purchased NUK pacifiers in Illinois or nine other states with "similar state statutes." (ECF No. 113, Pls.' Mem. Supp. Mot. at 7.) Plaintiffs define their proposed class (to which they refer as the Multi-State Consumer Protection Class and to which the Court will refer as the "Multi-State Class" or the "Class") as follows:

> All persons who purchased in the State of Illinois or any state with similar laws any of the NUK-branded Orthodontic Pacifiers, within the applicable statute of limitations, until the date notice is disseminated.

(*Id.*)

Plaintiffs also propose a Multi-State Consumer Protection Subclass (the "Multi-State Subclass" or the "Subclass"), which is defined as

> All persons who purchased in the State of Illinois or any state with similar laws any of the NUK-branded Orthodontic Pacifiers, within the applicable statute of limitations, for use by a child 24 months or older until the date notice is disseminated.

(*Id.*)[2] Plaintiffs further specify that the states they consider to be those "with similar laws" to that of Illinois are California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington. (*Id.* at 7 n.2.) Thus, the proposed Class and Subclass would encompass individuals who made purchases in those ten states. As alternatives to the proposed Multi-State Class and Multi-State Subclass, plaintiffs propose an Illinois Class and Illinois Subclass, with the same definitions as the Multi-State Class and Subclass except with the elimination of the phrase "or any state with similar laws." (*Id.*)

Defendants oppose plaintiffs' motion on a variety of grounds, but they do not dispute that plaintiffs easily satisfy Rule 23(a)(1)'s numerosity requirement, given that defendants' sales data reveal that the proposed Class and Subclass include hundreds of thousands of members.

Next, there must be "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), but "commonality as to every issue is not required," *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 381 (7th Cir. 2015). Plaintiffs say that this element is met because the claims of plaintiffs and the proposed class members are based on common contentions that are central to the claims' validity, and the Court agrees. The claims of the entire Class and Subclass derive from a single course of conduct by defendants: the labeling and marketing of NUK pacifiers. Plaintiffs commonly contend that defendants' misrepresentation that NUK pacifiers are orthodontic and their omission of material facts about the risks associated with pacifier use by children over the age of 24 months were likely to deceive a reasonable consumer.

While defendants do not expressly contest that commonality exists, they argue that plaintiffs will be unable to use "common scientific evidence" to prove their claims because they have not disclosed an expert witness to testify about the scientific evidence underlying their theory, and "the time for disclosing experts expired months ago." (Defs.' Opp'n Pls.' Mot. at 16-17.) Defendants also assert in a footnote that this "failure of proof" warrants summary judgment, and they urge the Court to "dismiss Plaintiffs' claims *sua sponte*." (*Id.* at 17 n.4.) In support of their argument, defendants cite the Court's comments at the December 11, 2019, initial status conference in this case, as well as the Magistrate Judge's statement in a recent minute entry that "[a]ll discovery is now closed," (ECF No. 97). But defendants mischaracterize the nature of the discovery that has been completed and that may remain. This Court indicated to the parties at the initial status conference that it would not separate *fact* discovery into one period of class-

[2] Excluded from the proposed Classes and Subclasses are "(i) Defendants, any entity in which any Defendant has a controlling interest or which has a controlling interest in any Defendant, and Defendants' legal representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) Defendants' employees, officers, directors, agents, and representatives and their family members; (iv) all persons who make a timely election to be excluded from the class; and (v) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family." (Pls.' Mem. Supp. Mot. at 8 n.4.)

certification discovery and another period of non-class certification discovery; rather, the Court opted for all fact discovery to be completed in a single time frame. (ECF No. 94, Tr. of 12/11/2019 Hr'g at 3-4.) The Court then informed the parties that it would set an expert-discovery schedule shortly before the close of fact discovery. At the conclusion of the initial status conference, the Court indicated that a class-certification briefing schedule would be set after the parties were done with "all discovery." (*Id.* at 5-6.) To the extent that the Court may have intended for that statement to encompass all *expert* discovery, however (which is doubtful), that plan went by the wayside. After the onset of the COVID-19 pandemic in spring 2020, the Court asked the parties for written status reports instead of having periodic status hearings. In October and November 2020, the parties filed joint statements setting forth proposed expert-discovery schedules in which they used language indicating that their anticipated expert discovery would relate to class certification only. (ECF No. 77 at 9; ECF No. 91 at 1.) Accordingly, the Court set an expert-discovery schedule that used the qualifying phrase "as to class certification," setting dates for "expert disclosures as to class certification" and "rebuttal expert disclosures as to class certification." (ECF No. 92.) It was not the Court's intent at this later stage of the case, and it did not appear to be the parties' intent, to set an expert-discovery schedule that encompassed expert discovery on both class-certification issues and the merits of the case. The Court has not set a schedule for remaining expert discovery, so the defendants' argument is rejected.[3] The nature of the scientific evidence that plaintiffs intend to present about the effects of pacifiers on oral development is common to the class. Plaintiffs have demonstrated commonality.

The Court addresses the next two Rule 23(a) elements, typicality and adequacy, together. A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021). The typicality requirement is meant to ensure that the class representative's claims have the same "essential characteristics" as those of the class at large, in that the plaintiff's pursuit of her own interest will necessarily also benefit the class. *Id.* Typicality is satisfied here because plaintiffs and the proposed class members are subject to the same alleged practice—defendants' uniform labeling of their pacifiers—and their claims are based on the same legal theory that the labeling was deceptive. As for adequacy, this inquiry tests whether the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). Factors in this analysis are whether the named plaintiffs have (1) claims that do not conflict with those of other class members; (2) sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) competent, qualified, and experienced counsel who are able to conduct the litigation vigorously. *Dietrich v. C.H. Robinson Worldwide, Inc.*, No. 18 C 4871, 2020 WL 635972, at *4 (N.D. Ill. Feb. 11, 2020). Benson and Caparelli are members of the putative class and have the same interest and injury as other class members, and

---

[3] A comment is in order, nonetheless, about plaintiffs' arguments in reply that "even if no additional expert discovery is conducted, Plaintiffs will be able to proceed to trial upon the evidentiary record as it stands" and that the scientific studies they have relied upon thus far are "admissible under Federal Rule of Evidence 803(16)." (ECF No. 122, Pls.' Reply Supp. Mot. at 5 nn.5-6.) The Court is not ruling on the issue at this juncture, but plaintiffs should be mindful that their proposed use of Rule 803(16) is far from a traditional one, so it may not be wise to rely on this hearsay exception alone.

there is no indication that they are subject to defenses unique to them. Furthermore, the Court concludes that class counsel is qualified to conduct the litigation. Defendants' contentions with regard to typicality and adequacy are perfunctory and therefore waived. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008). In the closing pages of their brief, defendants state: "For all of the reasons discussed above in Parts III and IV, Plaintiffs' claims are atypical of putative class members and Plaintiffs are inadequate class representatives." (Defs.' Opp'n Pls.' Mot. at 28.) It is not the Court's obligation to dissect the arguments presented in Parts III and IV of defendants' brief and ascertain how they might apply to these requirements of Rule 23(a); regardless, Parts III and IV contain a six-page discussion in which defendants assert that plaintiffs have no admissible common scientific evidence and that the proposed subclasses are not ascertainable, arguments that the Court rejects as discussed herein. Plaintiffs have established typicality and adequacy.

The Court turns now to Rule 23(b)(3), under which plaintiffs must demonstrate predominance and superiority. Fed. R. Civ. P. 23(b)(3); *Messner*, 669 F.3d at 811. "Analysis of predominance under Rule 23(b)(3) begins, of course, with the elements of the underlying cause of action." *Messner*, 669 F.3d at 815 (internal punctuation and citation omitted). The elements of a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act are (1) a deceptive act by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive act; (3) the deceptive act occurred during a course of conduct involving trade or commerce; and (4) actual damage that was proximately caused by the deceptive act. *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018).[4] The Seventh Circuit has observed that "the importance of the class action device in vindicating the rights of consumers is one reason why the

---

4 Plaintiffs also claim unjust enrichment. Under Illinois law, plaintiffs' request for relief based on unjust enrichment is not a stand-alone claim; rather, it is tied to the fate of their claim for statutory fraud. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019). Plaintiffs state in their opening brief that their "claims for damages under the ICFA, unjust enrichment, both under Illinois law and the law of other similar state statutes, survived" defendants' motion to dismiss. (Pls.' Mem. Supp. Mot. at 2.) The only other mentions of unjust enrichment in their briefs are two oblique references to the existence of common questions about whether plaintiffs conferred benefits on defendants by purchasing NUK pacifiers and whether it was unjust for defendants to retain those benefits. (*Id.* at 10.) Plaintiffs fail to clearly state whether they are seeking class treatment for their unjust-enrichment claims. That is curious. This issue has been on the horizon since the Court ruled on defendants' motion to dismiss and indicated that class certification is the appropriate stage to address defendants' argument that the law of unjust enrichment varies too much from state to state to be amenable to adjudication on a nationwide basis. (ECF No. 58, Mem. Op. & Order at 6.) In any event, due to plaintiffs' failure to develop any argument as to class treatment of their unjust-enrichment claims (whether for a Multi-State or Illinois class) or to offer any proposal for how such a class would be managed in conjunction with the proposed consumer-protection class, the issue is waived for purposes of the instant motion. Any class certification accordingly will not include unjust enrichment. The Court is aware of its discretion to fashion subclasses as needed, but plaintiffs' treatment of their unjust-enrichment claims is far too cursory to enable or warrant any such undertaking. *See Suchanek v. Sturm Foods, Inc. ("Suchanek II")*, 311 F.R.D. 239, 253 (S.D. Ill. 2015) ("Simply put, to the extent that Plaintiffs are seeking certification of an unjust enrichment claim, it is denied because the parties did not sufficiently address class treatment of that claim.").

Supreme Court held that "predominance is a test readily met in certain cases alleging consumer fraud[.]'" *Suchanek v. Sturm Foods, Inc.* (*"Suchanek I"*), 764 F.3d 750, 760 (7th Cir. 2014) (internal punctuation omitted) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "In determining whether to certify a consumer fraud class, the court should begin with a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Id.* (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

In *Suchanek I*, a consumer-fraud case in which plaintiff alleged that defendant deceived consumers by telling them that its coffee pods contained freshly ground coffee when at most five percent of the pod did so, and by concealing the fact that the product was overwhelmingly instant coffee, the Seventh Circuit determined that the answer to this question was yes. *Id.* Citing the report of plaintiff's damages expert, the court explained that the plaintiff's damages "might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the pods contained real coffee grounds)." *Id.* Here, the answer is also yes. With regard to common proof of damages, plaintiffs rely on the expert opinion of Jean-Pierre H. Dubé, the Sigmund E. Edelstone Professor of Marketing at the University of Chicago Booth School of Business ("Booth"). Dubé has a B.Sc. in quantitative methods in economics and a Ph.D. in economics. He has been on the faculty at Booth for twenty-one years and has taught MBA and executive courses on digital marketing strategies, pricing strategies, category management for retailers, and marketing analytics and big data, and a Ph.D.-level course in advanced quantitative marketing. Dubé is also the director of Booth's Kilts Center for Marketing, which serves as the official distributor of Nielsen's Consumer Packaged Goods ("CPG") databases for academic use worldwide; these databases include household purchases and store-level sales and marketing data for CPGs like the pacifiers in this case. Dubé has published forty articles, mostly in scientific marketing and economics journals, and his scientific research focuses on topics related to consumer demand for branded goods (on the demand side) and pricing, advertising, and branding decisions (on the supply side). (ECF No. 110-2, Expert Report of Professor Jean-Pierre H. Dubé, at ECF Page Nos. 4-5.)

Dubé states in his report:

> I have been advised by counsel for Plaintiffs that individuals purchased Defendant[s]' NUK [] brand pacifiers (together, "the Challenged Products") which were labeled throughout the class period as "Orthodontic" ("the Challenged Claims").
>
> . . .
>
> Counsel for Plaintiffs asked me to provide an expert opinion on whether a method exists to determine economic damages in this case on a classwide basis using common evidence for the Challenged Claims.
>
> It is my opinion that it is possible to determine classwide economic damages in this case using Conjoint Analysis. . . .
>
> . . .
>
> I will use a choice-based conjoint analysis to measure the impact of the Challenged Claims and several other pacifier product features on demand for pacifiers. The conjoint analysis (hereafter "Conjoint Analysis") will control for the

> marketplace realities of competitors to the Challenged Products with different product features and different prices. Therefore, the analysis will control for the supply-side of the market.
>
> The Plaintiffs' theory of liability comprises two sources of economic damages in this case:
> i. A Price Premium associated with the Challenged Claims on the labels of the Challenged Products; and
> ii. Consumers' perceived benefits associated with the Challenged Claims on the labels of the Challenged Products.
>
> I will use the results of the Conjoint Analysis to compute both these sources of economic damages. The Conjoint Analysis will provide the necessary consumer demand measurements required to conduct a market-place simulation to measure the price premium. This price premium will account for the oligopoly price competition between the Defendants and competitors on the supply side of the market.
>
> The Conjoint Analysis will also provide the necessary consumer preference measurements to determine willingness-to-pay, the microeconomic measure of total incremental classwide economic value from the benefits associated with the Challenged Claims on the labels of the Challenged Products.
>
> Based on my analysis of market data and other marketing documents made available through discovery, I have determined that Conjoint Analysis is well-suited to the facts of this case and will successfully isolate the economic damages associated with the Challenged Claims. I base this conclusion on my past academic experience with the use of Conjoint Analysis to determine demand and market prices for CPG products like the ones in this case, and my professional experience using Conjoint Analysis to advise companies on how to set their prices, including CPG firms.

(*Id.* ¶¶ 1-3, 14-18.) In his report, Dubé goes on to explain the sources of economic damages to consumers. He begins with the assumption that defendants' claims about their pacifiers are false, and states that under that assumption, the economic damages to consumers who purchased the products consist of the two components mentioned above, a Price Premium and Willingness-to-pay ("WTP"). (*Id.* ¶¶ 19-20.) The Price Premium "measures the extent to which all Class Members overpaid because of the extent to which Defendants could inflate their market price due to the Challenged Claims." (*Id.* ¶ 21.) Dubé sets out how he will compute the Price Premium, which involves conducting a marketplace simulation of the oligopoly market in which defendants and their main competitors compete on prices. (*Id.* ¶¶ 21-23.) The second component, WTP, "consists of the incremental economic value to Class Members from the benefits they associate with the Challenged Claims on the labels of the Challenged Products." (*Id.* ¶ 24.) After describing his methodology in detail, Dubé states that the features of a choice-based conjoint analysis provide "the necessary consumer demand inputs required to measure economic damages," as well as the ability to "predict real marketplace choices." (*Id.* ¶ 71.)

As plaintiffs indicate, price-premium damages calculations based on conjoint analysis designed to isolate the portion of the payment attributable to a misrepresented product feature have been accepted by several courts. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14 C 5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017) (citing cases) ("A damages calculation that reflects the difference between the market price of the product as represented and as delivered is neither novel nor problematic from a class certification perspective."). Defendants nonetheless characterize Dubé's proposed analysis as "an incomplete and untested methodology that is full of holes and uncertainty." (Defs.' Opp'n Pl.'s Mot. at 27.) Their primary criticisms stem from the fact that Dubé has not yet conducted the conjoint analysis or performed the tasks it entails. This argument misses the mark because plaintiffs' burden at this juncture is not to prove their case; as to this component of predominance, it is to show that there is a method of estimating damages that applies class-wide and that method measures damages attributable to plaintiffs' theory of liability. *Suchanek I*, 764 F.3d at 760; *Comcast*, 569 U.S. at 35. Plaintiffs have carried that burden. Dubé discusses his proposed conjoint analysis in detail, and it appears to be feasible and tied to plaintiffs' theory of liability that NUK pacifiers are not actually

orthodontic or suitable for use by children who are older than 24 months, whereas defendants' criticisms of the model are off base[5] or asserted only superficially.[6]

Given that damages can be estimated class-wide, the Court moves on to the remaining predominance and superiority considerations under Rule 23(b)(3). These inquiries "deal with the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit." *Suchanek I*, 764 F.3d at 760 (internal punctuation and citation omitted). "Thus, the court needs to assess the difficulty and complexity of the class-wide issues as compared with the individual issues. The class issues often will be the most complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." *Id.* Plaintiffs argue that class-wide objective issues and questions focusing on defendants' conduct are the driving issues that predominate over individual ones and that class-action treatment is the superior way to litigate their claims. The Court agrees. The central issue in the case is whether defendants' packaging and marketing was likely to mislead a reasonable consumer. According to defendants' Rule 30(b)(6) witness, Melissa Wolf, defendants sold

---

5 For instance, defendants contend that "[w]hat little [Dubé] has done shows he has no method for understanding what 'orthodontic' means to consumers." (Defs.' Opp'n Pls.' Mot. at 27 (emphasis omitted).) Yet that topic is not Dubé's province. His report relates to a class-wide damages model that proposes to isolate the effect of the alleged misrepresentations, while the report of plaintiffs' other expert, Dr. Dennis, pertains to defendants' use of the term "orthodontic," as discussed below.

6 Defendants simply present a list of considerations for which they assert Dubé has "no method," including addressing the results of defendants' market research and "NUK's pacifier design change in 2018 and packaging changes over time." (Defs.' Opp'n Pls.' Mot. at 27.) The upshot is unclear because defendants do not develop any argument as to why these considerations undermine Dubé's proposal for measuring damages on a class-wide basis. In a similar vein, while defendants submit the reports of their two rebuttal experts (who, unsurprisingly, are critical of Dubé) and cite several paragraphs of those reports, they fail to integrate their experts' discussions or conclusions into their legal argument, nor do they truly engage with Dubé's proposed methodology. It is not the Court's job to sift through the rebuttal reports and construct defendants' legal arguments for them. *See SEC v. Nutmeg Grp., LLC*, No. 09 C 1775, 2017 WL 1545721, at *9 (N.D. Ill. Apr. 28, 2017) (stating that skeletal presentations that cite an expert report "impermissibly shift[] the responsibility to the court to do the lawyer's work and to explicate the arguments that the briefs have left undeveloped"). The Court will note that Dubé does address defendants' market research and explains why he believes those data are marked by "inconsistencies and anomalies" and thus "unreliable." (Dubé Report at ECF Page Nos. 14-18.) Plaintiffs have also submitted a declaration by Dubé in which he responds to the criticisms of defendants' experts. As for "packaging changes over time," those changes do not appear to be material; although defendants in 2017 ceased using a representation about "healthy oral development," the label "orthodontic" continued to appear, as well as the age-range designations, and those are the representations plaintiffs allege to be false and/or misleading. Defendants further contend in a single sentence that Dubé's methodology does not measure only those damages attributable to plaintiffs' theory of liability, (Defs.' Opp'n Pls.' Mot. at 28), but they also fail to elaborate on this argument and therefore waive it.

pacifiers uniformly labeled as "orthodontic" and bearing age-range designations. (ECF No. 108-1, Dep. of Melissa Wolf at 48, 59-61.) Proving plaintiffs' allegations of consumer fraud will be complex and costly; it will require expert testimony on the effect of pacifier use on children's oral development. That proof, of which no rational individual plaintiff would be willing to bear the cost, can be offered on a class-wide basis.

Plaintiffs also demonstrate that they can prove materiality on a class-wide basis; the claims of every class member will rise or fall on the resolution of the question of whether defendants' packaging was likely to deceive a reasonable consumer. This inquiry involves the use of survey evidence, which is likewise costly. Plaintiffs submit the report of Dr. J. Michael Dennis, a Senior Vice President with the National Opinion Research Center ("NORC") at the University of Chicago who leads NORC's online panel survey research business. (ECF No. 108-5, Decl. & Expert Report of J. Michael Dennis, Ph. D., at 2.) Dennis has more than twenty years' experience designing and conducting surveys "about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens." (*Id.*) He has conducted more than twenty consumer surveys in the litigation context, including consumer-perception surveys. (*Id.* at 3-4.) Dennis states in his report that he was asked to "design, conduct, and report on a reliable consumer survey" to include "two measurements." (*Id.* at 6.) First, Dennis was asked to measure "the extent to which (if at all) consumers understand the Products['][7] packaging to communicate that the Products help promote healthy oral development and are safe and beneficial for children over the age of 24 months." (*Id.*) Second, he was asked to measure "the extent to which (if at all) the aforementioned dental health benefits were material to a reasonable consumer's purchase decision." (*Id.*) Dennis states that he designed and conducted a consumer survey by creating a sampling plan designed to survey respondents who would represent the target population of nationwide and Illinois purchasers; researching and considering defendants' packaging and market research; testing the survey through cognitive interviews and pretests with research subjects; retaining a survey vendor to program and execute the survey and administer it to purchasers of pacifier products; compiling the interview data and reviewing it to assess its quality; and creating his report. (*Id.* at 6-7.) In his report, Dennis discusses in detail his methodological considerations; his survey questionnaire; and the representativeness of his sample. (*Id.* at 9-24.) The survey randomly assigned respondents to one of four conditions—three that corresponded to one of the age-specific pacifiers and one that was a "referendum" question designed to measure the materiality of the "orthodontic" descriptor. The questionnaire for the first three survey conditions displayed defendants' pacifier packaging (disguised to remove the brand name and branding elements) and included questions about respondents' expectations of the pacifiers based on various descriptors on the packaging ("silicone," "orthodontic pacifier," and "BPA free"). The referendum condition asked about consumer preference for the "orthodontic" claim. Dennis concluded from his survey that (1) over 90 percent of consumers perceived the "orthodontic" claim on the pacifiers to mean that the pacifiers will promote healthy oral development and are safe and beneficial for children over the age of 24 months, and (2) the "orthodontic" claim was material to their decisions to purchase defendants' products. (*Id.* at 25.)

---

[7] Dennis states that by "Products," he means "Defendants' pacifier products having the 'Orthodontic' descriptor" and that, based on Wolf's testimony, he understands that "all the Defendants' Products display the 'Orthodontic' claim." (Dennis Report at 6 n.1.)

In response, defendants assert that there are significant individualized issues regarding "interpretation of" their packaging. Defendants contend that the named plaintiffs' own testimony undermines their theory of deception in that plaintiffs stated at their depositions that they understood that the term "orthodontic" refers to the shape of a NUK pacifier nipple (also known as a "baglet"). But defendants rely on selective quotation. Neither Benson nor Caparelli was asked whether she understood that the term "orthodontic" referred *exclusively* to the shape of the baglet, and it is clear from the rest of their testimony that they purchased defendants' pacifiers based on their belief that the term is a claim that NUK pacifiers promote healthy oral development. (ECF No. 115-5, Dep. of Shelly Benson at 54, 58-60; ECF No. 115-6, Dep. of Lisa Caparelli at 38, 78, 88-89.) Furthermore, as plaintiffs point out, defendants' argument disregards the fact that the question of whether NUK packaging was likely to mislead a reasonable consumer is an objective question, "not one that depends on each purchaser's subjective understanding of the package."[8] *See Suchanek I*, 764 F.3d at 758. In addition, defendants' discussion of Dennis's survey consists of just two sentences: "Plaintiffs rely entirely on an internet survey their expert conducted, without any control group and providing minimal context, where he asked exclusively leading, closed-ended, binary questions designed to reach a particular result supporting Plaintiffs' theory. This result-oriented survey conducted for litigation is flawed for many reasons identified by Defendants' expert, Sarah Butler (*see* Ex. 12), but most importantly it is simply contradicted by the real-world evidence, Plaintiffs' own testimony and NUK's market research." (Defs.' Opp'n Pls.' Mot. at 24.) Defendants fail to incorporate their expert's discussion into their legal argument. Again, it is not the Court's function to connect the dots for defendants. Their undeveloped

---

8 Defendants suggest that this case is akin to *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 747 (7th Cir. 2008), and *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006), in that there is no "real-world evidence [in the form of consumer complaints] that others actually" share the named plaintiffs' grievances. (Defs.' Opp'n Pls.' Mot. at 24.) The Court disagrees. The plaintiff in *Thorogood* complained that defendant's having imprinted the words "stainless steel" on its clothes-dryer drums was misleading in the sense that it implied, without more, that the drum was 100 percent stainless steel because otherwise it might rust and cause rust stains on clothes. In the Seventh Circuit's view, the idea that the other putative class members shared Thorogood's "idiosyncratic" understanding of defendant's use of the "stainless steel" imprint was, "to put it mildly, implausible." 547 F.3d at 747-48. In *Oshana*, the plaintiff complained that the Coca-Cola Company deceived Diet Coke consumers by failing to disclose that fountain Diet Coke contained saccharin and bottled Diet Coke did not, but the claim was not based on any particular Coca-Cola advertisement during the relevant time period. In contrast, plaintiffs' claims in the instant case are straightforward—that defendants' representations are misleading on their face—and based on specific uniform product labeling that NUK pacifiers are "orthodontic" and suitable for the age range stated on the packaging. Plaintiffs have also submitted survey evidence as to the materiality of the representations. And, given the nature of the alleged misrepresentations, it does not seem particularly significant for present purposes that plaintiffs do not submit evidence of consumer complaints and defendants say that there was just one relevant consumer inquiry about "open bites." One would not expect a slew of relevant consumer complaints because the alleged problem is not one that would necessarily become apparent simply by using pacifiers in the "real world," and it is highly unlikely that an individual consumer would have the resources or ability to determine on their own that a NUK pacifier is not orthodontic or suitable for use by children older than 24 months.

criticism of Dennis's survey goes to its weight at the merits stage and does not alter the Court's conclusion that plaintiffs can use common proof to establish materiality.

Defendants also maintain that there are significant individualized issues regarding "exposure to" NUK packaging. (Defs.' Opp'n Pls.' Mot. at 22-23.) Within their "ascertainability" argument, defendants characterize this issue as one of overbreadth of the proposed classes. (*Id.* at 21.) They argue, without citation, that "[t]he record reflects that consumers can and do purchase NUK's pacifiers without viewing either 'orthodontic' or '18-36 m.'" (*Id.* at 22.) There are two issues here: (1) whether defendants' packaging consistently used the representations; and (2) whether online purchasers see an image of the package. As to the first issue, defendants acknowledge that their Rule 30(b)(6) witness stated that NUK packaging has "always been consistent" in using the "orthodontic" representation, (Wolf Dep. at 60), but they note that plaintiff Benson testified at her deposition that she recalled seeing NUK pacifiers at Wal-Mart that "did not say orthodontic on them." (*Id.* at 21.) The Court agrees with plaintiffs' observation in reply that it is "telling" that defendants do not identify or submit "a single exemplar of product packaging where the representation 'orthodontic' is not used." (ECF No. 122, Pls.' Reply at 9 n.16.) If such evidence existed, defendants undoubtedly would possess it. Benson's recollection by itself does not persuade the Court that the proposed classes include "a great number of members who for some reason could not have been harmed by" the defendant's allegedly unlawful conduct, as the Seventh Circuit put it in *Suchanek I*. *See* 764 F.3d at 758. On the second issue, defendants argue, without citation, that online purchasers of pacifiers might not see images of product packaging. (Defs.' Opp'n Pls.' Mot. at 22 (emphasis added).) Attached to the rebuttal report of defendants' expert, Sarah Butler, are a few examples of certain retailers' online listings of defendants' products that do not depict the product packaging. (ECF No. 115-12, Dep. of Sarah Butler, Ex. C.) Nonetheless, nearly all of the examples use the "orthodontic" descriptor, and all of them use age-range descriptors, so the Court is not persuaded by this limited evidence that there is a reason to believe that there are a great number of members in the proposed class that *could not* have been harmed (as opposed to those who *were not* harmed).

Next, defendants make much of the individual inquiries as to reliance and causation that will be required. But in *Suchanek I*, the Seventh Circuit minimized such concerns in the consumer-fraud context, stating that "if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation." 764 F.3d at 759-60 ("Every consumer fraud case involves individual elements of reliance or causation. [A] rule requiring 100% commonality would eviscerate consumer-fraud class actions."). The Court is not convinced by defendants' attempt to distinguish *Suchanek I* on the ground that it involved a "worthless or defective" product, whereas in this case plaintiffs do not dispute that NUK pacifiers "worked" by "effectively perform[ing] their function of soothing and calming Plaintiffs' babies." (Defs.' Opp'n Pls.' Mot. at 25.) The product in *Suchanek*, however, was neither worthless nor defective; there was no claim that defendants' coffee pods could not be used to make coffee or that they malfunctioned when used in coffee-pod machines. Rather, the claim was that the pods were deceptively marketed as containing freshly-ground coffee when they actually contained mostly instant coffee. Here, plaintiffs acknowledge that NUK pacifiers were effective in pacifying their children, but they allege that defendants' marketing misled them into believing that the pacifiers promote healthy oral development. In both cases, the claim is that consumers are deceived about the nature of the product. *See Suchanek I*, 764 F.3d at 761 ("The named plaintiffs in our case

allege that Sturm deceived consumers by telling them that the [coffee] pods contained freshly ground coffee, when at most 5% of the pod did so, and by concealing the fact that the product was overwhelmingly instant coffee. In fact, the substance of this claim is quite similar to the behavior at issue in *POM Wonderful LLC* [*v. Coca-Cola Co.*, 573 U.S. 102 (2014)], in which the Court upheld the right of POM to bring an action for deceptive practices against Coca-Cola under the Lanham Act . . . complaining about Coca-Cola's labeling of a juice product as 'pomegranate-blueberry' even though the product actually contained only 0.3% pomegranate juice and 0.2% blueberry juice."). The *Suchanek I* analysis is directly on point. In light of the difficulty and complexity of the class-wide issues, the need for individualized proof on causation and reliance does not support the denial of class certification. *See Suchanek II*, 311 F.R.D. at 259-60 ("Proximate causation and reliance are simpler issues than the issue of liability, and the information needed to prove them is more accessible to individual litigants than the information needed to prove liability. That's because each class member can simply state for himself that, based on [the product's] packaging, he mistakenly believed [the product] was ground coffee, and he purchased it as a result of that mistaken belief.") (citation omitted).

The Court moves on to the matter of ascertainability. This requirement is satisfied here because the Class and Subclass are not defined vaguely or in terms of success on the merits, and they are not based on subjective criteria; they identify a particular group of people (purchasers of NUK pacifiers) allegedly harmed in a particular way (defrauded by defendants' labels and marketing materials) during a specific time period in particular geographic areas. *See Mullins*, 795 F.3d at 660-61, 672 (stating that class definitions satisfy the ascertainability requirement when they are defined clearly, with objective criteria, and do not depend on defendant's liability). Defendants nevertheless assert that the proposed Subclass of persons who purchased NUK pacifiers for use by a child 24 months or older are not ascertainable because plaintiffs have no "viable method" for identifying those purchasers. (Defs.' Opp'n Pls.' Mot. at 18.) For this proposition, defendants rely on a single decision, *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574 (N.D. Ill. 2014). In *Langendorf*, the district court stated that, in addition to defining a proposed class clearly and by reference to objective criteria, "the plaintiff must propose a method for ascertaining class members with some evidentiary support that the method will be successful." *Id.* at 578-79 (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)).

Defendants fail, however, to acknowledge the Seventh Circuit's 2015 decision in *Mullins*,[9] in which the Court of Appeals expressly rejected this "new" and "heightened" component to the ascertainability requirement "that goes beyond the adequacy of the class definition itself" in requiring a plaintiff "to show a reliable and administratively feasible way to determine whether a particular person is a member of the class." 795 F.3d at 661. The Seventh Circuit noted that *Carrera*, which the *Langendorf* court relied on, and similar decisions "have given four policy

---

[9] Defendants' counsel's reliance on *Langendorf*, a district-court decision, while failing to address *Mullins*, a Seventh Circuit decision that came after *Langendorf* and undercuts its treatment of ascertainability, is disappointing. *Mullins* is directly adverse to defendants' position on this issue, and it is cited by plaintiffs in their opening brief and in a number of decisions defendants rely upon in their own brief. "Lawyers are not entitled to ignore controlling, adverse precedent." *Jackson v. City of Peoria*, 825 F.3d 328, 331 (7th Cir. 2016).

reasons for requiring more than affidavits from putative class members," which the Court addressed in detail and found "unpersuasive." *Id.* at 662. Ultimately, the Seventh Circuit concluded that imposing the "stringent" version of ascertainability "does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements." *Id.* It also observed that "the stringent version of ascertainability loses sight of a critical feature of class actions for low-value claims" like the instant claims, where "only a lunatic or a fanatic would litigate the claim individually." *Id.* at 665 (internal punctuation and citation omitted). Some of defendants' "ascertainability" arguments are better addressed by the superiority requirement of Rule 23(b)(3), so the Court has discussed them in that context. The gist of defendants' remaining arguments that the classes are not "ascertainable" stems from the fact that their products are sold through retailers, so they possess no records that would identify individual purchasers or allow for individual notice. Defendants also maintain that without the retention of receipts from pacifier purchases, which is unlikely in most instances, "[t]here is no possible way" consumers can distinguish pacifiers they purchased from those that were received as gifts or free samples or determine whether they purchased them for use by a child older than 24 months. (Defs.' Opp'n Pls.' Mot. at 18-20.) The Court is unpersuaded. When individual notice to class members is not possible, "courts may use alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members." *Mullins*, 795 F.3d at 665 (affirming certification of class of dietary-supplement purchasers); *see also Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1030 (7th Cir. 2018) (stating that individualized inquiries in a consumer-fraud class of software purchasers "could be handled through streamlined mechanisms such as affidavits and proper auditing procedures") (internal punctuation omitted). The concern about consumers who received a pacifier as a gift or a sample is a red herring. The Class and Subclass include only *purchasers* of pacifiers, and the Court does not share defendants' skepticism of class members' powers of recollection, especially in light of the Seventh Circuit's holding in *Mullins* that a district judge "has discretion to allow class members to identify themselves with their own testimony and to establish mechanisms to test those affidavits as needed."[10] 795 F.3d at 669. Identification of class members in this case can take place at the claims-administration stage through self-identification in sworn affidavits or claim forms.

Ultimately, the Court concludes that class-wide resolution would substantially advance this case. The final disputed issue is the geographical scope of the class. Plaintiffs contend that while the consumer-protection laws of Illinois, California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington are not identical, they are sufficiently similar to allow for certification of a Multi-State Class and Subclass. Plaintiffs submit a chart outlining various aspects of the ten states' laws in which they note that each state's law provides a private right of action, uses a reasonable-consumer standard, and allows for remedies in the form of actual damages or monetary relief. (ECF No. 105-1, Ex. 2 to Decl. of Melissa S. Weiner.) The chart includes columns pertaining to reliance, materiality, and scienter. Plaintiffs also cite decisions in which these states' consumer-protection laws were found to have sufficient common characteristics as to liability such that multi-state class treatment was appropriate. *See, e.g.*,

---

[10] In *Mullins*, the Seventh Circuit assumed that the defendant had "no records for a large number of retail customers" and that "many consumers of [the product at issue were] unlikely to have kept their receipts" since it is a "relatively inexpensive consumer good." 795 F.3d at 661.

*Mullins v. Direct Digital, LLC*, No. 13 C 1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014) (certifying a multi-state consumer-protection class of purchasers in the same ten states), *aff'd*, 795 F.3d 654 (7th Cir. 2015); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 157 (N.D. Ill. 2017) (certifying a multi-state consumer-protection class of purchasers in Illinois, California, Missouri, New Jersey, and New York); *Suchanek II*, 311 F.R.D. at 264 (on remand, certifying a multi-state consumer-protection liability class that included purchasers in Illinois, California, New Jersey, and New York).

Defendants contend that variations in these states' laws will render the Multi-State Class unmanageable,[11] and they submit a chart of the statutes that contains more detail than plaintiffs'. The chart includes additional information such as the specific prohibited conduct, as well as statutory features like causation, required injury, and miscellaneous requirements. (ECF No. 115-14, Ex. 14 to Decl. of David C. Scott.) Defendants also present a laundry list of what they deem "outcome-determinative" variations among the statutes. (Defs.' Opp'n Pls.' Mot. at 29-30.) This list is unhelpful because defendants do not explain why the variations are material; it is simply stated in a conclusory fashion that they "render class certification entirely improper here." (*Id.* at 30.) The Court is not persuaded. For instance, defendants state that in California, a presumption of reliance by absent class members does not arise "if class members were exposed to different information." (*Id.*) But plaintiffs have demonstrated that class members were exposed to largely uniform product packaging and labeling. Defendants also conclusorily assert that the statutes "vary" as to materiality standards, "vary widely" in defining deceptive conduct, and "vary substantially" as to remedies and the statute of limitations. (*Id.*) These variations appear to be distinctions without a difference, and the Court declines to construct any legal arguments for defendants on the materiality of these differences. What is important for class-certification purposes, and what plaintiffs have demonstrated, is that all of the ten states' statutes require proof (which is common here) that the deceptive conduct at issue was likely to mislead a reasonable consumer. *See Suchanek I*, 764 F.3d at 756 (stating that the "same legal standards govern every class member's claim" where each of the applicable consumer-protection laws could be satisfied by proof that a statement was literally false or likely to mislead a reasonable consumer). If it turns out down the road that there is a certain unique statutory feature that requires purchasers in that state to be treated separately, that issue can be handled by creating another subclass. But defendants have not demonstrated at this juncture that any particular state-based subclass is warranted.

---

[11] In conjunction with this argument, defendants state in a footnote that "[m]ultistate classes also fail for lack of personal jurisdiction" and that while defendants "acknowledge" *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 443 (7th Cir. 2020) (holding that the restrictions on the exercise of personal jurisdiction set forth in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), do not apply to nationwide class actions filed in federal court under a federal statute), they "submit it is limited to class actions under federal statutes, not state law claims." (Defs.' Opp'n Pls.' Mot. at 30 n.8.) These contentions are undeveloped, so the Court will not address them except to say that it sees no reason why the reasoning underlying *Mussat* would not "appl[y] just as well to state law claims." *Freeman v. MAM USA Corp.*, No. 20 C 1834, 2021 WL 1103350, at *6 (N.D. Ill. Mar. 23, 2021).

For clarity, the Court thinks it best to revise the definitions of the Multi-State Class and Subclass to substitute the actual states for the phrase "or any state with similar laws." Therefore, the Multi-State Class, as certified, is as follows: "All persons who purchased in the State of Illinois, California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington any of the NUK-branded Orthodontic Pacifiers, within the applicable statute of limitations, until the date notice is disseminated." The Multi-State Subclass, as certified, is as follows: "All persons who purchased in the State of Illinois, California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington any of the NUK-branded Orthodontic Pacifiers, within the applicable statute of limitations, for use by a child 24 months or older until the date notice is disseminated."

## CONCLUSION

Plaintiffs' motion for class certification [103] is granted. A telephonic status hearing is set for December 8, 2021, at 10:45 a.m. to discuss the next steps in the case. The Clerk of Court is directed to amend the case caption to correct the spelling of the second plaintiff's name to Lisa Caparelli.

**DATE:** November 16, 2021

**Hon. Ronald A. Guzmán**
**United States District Judge**