**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHELLY BENSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 19-cv-06836 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| NEWELL BRANDS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Shelly Benson and Lisa Caparelli bring this action on behalf of a certified class of consumers who purchased pacifiers manufactured, marketed, distributed, and sold by Defendants Newell Brands, Inc. and Graco Children's Products Inc. (collectively, "Defendants" or "NUK")[1]. Specifically, Plaintiffs allege that Defendants engaged in a deceptive and misleading marketing campaign by advertising their pacifiers as "orthodontic." Now before the Court are Defendants' motion to decertify the multi-state class (Dkt. No. 244), motion for summary judgment (Dkt. No. 229), and motions to exclude three of Plaintiffs' experts (Dkt. Nos. 233, 236, 240). For their part, Plaintiffs have moved to exclude two of Defendants' experts (Dkt. Nos. 217, 223). For the reasons stated below, the motions are all denied.

## BACKGROUND

### I.    Factual Background

The Court recounts the following facts drawn from the parties' submissions pursuant to Local Rule 56.1. With respect to Defendants' summary judgment motion, the Court views the

---

[1] Graco Children's Products Inc. was substituted for NUK USA LLC as a defendant after NUK USA LLC merged with Graco Children's Products. (*See* Dkt. Nos. 211, 213.)

facts in the light most favorable to Plaintiffs as the non-moving parties. *See Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

NUK was founded in the 1950s when two German dentists invented the first pacifier called "orthodontic." (Pls.' Resp. to Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J ("PRDSMF") ¶ 1, Dkt. No. 255.) Today, Defendants maintain a patent for the unique NUK pacifier nipple that is "shaped orthodontically, i.e. is adapted to the shape of the oral cavity." (*Id.* ¶ 3.) The shape of a NUK pacifier nipple is asymmetrical, angled, and flatter than conventional round pacifiers and includes integrated channels. (*Id.* ¶ 4.) Although NUK pacifier packaging has changed over time, NUK pacifiers have always been labeled or marketed as "orthodontic" in the United States. (*Id.* ¶ 10; Defs.' Resp. to Pls.' Statement of Additional Material Facts in Opp'n to Defs.' Mot. for Summ. J. ("DRPSAF") ¶ 6, Dkt. No. 292.) Below is an example of such packing:



(PRDSMF ¶ 4.)

Class representatives Shelly Benson and Lisa Caparelli are both residents of Illinois. (PRDSMF ¶ 17.)[2] Benson used pacifiers for her daughter from birth until her daughter was 30 months old. (*Id.* ¶ 19.) Although Benson originally purchased a pacifier with a round nipple, which her daughter would not accept, Benson eventually purchased a NUK pacifier. (*Id.* ¶¶ 20–

---

[2] There are no named plaintiffs from any of the other nine states in the certified multi-state class. (PRSDMF ¶ 17.)

21.) NUK pacifiers soothed her daughter and fit better in her daughter's mouth. (*Id.* ¶ 22.) After switching to NUK pacifiers, Benson used them exclusively. (*Id.* ¶ 22–23.) She testified that she chose NUK pacifiers because "on the packaging like it says like helps soothe baby, helps calm baby, orthodontic pacifier. So then I thought orthodontic, dental, its [*sic*] safe for her to use." (DRPSAF ¶ 15.) When asked whether she understood the term "orthodontic" to refer to the shape of the nipple, Benson testified, "Yes. And then it was saying that it's safe for oral development. And so I put the two together, that I thought the shape of it wouldn't interfere with her teeth development." (*Id.* ¶ 16.) According to Benson, she understood an "orthodontic" product to mean that "it is safe for oral development" and that "the shape, it fits in the mouth so that it won't interfere with teeth development or growth." (*Id.* ¶ 17.)

Caparelli used pacifiers for her son from birth until he was 54 months old. (PRDSMF ¶ 27.) For the first six months of her son's life, Caparelli used silicone pacifiers with a round nipple. (*Id.* ¶ 28.) She then switched to NUK pacifiers and used them exclusively until her son was 54 months old. (*Id.* ¶ 29.) Caparelli testified that she switched to NUK pacifiers because she "saw the packaging and it led me to believe that this was the best pacifier. With many different pacifiers and the amounts of money and from what this packaging said, orthodontic and the reasons, that it was orally better for him to have." (DRPSAF ¶ 18.) And she continued to use and purchase NUK pacifiers for four years because they worked well in soothing her son. (PRDSMF ¶ 32.) Because NUK pacifiers performed their function, and she and her son were happy with them, Caparelli did not consider purchasing a different brand of pacifiers. (*Id.* ¶ 33.)

Benson and Caparelli now claim that the "orthodontic" descriptor on Defendants' pacifiers misled them and other consumers into believing that the pacifiers would promote oral development. Maintaining that the pacifiers do not in fact promote oral development, Plaintiffs

assert that they and other consumers were harmed by Defendants' misrepresentations and paid more than they otherwise would have for Defendants' pacifiers. In support of their case, Plaintiffs intend to offer testimony from various expert witnesses, three of whom Defendants seek to exclude: (1) Dr. Jean-Pierre H. Dubé, a damages expert who opines on the measure of economic damages on a class-wide basis; (2) Dr. J. Michael Dennis, a survey expert who opines on consumer perception and materiality; and (3) Dr. Jeffrey A. Dean, a dental expert who opines on the use of "orthodontic" pacifiers. In turn, Defendants have retained the following experts who Plaintiffs challenge: (1) Dr. Denise Martin, who offers a rebuttal to Dubé's opinion from an economics perspective; and (2) Dr. W. Eugene Roberts, who opines on NUK's use of the "orthodontic" descriptor for its pacifiers.

## II.     Procedural Background

Plaintiffs brought the present action in October 2019.[3] In their amended complaint, Plaintiffs assert claims under (1) the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, (2) the Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq.*, (3) the consumer protection statutes of nine other states,[4] and (4) the common law of unjust enrichment. (Dkt. No. 31.) After Defendants moved to dismiss

---

[3] Judge Ronald A. Guzmán presided over the case from its inception in October 2019 until October 2022, when the case was reassigned to Judge Nancy L. Maldonado. Following Judge Maldonado's confirmation to the United States Court of Appeals for the Seventh Circuit in July 2024, the case was reassigned to the undersigned judge. Most of the prior substantive rulings in this case were issued by Judge Guzman, to whom the Court hereinafter refers as the "predecessor judge."

[4] In addition to the ICFA, Plaintiffs bring claims under the consumer protection statutes of (1) California, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) Florida, Fla. Stat. §§ 501.201, *et seq.*; (3) Massachusetts, Mass. Gen. Laws ch. 93A, §§ 1, *et seq.*; (4) Michigan, Mich. Comp. Laws Ann. §§ 445.901, *et seq.*; (5) Minnesota, Minn. Stat. §§ 325F.68, *et seq.*; (6) Missouri, Mo. Rev. Stat. §§ 407.010, *et seq.*; (7) New Jersey, N.J. Stat. Ann. §§ 56:8-1, *et seq.*; (8) New York, N.Y. Gen. Bus. Law §§ 349, *et seq.*; and (9) Washington, Wash. Rev. Code §§ 19.86.010, *et seq.* (*See* Ex. 2 to Weiner Decl. ("State Claims Chart") at 1–11, Dkt. No. 105-1.)

the first amended complaint, the predecessor judge dismissed Plaintiffs' claims under the UDTPA and Plaintiffs' claims for injunctive relief, the latter based on a lack of standing. (*See* Dkt. No. 58.) Plaintiffs' claims under the ICFA and the consumer protection statutes of nine other states, as well as their claims for unjust enrichment, survived.

Plaintiffs subsequently sought class certification, which was granted in part and denied part. (Class Certification Order at 16, Dkt. No. 126.) Although he declined to allow class treatment of Plaintiffs' claims for unjust enrichment, the predecessor judge certified a multi-state class of consumers ("Multi-State Class") for purposes of the claims under the various state consumer protection statutes defined as follows: "All persons who purchased in the State of Illinois, California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington any of the NUK-branded Orthodontic Pacifiers, within the applicable statute of limitations, until the date notice is disseminated." (*Id.* at 5 n.4, 16.) In addition to the Multi-State Class, the predecessor judge also certified a multi-state subclass based on the purchase of NUK pacifiers for use by children 24 months or older. (*Id.* at 16.) But the parties later filed a joint stipulation decertifying the multi-state subclass. (*See* Dkt. No. 212.) Thus, only the Multi-State Class remains certified.

With discovery concluded, Defendants have moved to decertify the Multi-State Class and for summary judgment. In seeking decertification, Defendants argue that Plaintiffs have failed to establish a class-wide damages model and that Plaintiffs have no common evidence that NUK pacifier packaging is deceptive. With respect to summary judgment, Defendants argue that Plaintiffs have failed to establish that the "orthodontic" descriptor was deceptive or material, and that Plaintiffs cannot show injury or proximate cause. In conjunction with those motions, Defendants challenge the opinions of Plaintiffs' three experts. The Court first addresses the

5

parties' respective *Daubert* motions before turning to the merits of Defendants' motions for decertification and summary judgment.

## DISCUSSION

### I.    *Daubert* **Motions**

Because Defendants' motions for decertification and summary judgment rely in large part on their challenges to the opinions of Plaintiffs' three experts, the Court starts by assessing the admissibility of those opinions. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) ("[W]hen an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion."); *cf. Serrano v. Menard, Inc.*, 671 F. Supp. 3d 877, 883 (N.D. Ill. 2023) (denying the defendant's *Daubert* motion as moot where the court "d[id] not find it essential to rule on [the] defendant's *Daubert* motion before resolving the summary judgment motion").

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotation marks omitted). Accordingly, a district court must engage in a three-step analysis before admitting expert testimony. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Namely, it must assess: (1) "whether the witness is qualified," (2) "whether the expert's methodology is scientifically reliable," and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotation marks omitted). But this gatekeeping responsibility "does not render the district court the trier of all facts relating to expert testimony." *Gopalratnam*, 877 F.3d at 780. Ultimately, "[t]he jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Id.*

While "shaky expert testimony may be admissible, subject to attack on cross-examination," the district court has an obligation to exclude any testimony that crosses the line from shaky to unreliable. *Bielskis*, 663 F.3d at 894 (internal quotation marks omitted). Even so, the party seeking admission of the expert testimony "bears the burden of demonstrating that the expert witness testimony satisfies the [*Daubert*] standard by a preponderance of the evidence." *Gopalratnam*, 877 F.3d at 782. Ultimately, a district court enjoys "wide latitude and discretion . . . when deciding whether to admit or exclude expert testimony. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (internal quotations marks omitted).

### A. Dr. Jean-Pierre H. Dubé

Plaintiffs have retained Dr. Jean-Pierre H. Dubé to provide expert testimony regarding the calculation of class-wide damages. As a preliminary matter, the Court finds Dubé qualified to

opine that topic. Indeed, his qualifications as an expert are not contested by Defendants. Having a B.Sc. in quantitative methods from the University of Toronto and a Ph.D. in economics from Northwestern University, Dubé is a professor of marketing at the University of Chicago Booth School of Business, where he has served on the faculty since 2000. (Dubé Expert Report ¶ 1, Dkt. No. 271-1.) At the university, Dubé has taught MBA, executive, and Ph.D.-level courses on digital marketing strategies, pricing strategies, category management for retailers, and marketing analytics. (*Id.* ¶¶ 2–3.) Additionally, he serves as a faculty research fellow at the National Bureau of Economic Research and an academic trustee for the Marketing Science Institute. (*Id.* ¶ 1.) With over 40 published peer-reviewed articles, Dubé's research focuses on consumer demand for branded goods and firms' pricing, advertising, and branding decisions. (*Id.* ¶¶ 4–5.) As part of his research, he has designed and analyzed various consumer surveys. (*Id.* ¶ 7.) Dubé has opined as an expert in multiple cases concerning deceptive marketing and packaging claims, including cases involving the use of conjoint analysis. (*Id.* ¶ 8.) In sum, the Court finds Dubé qualified to opine as an expert on class-wide damages.

Nonetheless, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In assessing the reliability of an expert's opinion, a court must assess "the validity of the methodology employed by [the] expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). If a court "unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed," the court "usurps the role of the jury, and therefore abuses its discretion." *Id.* at 806. An expert's work is admissible "only to the extent it is reasoned, uses the methods of the discipline, and is founded

on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Overall, a court "enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015).

Here, Plaintiffs retained Dubé to "measure the economic damages in this case on a classwide basis" based on Defendants' use of the "orthodontic" descriptor on their pacifiers. (Dubé Expert Report ¶ 16.) Specifically, Dubé was asked to "isolate the economic damages associated with the use of the term 'orthodontic'" on NUK pacifiers. (*Id.*) His methodology applied conjoint analysis to determine consumer demand for the product and then used marketplace simulation to calculate the price premium attributable to the word "orthodontic." (*Id.* ¶ 17.) The price premium measures the extent to which class members overpaid for Defendants' pacifiers due to the "orthodontic" descriptor on the product. (*Id.* ¶ 24.)

As described by Dubé, conjoint analysis is a common and accepted survey technique that "uses a structural approach whereby consumers' utilities for products are based on their preferences for the underlying product features and prices." (*Id.* ¶ 30.) Choice-based implementation of conjoint analysis "amounts to a simulation of the market conditions implemented through an experimental design," whereby consumers in a survey sample are asked to respond to a sequence of choice tasks, which involve choices between several product alternatives. (*Id.* ¶ 31.) To evaluate the price premium, Dubé applied a methodology that assumed the total number of products Defendants sold in the "but-for world" was the same as the number of products sold in the actual world. (*Id.* ¶¶ 21–22.) Dubé determined that holding the volume of commerce fixed was "appropriate for cases like this as it utilizes actual market prices and the actual quantity of pacifier products sold." (*Id.* ¶ 22.) Based on his analysis, Dubé determined that consumers value the "orthodontic" descriptor on the label of pacifier products,

and that expected demand for the product is substantially reduced when the descriptor is removed from Defendants' labels. (*Id.* ¶ 19.)

In challenging Dubé's methodology, Defendants argue that his survey does not reliably measure relevant market-price damages or reflect real-world products or purchase choices. Specifically, Defendants contend that Dubé's decision to conduct a "fixed supply" simulation does not yield accurate market prices because it ignores willingness to sell. However, Dubé reasoned that keeping supply fixed would "provide[] a more accurate measure of economic damages" if class members were to "switch to a competing pacifier brand or not purchase a pacifier at all" but for the "orthodontic" descriptor on Defendants' packaging. (*Id.* ¶ 22.) Further, he explained that allowing the quantity of pacifiers sold to adjust in the but-for scenario "would be inappropriate because the NUK pacifiers labeled as 'orthodontic' have already been sold in the actual world and the resulting harm to consumers has already occurred." (*Id.* ¶ 27.)

The Court is satisfied that Dubé's choice to keep the volume of commerce constant was reasonable. Multiple courts have permitted conjoint analyses where the survey experts kept supply constant. *See, e.g.*, *Hawes v. Macy's Stores W., Inc.*, No. 1:17-cv-754, 2022 WL 194407, at *6 (S.D. Ohio Jan. 22, 2022) (explaining that "the clear trend in the federal courts cuts against striking [an expert] report" where the *Daubert* motion is "based on an alleged failure to consider supply-side considerations"); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 970 (N.D. Cal. 2018) ("The [c]ourt cannot conclude at this stage that [the expert's] assumption that the supply would have been the same regardless of the change of price within the range of his survey is indisputably wrong." (internal quotation marks omitted)). Moreover, where a conjoint analysis is challenged for purported failure to account for supply-side factors, the "majority" of courts, "at least for class-certification purposes, hold that relying on real-world historical pricing

data suffices to account for supply-side factors in a 'classic mislabeling' case." *Andrews v. Sazerac Co., Inc.*, No. 23-cv-1060 (AS), 2025 WL 1808797, at *10 (S.D.N.Y. July 1, 2025). Likewise, here, Dubé relied on historical market data from a renowned data analytics and market research company, thereby accounting for supply-side factors in his methodology. (Dubé Expert Report ¶ 101.)

Overall, the reasons underlying Dubé's decision to maintain the same number of pacifiers in the but-for world and the actual world are "not so far-fetched as to be indisputably wrong." *In re MyFord*, 291 F. Supp. 3d. at 970. Defendants' attacks on the fixed-supply simulation speak to the weight of Dubé's opinion, not its admissibility. *See Hawes*, 2022 WL 194407, at *6 ("In some cases, courts have held the inclusion or omission of supply-side factors in a class-wide damages model is a question of weight, not admissibility. Either way, the failure to fully reconstruct the supply curve has not routinely been held fatal to experts." (citation omitted)).

Next, Defendants argue that Dubé's survey did not reflect real-world products or purchases choices and therefore lacks reliability. Defendants take issue with the survey's use of textual descriptions, rather than images, of the product packaging, and they criticize Dubé's failure to include additional product features. Where, as here, Dubé was tasked with identifying the price premium associated with a descriptor, the Court does not find his reliance on textual descriptions to be flawed. Moreover, Dubé's report provides plentiful detail regarding his survey design and his choice of product features. (*See* Dubé Expert Report ¶¶ 33–47.) His reasoning for limiting the product attributes was sound, as he explained that "a survey with too many features runs the risk of confusing respondents because they may be unable to internalize all the details presented." (*Id.* ¶ 36.) To the extent Defendants disagree with the survey's design, they "remain[]

free to address those deficiencies through vigorous cross-examination." *Vanzant v. Hill's Pet Nutrition, Inc.*, No. 17 C 2535, 2023 WL 6976988, at *6 (N.D. Ill. Oct. 23, 2023).

Further, Defendants challenge Dubé's testimony on class-wide damages as irrelevant. But Plaintiffs' ability to offer proof on a class-wide basis is central to class certification, as discussed below. Likewise, Dubé's survey speaks to the issue of injury with respect to Plaintiffs' consumer-protection claims. As such, Dubé's testimony may assist the trier of fact in understanding and resolving these pertinent issues.

In sum, the Court finds Dubé's methodology sufficiently reliable and relevant to be helpful to the trier of fact. Accordingly, Defendants' motion to exclude Dubé's expert opinion is denied.

### B.  Dr. J. Michael Dennis

Next, Plaintiffs have retained Dr. J. Michael Dennis as their survey expert to opine on consumer perception and materiality. Although Defendants do not challenge Dennis's qualifications, the Court notes that he appears well-qualified in light of his extensive experience as a survey expert. With a Ph.D. in political science from the University of Chicago, Dennis has served since 2014 as the senior vice president of the National Opinion Research Center at the University of Chicago, where he leads the online panel survey research business. (Dennis Expert Report ¶ 5, Dkt. No. 231-11.) He has more than 20 years of experience designing and conducting surveys "about the opinions, perceptions, attitudes, preferences, and values of consumers," among other demographics. (*Id.* ¶ 4.) Having authored more than 60 articles, papers, and book chapters, Dennis is a frequent speaker on topics regarding public opinion research and serves on a task force for online panels, which publishes recommendations for researchers regarding online surveys. (*Id.* ¶ 6.) In the litigation context, Dennis has designed and conducted more than 20

consumer surveys, several of which have been accepted by various courts. (*Id.* ¶ 10–11.) Since 2002, he has testified on more than 40 occasions as an expert witness. (*Id.* ¶ 13.)

Plaintiffs engaged Dennis to design and conduct a reliable consumer survey to address issues relevant to this litigation. First, Dennis was asked to measure the extent to which, if at all, consumers understand NUK pacifier packaging "to communicate that the [pacifiers] help promote healthy oral development." (*Id.* ¶ 17.) Second, Dennis was asked "to measure the extent to which (if at all) [those] dental benefits were material to a reasonable consumer's purchase decision." (*Id.*) To answer these questions, Dennis conducted a consumer survey, which included a Consumer Perception Survey and a Materiality Survey. (*Id.* ¶¶ 41, 49.)

For the Consumer Perception Survey, Dennis asked the same consumer-understanding questions for three product descriptors: "Silicone," "BPA Free," and "Orthodontic Pacifiers." (*Id.* ¶¶ 46, 55, 56.). To avoid focalism bias, the survey asked about two descriptors ("Silicone and "BPA Free") unrelated to this litigation. (*Id.* ¶ 55.) Specifically, the survey asked respondents about their expectations for the products based on the assigned descriptor. (*Id.* ¶ 56.) For every question, the survey displayed Defendants' pacifier packaging in a disguised manner—with the brand name and branding elements removed, and one of the three descriptors included. (*Id.* ¶ 44.) Two questions asked about "Orthodontic Pacifiers." (*Id.* ¶ 55.) Displaying an image of the product packaging with the "Orthodontic Pacifier" descriptor, the first question asked whether respondents expected that product, "[c]ompared to other pacifier products," would: (1) "Help promote healthy oral development," (2) "Not help promote healthy oral development," or (3) "Not sure/No expectation." (*Id.* ¶ 56.) Displaying the same image as the first question, the second question asked respondents whether they expected that the orthodontic pacifier, "[c]ompared to other pacifier products," would: (1) "Help prevent jaw or teeth

misalignment," (2) "Not help prevent jaw or teeth misalignment," or (3) "Not sure/No expectation." (*Id.*) According to Dennis, these two questions were administered "to test the Plaintiffs' theory of liability that class members understand 'Orthodontic' to mean that the [pacifiers] deliver dental health benefits and/or dental health risk reduction." (*Id.*)

The Materiality Survey was designed as "a test of consumer preference for two products: one with the challenged claim; one without the challenged claim." (*Id.* ¶ 58.) Specifically, the survey presented respondents in the referendum group with a text description of two pacifier products, with no images provided. (*Id.* ¶¶ 59–60.) The two products were described as having the same brand, packaging, product size, and price, not including tax. (*Id.* ¶¶ 59–60.) The only difference between the pacifier products was that one product had the label "Orthodontic Pacifier," while the other did not. (*Id.* ¶¶ 59–60.) Respondents were then asked which of the two pacifier products they would purchase, although respondents also had the option to select "Don't Know." (*Id.* ¶¶ 59–60.)

Based on the results of the Consumer Perception Survey, Dennis found that consumers overwhelmingly perceived the "Orthodontic Pacifier" descriptor to mean the pacifiers would "help promote healthy oral development" or "help prevent jaw or teeth misalignment." (*Id.* ¶ 21.) Therefore, a substantial majority of consumers understood the 'orthodontic' descriptor "to convey dental health benefits and to reduce the risk of jaw or teeth of misalignment." (*Id.*) And based on the Materiality Survey, Dennis found that the "orthodontic" descriptor was material for a substantial majority of consumers, thereby concluding that a reasonable consumer "would attach importance to the challenged 'Orthodontic' claim in determining purchasing behavior of the Defendants' [pacifiers]." (*Id.* ¶¶ 26–27.)

14

In seeking to exclude his opinions and testimony, Defendants assert that Dennis's surveys are irrelevant and unreliable. As to the Consumer Perception Survey, Defendants maintain that the survey has methodological flaws—namely, the inclusion of closed-ended questions and the absence of a control group. From Defendants' perspective, the closed-ended questions are leading and biased. However, the "mere existence" of a closed-ended question "does not render [a] survey inadmissible." *LG Elecs. USA, Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 955 (N.D. Ill. 2009). Importantly, here, Dennis's inclusion of "Not sure/No expectation" as an answer to the survey questions weighs in favor of the survey's reliability. *See, e.g., id.* at 954 (indicating that a survey's inclusion of a "don't know/not sure" option as an answer to an otherwise close-ended question, "in case [the respondents] do not agree with any of the provided choices," helped mitigate concerns about its reliability); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1009 (N.D. Ill. 2010) (finding that a survey's reliability was "significantly compromised by its failure to use open-ended questions or to allow for 'don't know' responses"); *Black & Decker Corp. v. Positec USA Inc.*, No. 11–cv–5426, 2015 WL 5612340, at *19 (N.D. Ill. Sept. 22, 2015) ("'[D]on't remember' is also an option. This is one way that [r]eliable surveys address the problem of respondents guessing as to the right answer." (internal quotation marks omitted)). Dennis included this option so that "respondents having 'non-attitudes' would have an appropriate mechanism to record a no-opinion response." (Dennis Expert Report ¶ 55.) All things considered, the Court concludes that Defendants' attacks on the survey's design go to the weight of the evidence, not its admissibility. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018) ("Courts rarely exclude consumer surveys from evidence, since most 'shortcomings' go to 'the proper weight of the survey' rather than admissibility."). In

this case, the jury "will be free to weigh the utility" of the closed-ended questions. *LG Elecs. USA*, 661 F. Supp. 2 at 954.

Likewise, Defendant's concerns about the absence of a control group speak to the weight of the evidence and not its admissibility. *See, e.g.*, *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts*, LLC, No. 07 CIV. 5804 (GEL), 2009 WL 959775, at *11 n.9 (S.D.N.Y. Apr. 8, 2009) (explaining that assertions of methodological errors in a survey, including "failure to incorporate a control group," "bear exclusively on the weight to be given the survey rather than bearing on an admissibility determination"); *see also Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *3 (N.D. Ill. Mar. 29, 2022) ("[The expert's] reasoning [for not using a control group] is methodologically reliable enough to pass muster at the *Daubert* stage. [The expert's] rationale—that use of a control group . . . would be nonsensical, confuse survey respondents, and yield no meaningful results—is not so scientifically unreliable to be excluded, but goes to the weight to be afford to the results.") Moreover, Dennis implemented certain controls to mitigate the potential effect of respondents' preexisting beliefs. For example, in addition to providing a "Not sure/No expectation" option to avoid bias, Dennis displayed disguised images of the pacifiers, without mention of Defendants' brand, to "prevent respondents from relying on pre-existing attitudes and beliefs about the [p]roducts." (Dennis Expert Report ¶ 37; *see also id.* ¶ 44.)

Defendants' reliance on *In re KIND LLC "Healthy and All Natural" Litigation*, 627 F. Supp. 3d 269 (S.D.N.Y. 2022), where another district court rejected a similar survey designed by Dennis, is unconvincing. Among other things, the circumstances in that case are readily distinguishable from those here. For example, the *KIND* court faulted Dennis for "choos[ing] to display the 'All Natural' claim in isolation, rather than as part of the 'All Natural/Non GMO'

statement, as it always appeared on KIND labels." *Id.* at 288. Because the "All Natural" term always coincided with the "Non GMO" term, Dennis's decision to isolate the "All Natural" claim "undercut[] the relevance of his results." *Id.* By contrast, here, it was necessary for Dennis to isolate the "orthodontic" descriptor for the survey to correspond with Plaintiffs' theory of liability. Moreover, the *KIND* court highlighted how Dennis failed to account for various other interpretations of the "All Natural" claim, which ultimately proved to be an ambiguous term. *Id.* Indeed, even the plaintiffs' own statements "demonstrate[d] the diversity of views about how to understand the term 'All Natural.'" *Id.* at 284. Whereas, here, Plaintiffs have focused on a single understanding of the "orthodontic" descriptor as promoting oral development, and other evidence (as discussed below) supports this understanding.

As for Dennis's Materiality Survey, Defendants likewise dispute its relevance and reliability. For one thing, Defendants maintain that the survey was not designed to test whether the "orthodontic" descriptor affected consumers' purchasing decisions and therefore it does not speak to materiality. The Court is unpersuaded. To be material, a representation must concern information that would have led a buyer to "act[] differently" had they known the information, or it must concern "the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Santiago v. Tesla*, No. 23 CV 2891, 2024 WL 4871350, at *7 (N.D. Ill. Nov. 22, 2024) (quoting *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 595 (Ill. 1996)); *see also Energy Intel. Grp., Inc. v. Constellation Energy Generation, LLC*, 2022 WL 865821, at *4 (N.D. Ill. Mar. 23, 2022) (explaining that a material fact "must be essential to the transaction between the parties" (quoting *Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 54 (7th Cir. 1995))). By asking survey respondents whether they would purchase a pacifier with the orthodontic descriptor or one without it, Dennis's survey tested whether the descriptor's presence

or absence would influence the respondents' purchasing decisions. In other words, Dennis's survey tested whether the descriptor was "important to consumers and, hence, likely to affect their choice of, or conduct regarding [the] product." *LG Elecs. USA, Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 2921633, at *3 (N.D. Ill. July 22, 2010). Therefore, Dennis's Materiality Survey is relevant to the question of materiality.

Furthermore, Defendants fault Dennis's Materiality Survey for producing a scenario that does not reflect a real-world consumer's experience. Specifically, Defendants criticize the survey for holding other attributes of the tested products constant and for only presenting text without providing images of the products. However, Dennis's efforts to disguise the products were intended to eliminate preexisting biases or attitudes associated with the products. (*See* Dennis Expert Report ¶ 37.) And relatedly, like his Consumer Perception Survey, Dennis's Materiality Survey included a "Don't Know" control option to address preexisting biases and mitigate concerns about reliability. *See, e.g.*, *LG Elecs.*, 661 F. Supp. 2d at 954; *Competitive Edge*, 763 F. Supp. 2d at 1009.

Overall, Defendants have not shown that Dennis' methodology is not so shaky as to be unreliable. Their motion to exclude Dennis is accordingly denied.

### C. Dr. Jeffrey A. Dean

Lastly, Plaintiffs have retained Dr. Jeffrey A. Dean as their dental expert. Like Dubé and Dennis, Dean's qualifications are not disputed. Nonetheless, the Court finds him qualified to opine on the dental effects of pacifiers. Dean is a professor of pediatric dentistry and a professor of orthodontics and dentofacial orthopedics at the Indiana University School of Dentistry and Riley Hospital for Children at IU Health in Indianapolis. (Dean Expert Report ¶ 7, Dkt. No. 231-13.) At the university, he has served as a hospital residency program director, chair of the

department of oral facial development, and executive associate dean of the dentistry school. (*Id.*) Having a Doctor of Dental Surgery degree, Dean has also served as a board director and president of the American Board of Pediatric Dentistry and CEO of the American Board of Pediatric Dentistry. (*Id.* ¶ 9–10.) A coauthor and editor of a comprehensive textbook on pediatric dentistry, Dean has contributed chapters to pediatric handbooks and textbooks and published over 50 scientific articles and research abstracts. (*Id.* ¶ 11.) He has expertise in early orthodontic treatment, "which includes treating infants, toddlers, and school aged children to intercept or correct developing malocclusions." (*Id.* ¶ 14.) Beyond his academic work, he maintains an extramural pediatric dentistry and orthodontic private practice. (*Id.* ¶ 15.)

Here, Plaintiffs asked Dean to provide expert opinion testimony on the use of "orthodontic" pacifiers and, specifically, "whether 'orthodontic' pacifiers are known to provide therapeutic or preventive dental bite (occlusal) benefit." (*Id.* ¶ 2) Dean was also asked to provide his opinion on pacifier use after the age of 24 months. (*Id.*) To answer these questions, Dean conducted a research literature review of pacifier uses, benefits, and risks. In doing so, Dean reviewed over three dozen research or research review articles about pacifiers or bad bites, otherwise known as malocclusions. (*Id.* ¶ 21.) His study relied on policy review statements and three main systematic reviews on conventional and "orthodontic" pacifiers. (*Id.* ¶¶ 22, 25.)

Based on his review of the literature and his own experience, Dean concluded that labeling a pacifier as "orthodontic" is "inappropriate, misleading, and not supported by research." (*Id.* ¶ 36.) According to Dean, "no pacifier is orthodontic" because pacifiers "do not promote oral development or prevent bite problems," and the use of the descriptor "wrongly implies healthy oral development or treatment or prevention of dental malocclusions." (*Id.* ¶ 3.) Dean further determined that prolonged pacifier use beyond the age of 18 to 24 months "does not

promote oral development and significantly increases the oral health risk for malocclusions to children." (*Id.* ¶ 37.)

First, Defendants challenge Dean's testimony as unreliable because he did not personally study their pacifiers and instead relied on systematic reviews. However, Dean's reliance on systematic reviews does not render his methodology flawed. For one thing, a systematic review "uses formal search methods to allow a researcher to obtain a neutral 'snapshot' of the existing research on a particular question." *In re Zimmer Knee Implant Prod. Liab. Litig.*, No. 11 C 5468, 2015 WL 5050214, *3 (N.D. Ill. Aug. 25, 2015). "The process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology." *Zarinebaf*, 2022 WL 910638, at *3 (citation omitted). By reviewing the relevant literature, using his experience to interpret that data, and then connecting the data to the facts of the case, Dean applied sound methodology. *See, e.g.*, *Nelson v. Pace Suburban*, No. 17 C 7697, 2022 WL 1401529, at *2 (N.D. Ill. Mar. 21, 2022) (finding that an expert's literature review comparing the factors considered in peer-reviewed journals to the facts of the case was "a clear, replicable method and meets *Daubert*'s requirements"). That the systematic reviews at issue were published and peer-reviewed further supports the soundness of his approach. *See, e.g.*, *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 1283927, at *15 (N.D. Ill. May 2, 2025) ("While [the expert's] literature review was not 'tested' (whatever that would mean in this context) or peer-reviewed, the studies that he analyzed were experiments that were subject to peer review, and his easily replicable review meets the *Daubert* standard."). Insofar as Defendants argue that Dean should have studied their pacifiers directly, this is another instance where Defendants' argument addresses the weight to be afforded the evidence, not its

admissibility, and can be addressed in cross-examination. *See id.* at *2 ("While [d]efendants argue that [the expert's] [literature review] analysis should have utilized in-person interviews and certain psychological tests, that is a matter of weight, not admissibility, and is better left for cross-examination.").

Second, Defendants contest Dean's opinion as irrelevant because he did not address consumer interpretations of the word "orthodontic," nor did he consider Dennis's Consumer Perception Survey. When making a relevance determination, however, "[t]he question is not whether the disputed evidence has great probative weight, but whether it has any." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 244 F. Supp. 3d 716, 719 (N.D. Ill. 2017). Here, it was not necessary for Dean to opine specifically on consumer interpretations of the "orthodontic" descriptor for his opinion to have relevance. By determining that no pacifier can be "orthodontic," and that so-called "orthodontic" pacifiers do not promote oral development, Dean's opinion is relevant to the issue of deceptiveness. Because his opinion speaks to the truth of the "orthodontic" descriptor, which is a key factual issue here, his opinion would be helpful to the trier of fact.

Therefore, Defendants' motion to exclude Dean's expert testimony is denied.

### D.    Dr. Denise Martin

Having denied Defendants' motions to exclude Plaintiffs' experts, the Court turns to Plaintiffs' *Daubert* motions to exclude Defendants' experts. First, Plaintiffs ask the Court to exclude the expert testimony of Dr. Denise Martin, who Defendants retained to offer a rebuttal report evaluating Dubé's opinion from an economic perspective. Among other criticisms, Martin faults Dubé for the changes between his proposed and executed methodologies, for his approach to calculating a price premium, and for his failure to provide a consumer definition for the

"orthodontic" descriptor in his conjoint analysis. In sum, Martin concludes that Dubé's methodological approach violates core economic principles.

In moving to exclude Martin, Plaintiffs largely dispute Martin's qualifications to opine on the reliability of Dubé's report. In particular, Plaintiffs maintain that Martin lacks the requisite expertise to offer opinions as to survey design and the meaning of the "orthodontic" descriptor. However, Plaintiffs misconstrue the purposes for which Defendants offer Martin as an expert. Defendants did not retain Martin to assess Dubé's survey from the perspective of a survey design expert, as they already retained Sarah Butler (who Plaintiffs do not challenge) for that purpose. (*See* Butler Expert Report ¶ 5, Dkt. No. 271-3.) Nor did Defendants retain Martin to provide a consumer understanding of the "orthodontic" descriptor. Rather, Defendants offer Martin as an expert to criticize Dubé's methodology from "the perspective of economics." (*See* Martin Expert Report ¶¶ 9, 40, 62, Dkt. No. 271-4.)

Based on Martin's background in the field of economics, the Court is satisfied that she has the requisite qualifications to opine on Dubé's survey methodology from an economics perspective. Having earned a B.A. in Economics from Wellesley College and an M.A. and Ph.D. in Economics from Harvard University, Martin has previously taught classes in microeconomics, industrial organization, and statistics at Harvard University. (*Id.* ¶¶ 12–13.) Currently, she is the Managing Director at NERA Economic Consulting, where she has been retained as an economic expert on more than 200 class actions, including consumer class actions. (*Id.* ¶ 14.) With respect to those class actions, Martin has often been tasked with analyzing issues related to class certification and damages, "including whether a formulaic method can be used to estimate damages on a class-wide basis." (*Id.*) She frequently works with large datasets involving pricing

22

and sales data, and she has routinely provided testimony regarding the application of statistical and econometric techniques, including hedonic regression and conjoint analysis. (*Id.*)

Overall, Martin's extensive economic experience renders her qualified to provide an opinion on Dubé's methodology from an economics perspective. Because Martin's criticisms concern the economic validity of Dubé's methodology, the Court is not concerned that her report extends beyond the bounds of her qualifications. *See Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409, 2019 WL 978934, at *11 (E.D. Mich. Feb. 28, 2019) ("To the extent [the rebuttal expert] attacked the design or administration of [the damages expert's] conjoint survey, he did not do so from a consumer survey design perspective. Instead, he questioned the economic validity of [the damages expert's] survey.").

Insofar as Plaintiffs contest Martin's rebuttal report as unreliable, they mainly take issue with her qualifications. However, in light of her significant background in economics, the Court is not persuaded that Martin's reliance on her experience necessarily renders her opinion unreliable. *See Johnson v. Amazon.com LLC*, No. 17 C 7335, 2019 WL 2323876, at *15 (N.D. Ill. May 30, 2019) ("An expert's testimony, however, 'is not unreliable simply because it is founded on his experience rather than on data' because Rule 702 allows an expert witness to be qualified on the basis of his or her experience. (quoting *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010))). Nor has Martin "simply asserted a bottom line." *Johnson*, 2019 WL 2323876, at *15 (quoting *Metavante*, 619 F.3d at 761). Rather, Martin thoroughly explains the economic principles underlying her assessment of Dubé's methodology in a detailed 38-page report.

In addition to her qualifications, Plaintiffs also challenge Martin's use of the internet to identify possible interpretations of the "orthodontic" term, in relation to her argument that Dubé

should have defined the term for survey respondents. Again, Plaintiffs' arguments imply that Martin was responsible for evaluating a consumer understanding of the descriptor, but she was not tasked with that assignment. To the extent Plaintiffs find Martin's approach lacking, such a purported inadequacy "bears on the weight of the evidence and can be explored on cross-examination." *Think Green Ltd. v. Medela AG*, No. 21 CV 5445, 2025 WL 1826137, at *8 (N.D. Ill. July 2, 2025).

Separately, Plaintiffs assert that Martin's report lacks a reliable basis standing alone because it "merely parrot[s] the opinions of Defendants' other expert, Sarah Butler." (Pl.'s Memo in Support at 7, Dkt. No. 221.) However, Plaintiffs overstate Martin's reliance on Butler's expert report. Indeed, Martin's report only refers to Butler's report twice. (*See* Martin Expert Report ¶¶ 9, 62.) And those two references simply identify Butler's conclusion that Dubé's conjoint survey was not well-designed "from the perspective of survey best practices." (*Id.* ¶ 62; *see also id.* ¶ 9.) Martin then clarifies that her opinion on the purported flaws of Dubé's conjoint survey arises "from the perspective of economics." (*Id.* ¶ 62; *see also id.* ¶ 9.) So, Martin's references to Butler's report have no bearing on the reliability of her own opinion.

Finally, the Court observes that Martin's opinion is relevant because it speaks to the credibility of Dube's methodology in calculating class-wide damages based on a price premium theory of liability. Ultimately, the trier of fact will be best positioned to assess the relative credibility of the two experts. As such, Plaintiffs' motion to exclude Martin's expert testimony is denied.

### E.  Dr. W. Eugene Roberts

Plaintiffs next challenge Defendants' expert Dr. W. Eugene Roberts, who Defendants have offered to opine on NUK's use of the "orthodontic" descriptor for its pacifiers. Roberts was

retained to review Dean's expert report; to review the computational model study of pacifiers conducted by Dr. Ana Norton and Dr. J. Miguel Nobrego ("Norton and Nobrego Study"), which involved the use of finite element analysis ("FEA"); and to opine on those materials and other opinions on issues presented by the parties. (*See* Roberts Expert Report ¶ 1, Dkt. No. 267-1.) In sum, Roberts concluded that NUK pacifiers are appropriately described as "orthodontic" because "the unique shape of the nipple or baglet of NUK pacifiers is designed to adapt to the shape of a child's oral cavity." (*Id.* ¶ 3.)

As a preliminary matter, the Court observes that Roberts is qualified to opine on the potential "orthodontic" features or benefits of NUK pacifiers. As a tenured professor of orthodontics at Indiana University, Roberts has over 34 years of experience in teaching, researching, and practicing orthodontics. (*Id.* ¶ 4.) As a former National Institute of Health postdoctoral fellow, he obtained a Ph.D. in anatomy, and he received extensive training in craniofacial growth and development and clinical orthodontics. (*Id.*) His training involved a focus on habit management, "including the theory and use of the NUK orthodontic pacifier to train optimal tongue posture." (*Id.*) Roberts's achievement in the biophysics of tooth movement and osteoporosis of weightlessness resulted in his eventual recruitment as a tenured professor of orthodontics. (*Id.* ¶ 5.) His professional publications in his areas of expertise include over 100 abstracts, over 100 peer-reviewed articles, over 250 clinal papers, and 50 textbook chapters. (*Id.*)

Further, the Court finds Roberts qualified to assess studies applying FEA to determine the effects of "orthodontic" pacifiers. As Roberts explains, "FEA is a computerized method used to simulate physical effects and predict how a product reacts to real world forces." (*Id.* ¶ 48.) In the 1980s, Roberts was first introduced to FEA, leading to his pursuit of mechanical engineering to define clinical biomechanics. (*Id.* ¶ 5.) During his 22-year appointment to the adjunct faculty in

mechanical engineering at Indiana University and Purdue University, Roberts learned the practical application of FEA to clinical biomechanics and "specified the method to assess and simulate clinical treatment." (*Id.* ¶ 46.) Through a series of Ph.D.-level research projects with his graduate students, Roberts has applied FEA to bone physiology and orthodontics, resulting in numerous publications in the engineering and dental literature. (*Id.*)

With their *Daubert* motion, Plaintiffs primarily contest Roberts's qualifications as an expert. Although Plaintiffs do not challenge his qualifications as an orthodontist, they maintain that Roberts lacks the expertise to offer opinions on the Norton and Nobrego Study or on a consumer's understanding of the "orthodontic" descriptor. Once again, Plaintiffs mischaracterize the purposes for which Defendants retained Roberts. Effectively, Plaintiffs conflate the qualifications needed to execute an FEA study with the qualifications needed to evaluate an FEA study. But much as an expert "need not be a mathematician to rely on a statistical model," Roberts need not be an expert in the design of FEA modeling to analyze FEA models through the lens of his orthodontic experience. *Schmidt v. Conagra Foods, Inc.*, No. 3:14-cv-1816 (SRU), 2020 WL 7027445, at *23 (D. Conn. Nov. 30, 2020). Given his extensive experience applying FEA modeling to orthodontics, the Court is persuaded that Roberts is qualified to opine on the results of FEA studies concerning orthodontics, including the Norton and Nobrego Study. Ultimately, it was "appropriate for [Roberts] to rely on a third party to perform the actual FEA analysis," where Roberts was qualified to evaluate such an analysis as applied to orthodontics. *Schmidt*, 2020 WL 7027445, at *23; *see also Noffsinger v. Valspar Corp.*, Case No. 09 C 916, 2013 WL 12340339, at *2 (N.D. Ill. Jan. 4, 2013) ("Accordingly, the resolution of [the plaintiff's motion to strike] depends on whether [the defendant's expert] is qualified to evaluate [the third party's] FEA analysis.").

In challenging the reliability of Roberts's opinion, Plaintiffs fault Roberts for his focus on the Norton and Nobrego Study, which is not yet peer reviewed. However, Plaintiffs minimize the fact that Roberts relied on his extensive orthodontic experience and other peer-reviewed studies in interpreting the results of the Norton and Nobrego Study. For example, Roberts reported that the results of the Norton and Nobrego Study and a separate peer-reviewed study were "consistent with [his] opinion that the shape of a pacifier nipple or baglet matters during non-nutritive sucking, and the NUK pacifier helps promote healthy oral development when compared to other pacifiers or other methods of non-nutritive sucking (e.g. thumb-sucking)." (Roberts Expert Report ¶ 55.) Roberts also highlighted the commonalities between the Norton and Nobrego Study and a peer-reviewed study, where both "analyzed the stress caused on the palate during sucking of various pacifier shapes," and then he distinguished the Norton and Nobrego Study to the extent it "specifically compared the shape of the NUK orthodontic Genius and pacifier to other competitive devices." (*Id.* ¶ 53.) Insofar as Plaintiffs challenge the reliability of the Norton and Nobrego Study, their arguments go to the weight, and not the admissibility, of Roberts's opinion. Such arguments are proper subjects for cross-examination.

The Court further observes that Roberts's decision to rely on FEA modeling was sound. According to Roberts, "FEA is of vital importance for understanding the internal biomechanics of living bone and mechanically-loaded periodontium," and to his knowledge, "only iterations of FEA are capable of simulating complex dentofacial orthopedic treatment." (*Id.* ¶ 46.) Roberts later underscored "the absence of appropriate randomized clinical trials" to test the efficacy of NUK "orthodontic" pacifiers, thereby rending FEA modeling a compelling alternative. (*Id.* ¶ 36; *see also id.* ¶ 47.) The Court is satisfied that FEA modeling constitutes a reasonable method of simulating the effects of "orthodontic" pacifiers. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 815

(7th Cir. 2012) ("[S]imulation is one of the most common of scientific and engineering tools. Around the world, computers simulate nuclear explosions, quantum mechanical interactions, atmospheric weather patterns, and innumerable other systems that are difficult or impossible to observe directly. A mathematical or computer model is a perfectly acceptable form of test.").

Lastly, the Court concludes that Roberts's opinion is relevant to the case in that it speaks to the truth of the "orthodontic" descriptor on NUK pacifiers. Where, as here, the deceptiveness of the "orthodontic" descriptor remains contested, and Plaintiffs themselves have offered expert testimony on the descriptor's purported falsity, Roberts's expert testimony will likely assist the trier of fact in deciding the issue of deceptiveness. Therefore, Plaintiffs' motion to exclude Roberts's expert testimony is denied.

For the reasons stated, Defendants' *Daubert* motions to exclude Dubé, Dennis, and Dean, whose opinions are challenged in Defendants' decertification and summary judgment motions, and Plaintiffs' *Daubert* motions to exclude Martin and Roberts are all denied.

## II.     Motion to Decertify the Multi-State Class

The Court now turns to Defendants' motion to decertify the Multi-State Class. In certifying the Multi-State Class, the predecessor judge determined that the class met the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3). *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)."). Nonetheless, pursuant to Rule 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Even after a court enters a certification order, "the judge remains free to modify it in the light of subsequent developments in the litigation." *Brodsky v. HumanaDental Ins. Co.*, 269

28

F. Supp. 3d 841, 845 (N.D. Ill. 2017) (internal quotation marks omitted). However, "in the absence of materially changed or clarified circumstances, or the occurrence of a condition on which the initial class ruling was expressly contingent, courts should not condone a series of rearguments on the class issues by the opponent of the class." *Phillips v. Waukegan Hous. Auth.*, No. 13-CV-08444, 2023 WL 11645747, at *3 (N.D. Ill. May 19, 2023). As the parties seeking continued class certification, Plaintiffs "bear[] the burden of producing a record demonstrating the continued propriety of maintaining the class action." *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) [and 23(b)] have been satisfied." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).

In moving for decertification, Defendants primarily challenge Plaintiffs' ability to satisfy Rule 23(b)(3). Nonetheless, because "a district court must assure itself at all stages of the litigation that a certified class meets the requirements of Rule 23," this Court considers whether the requirements of both Rules 23(a) and 23(b)(3) continue to be met in this case. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021). That said, because "law-of-the-case principles are applicable when a case is transferred to a new judge midway through litigation[,] in general, the successor judge is discouraged from reconsidering the decisions of the transferor judge." *Parish v. Sheriff of Cook Cnty.*, No. 07 C 4369, 2016 WL 1270400, at *1 (N.D. Ill. Mar. 31, 2016) (quoting *Gilbert v. Ill. State Bd. of Educ.*, 591 F.3d 896, 902 (7th Cir. 2010)). As the successor, this Court "should depart from the transferor judge's decision only if [the Court] has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefitted from it." *Id.* at *2 (quoting *Gilbert*, 591 F.3d at 902).

### A.     Rule 23(a)

Bearing these principles in mind, the Court is satisfied that the requirements of Rule

23(a) continue to be met in this case, largely for the reasons set forth in the predecessor judge's

opinion. To remain certified, the Multi-State Class must first satisfy all four requirements of Rule

23(a), which permits certification only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

#### i.     Numerosity

The numerosity requirement is clearly met because Defendants sold their NUK pacifiers

to thousands of customers in the Multi-State Class. *See T.K. Through Leshore v. Bytedance Tech.*

*Co., Ltd.*, No. 19-CV-7915, 2022 WL 888943, at *3 (N.D. Ill. Mar. 25, 2022) (explaining that the

Seventh Circuit has held that a class of forty members constitutes "a sufficiently large group" to

satisfy numerosity and that district courts may rely on "common sense assumptions" when

determining numerosity (citations omitted)).

#### ii.     Commonality

The Multi-State Class also satisfies the commonality requirement, which asks "whether

'there are questions of law or fact common to the class." *Phillips v. Sheriff of Cook Cnty.*, 828

F.3d 541, 550 (7th Cir. 2016). There is a common question "[w]here the same conduct or

practice by the same defendant gives rise to the same kind of claims from all class members."

*Suchanek v. Sturm Foods, Inc.* ("*Suchanek I*"), 764 F.3d 750, 756 (7th Cir. 2014). In other

words, the claims of the Multi-State Class "must depend on a common contention that is capable

of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Howard*, 989 F.3d at 588 (internal quotation marks omitted). Where, as here, Defendants sold the same NUK pacifiers to all the class members, and Plaintiffs allege that Defendants deceptively marketed those pacifiers as orthodontic, the Multi-State Class shares a common question as to whether Defendants' sale of the NUK pacifiers was deceptive.

### iii.    Typicality

Likewise, typicality is present here. To be typical, a plaintiff's claim must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id.* at 605. The purpose of the typicality requirement is to "ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* Here, the claims of the named Plaintiffs are typical of the claims of the Multi-State Class because Defendants' labeling practices gave rise to all their claims, which rely on the same legal theory—that Defendants' labeling of the NUK pacifiers as orthodontic was deceptive. *See In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *4 (N.D. Ill. Sept. 9, 2015) ("[T]he claims of each named representative and class members are based on the same legal theory and arise from the same course of conduct (i.e. conspiring to restrict steel supply); therefore, typicality is satisfied under Rule 23(a)."). And so, the named Plaintiffs' claims largely share the same essential characteristics as the claims of the Multi-State Class.

### iv.    Adequacy of Representation

Finally, the fourth requirement of Rule 23(a)—adequacy of representation—is met. This requirement "serves to uncover conflicts of interest between named parties and the class they

seek to represent." *Id.* at 609. As members of the Multi-State Class, the named Plaintiffs share interests with the class members, and there is no reason to believe that Plaintiffs' interests conflict with those of other class members. *See Starr v. Chi. Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 874 (N.D. Ill. 2014) ("To be an adequate representative, the named Plaintiffs must not have 'antagonistic or conflicting claims.'" (quoting *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)). Therefore, the named Plaintiffs are adequate representatives of the Multi-State Class.

### B.    Rule 23(b)(3)

Having found that the requirements of Rule 23(a) are still satisfied, the Court turns to the predominance and superiority requirements of Rule 23(b)(3).

#### i.    *Predominance*

First, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement "builds on commonality; whereas Rule 23(a)(2) requires the existence of a common question, Rule 23(b)(3) requires the common question(s) to 'predominate' over the individual ones." *Howard*, 989 F.3d at 607. Although similar to commonality, predominance "is far more demanding." *Id.* Specifically, "common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Messner*, 669 F.3d at 815 (internal quotation marks omitted). "If the same evidence will suffice for each member [of a proposed class] to make a prima facie showing [on a given question], then it becomes a common question." *Id.*

In determining whether predominance is satisfied, "district courts look beyond the pleadings to determine whether the plaintiff's claims are subject to class-wide proof by common

evidence." *Siegel v. Shell Oil Co.*, No. 06 C 0035, 2009 WL 449073, at *2 (N.D. Ill. Feb. 23, 2009). Put differently, "predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." *Id.* at *2 (citing *Hyderi v. Washington Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006).

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). Here, there are five elements to an ICFA action: "(1) the defendant must undertake a deceptive act or practice; (2) the defendant intended that consumers rely on the deception; (3) the deception occurred in trade or commerce; (4) damages ensued; and (5) the deception caused the damages." *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2023 WL 2561613, at *5 (citing *Davis v. G.N. Morg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)); *see also Terrazzino v. Wal-Mart Stores, Inc.*, 335 F. Supp. 3d 1074, 1083 (N.D. Ill. 2018) (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006)). Thus, Plaintiffs here "will need to establish that some common deceptive practice, as understood by consumers, occurred such that 'a significant aspect of [the] case . . . can be resolved for all members of [the Multi-State Class] in a single adjudication." *Zarinebaf*, 2023 WL 2561613, at *5 (quoting *Messner*, 669 F.3d at 815).

In arguing that the Multi-State Class fails to satisfy the predominance requirement, Defendants first contend that Plaintiffs offer no common evidence that NUK pacifier packaging is false or deceptive. Relying on the reasoning in their *Daubert* motions, Defendants argue that Plaintiffs' only evidence of a reasonable consumer's understanding of the "orthodontic" descriptor is Dennis's survey, and their only evidence of the descriptor's falsity is Dean's opinion, neither of which is reliable from Defendants' point of view. Having denied their

*Daubert* motions targeting Dennis and Dean, the Court rejects the corresponding arguments with respect to decertification. Contrary to Defendants' assertions, Plaintiffs have produced scientific evidence regarding the effect of "orthodontic" pacifiers on oral development, as they promised at the class certification stage.

Second, Defendants argue that Plaintiffs have failed to produce a class-wide damages model. Their position is three-fold: (1) Plaintiffs' damages model from Dubé is unreliable, for the same reasons argued in Defendants' *Daubert* motion, (2) Plaintiffs' damages model is inconsistent with their theory of liability, and (3) differences between the proposed damages model and the model that Dubé eventually executed warrant decertification. Having rejected the arguments set forth in their *Daubert* motion regarding Dubé, the Court turns to Defendants' remaining arguments.

### a. Consistency Between Plaintiffs' Damages Model and Their Theory of Liability

The Court is persuaded that Plaintiffs' damages model remains consistent with their theory of liability pursuant to *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013). As the Supreme Court explained, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiff's] theory" of liability. *Comcast*, 569 U.S. at 35. Otherwise, the model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* In other words, "there cannot be a mismatch between the injury and the remedy." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 587 (S.D.N.Y. 2013). "'[A] methodology that identifies damages that *are not the result of the wrong*' is an impermissible basis for calculating class-wide damages." *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799 (7th Cir. 2013) (quoting *Comcast*, 569 U.S. at 37 (emphasis added)).

Here, Plaintiffs' theory of liability is that the "orthodontic" descriptor deceived consumers into believing Defendants' pacifiers would promote oral development. However, according to Defendants, Dubé's methodology does not align with Plaintiffs' legal theory because he did not define the term "orthodontic" and he presented the term in isolation. But Defendants' arguments fail to reveal a mismatch between Dubé's damages model and Plaintiffs' theory of liability. For one thing, any failure to define the term "orthodontic" goes to the weight that should be afforded Dubé's model and does not render it inadmissible. *See Andrews*, 2025 WL 1808797, at *8 ("[A]lthough defendants object that [the expert] failed to adequately define certain terms in the survey . . . , these arguments ultimately go to the weight' of [the expert's] model and so are are [sic] fodder for cross-examination, not exclusion." (internal quotations marks omitted)).

More importantly, to compute appropriate class-wide damages, Dubé needed to identify the price premium associated with the descriptor "orthodontic." Defendants contest Dubé's decision to present the "orthodontic" descriptor alone to survey respondents, instead of using the terms "orthodontic shape" or "orthodontic pacifier," which appear on the product packaging for NUK pacifiers. In challenging the reliability of Dubé's model, Defendants rely on *Price v. L'Oreal USA, Inc.*, where another district court decertified a consumer class after finding that the plaintiffs had failed to satisfy the requirements of *Comcast*. *Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614 (LGS), 2021 WL 4459115, at *6 (S.D.N.Y. Sept. 29, 2021). There, the plaintiffs had also retained Dubé to conduct a conjoint analysis, and the district court determined that his survey failed to calculate class-wide damages because he tested the term "Keratindose Pro-Keratin + Silk," although the plaintiffs were not challenging the impact of the term "+ Silk." *Id.* at *5–*6. As the *L'Oreal* court explained, "[b]ecause the impact of 'Pro-Keratin' cannot be

isolated from the impact of '+ Silk,' Plaintiffs have not provided a means of calculating the price premium consumers paid because of the [c]hallenged [c]laims." *Id.* at *6. In contrast, Defendants here fault Dubé for doing precisely what the *L'Oreal* court required of him. Because Plaintiffs' theory of liability is that the "orthodontic" descriptor was false and misleading, it was appropriate for Dubé to isolate the price premium associated with that term alone. As such, Dubé did not need to test the phrase "orthodontic shape" for an accurate measurement of class-wide damages. "All Comcast said is that the damages theory must correspond to the theory of liability." *In re Turkey Antitrust Litigation*, No. 19 C 8318, 2025 WL 264021, at *27 (N.D. Ill. Jan. 22, 2025). By isolating the "orthodontic" descriptor, Dubé's model aligns with Plaintiff's theory of liability.

Moreover, Defendant's argument implies that Dubé failed to provide sufficient context to survey respondents. On the contrary, Dubé's model asked respondents to assume, for the choice tasks presented to them, that they were shopping for pacifiers and that the product descriptors indicated which features varied for the given pacifiers. (Dubé Expert Report ¶ 76.) And so it was unnecessary to pair the descriptor "orthodontic" with the word "pacifier" or "shape" where the survey already made clear to respondents that the "orthodontic" descriptor was the "text printed on [the] pacifier packaging." (*Id.* at D-8.)

Notably, the facts here are distinguishable from those in *Comcast*, where the plaintiffs offered four theories of injury, only one of which the district court accepted as capable of class-wide proof. *See Comcast*, 569 U.S. at 31. There, the expert's damages model "failed to measure damages resulting from the particular antitrust injury on which [the defendants'] liability in [the] action [was] premised" because the model "did not isolate damages resulting from any one theory of antitrust impact" and instead "assumed the validity of all four theories." *Id.* at 32, 36.

36

So, in *Comcast*, "it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact—the injury—of which the plaintiffs were complaining." *Butler*, 727 F.3d at 800. The central issue underlying *Comcast* is not present here, where Plaintiffs have offered only one theory of liability: that the "orthodontic" descriptor is deceptive to consumers. Consistent with this theory, it was appropriate for Dubé to measure the extent to which the class members overpaid for Defendants' pacifiers due to the presence of the "orthodontic" descriptor.

### b. *Differences Between Dubé's Proposed and Executed Methodologies*

In further opposition to certification, Defendants argue that differences between Dubé's proposed and executed methodologies constitute material changes that warrant decertification. According to Defendants, Dubé changed his methodology in the following ways: (1) Dubé's survey did not reflect real-world products or purchase choices, (2) he reversed course on his marketplace simulation by keeping supply fixed, and (3) he abandoned "willingness-to-pay" damages. From Defendants' perspective, the original class certification order "relied on Plaintiffs' promises to follow through with" Dubé's proposed methodology. (Def.'s Memo in Support of Mot. to Decertify at 2, Dkt. No. 245.) That is, class certification was "contingent on Plaintiffs actually doing in the merits phase what they had said during the class certification phase they ultimately would do." (*Id.*)

Ultimately, the Court finds that Dubé properly computed a price premium and class-wide damages in accordance with his proposed methodology. As previously discussed, Dubé's methodology sufficiently accounted for real-world purchase choices, and his fixed-supply approach did not render the methodology flawed. Likewise, his decision not to compute willingness to pay was well-reasoned. In his proposal at the class-certification stage, Dubé

determined that economic damages to consumers who purchased the products at issue consisted of two components: a price premium, which measures the extent to which class members overpaid due to the "orthodontic" descriptor, and willingness to pay, which consists of the incremental economic value to class members from the benefits they associate with the "orthodontic" descriptor. When the time came to execute his conjoint analysis, however, Dubé determined that it was not necessary to compute willingness to pay because the price premium methodology adequately compensated consumers who overpaid for the "orthodontic" pacifiers. (*See* Dubé Dep. 182:8–182:21; *see also* Dubé Rebuttal Report ¶¶ 8–9.) Where, as here, a price premium theory of damages aligns with Plaintiffs' theory of liability, and multiple courts have accepted a price premium theory of damages, the Court is satisfied that Dubé's decision to measure the price premium alone did not undermine the reliability of his conjoint analysis. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14 C 5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017) (citing cases) ("A damages calculation that reflects the difference between the market price of the product as represented and as delivered is neither novel nor problematic from a class certification perspective. . . .  Moreover, a price premium theory based on a conjoint analysis has been accepted by several courts." (internal quotation marks omitted)).

Overall, changes in Dubé's methodology did not constitute material changes that would warrant decertification. Contrary to Defendants' assertions, the original class certification order was not "contingent" on specific elements of Dubé's proposed methodology. Rather, it depended on the expectation that Plaintiffs would execute a reliable methodology for computing class-wide damages. The Court is satisfied that Plaintiffs have met that expectation, as Plaintiffs have established that common evidence can be used to show that each class member relied on

Defendants' allegedly deceptive conduct when purchasing orthodontic pacifiers at a higher price. *See Suchanek I*, 764 F.3d at 760 ("In determining whether to certify a consumer fraud class, the court should begin with a rigorous analysis into whether the plaintiffs' damages are susceptible of measurement across the entire class. In this case, the answer is yes: for example, plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the pods contained real coffee grounds)." (internal quotation marks omitted)).

### ii. Superiority

As the second requirement of Rule 23(b), "[t]he superiority inquiry requires courts to assess the fairness and efficiency of class adjudication 'with an eye toward other available methods.'" *Quinn v. Specialized Loan Servicing, LLC*, 331 F.R.D. 126, 133 (N.D. Ill. 2019) (quoting *Mullins v. Direct Digit.*, 795 F.3d 654, 664 (7th Cir. 2015)). Class actions are superior "where potential damages may be too insignificant to provide class members with incentive to pursue [their] claim[s] individually." *Id.* at 133 (quoting *Quiroz v. Revenue Prod. Mgmt. Inc.*, 2552 F.R.D. 438, 444 (N.D. Ill. 2008)). Put another way, the superiority requirement is met "where collective treatment 'would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated.'" *Id.* at 134 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

Here, the Multi-State Class includes thousands of customers who purchased NUK pacifiers and whose claims arise from the same conduct. Given these considerations, it would be inefficient to separately adjudicate the class members' individual cases one by one. Instead, "classwide resolution would substantially advance the case." *Wilkins v. Just Energy Grp., Inc.*,

308 F.R.D. 170, 190 (N.D. Ill. 2015). Accordingly, a class action is superior in this case. And thus, all four requirements of Rules 23(b) are met.

### C.  New York Statutory Damages

Separately, Defendants contend that Plaintiffs cannot pursue New York statutory damages on behalf of the Multi-State Class. As Defendants observe, Dubé's damages model included a calculation of New York statutory damages pursuant to the state's consumer protection statute. *See* N.Y. Gen. Bus. Law § 349(h) ("[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater."). (*See also* Dubé's Expert Report ¶ 19 ("In New York, there are two options for damages: plaintiffs can recover the price premium . . . but plaintiffs can choose the available statutory damages if they exceed the price premium. By assigning $50 statutory damages to each NUK pacifier sold in New York between 2017 and 2022, 18 total classwide economic damages for New York are $57.1M.").) Defendants, however, argue that Plaintiffs lack standing to pursue statutory damages and that they waived the right to any such damages.

As a threshold matter, this Court must determine whether Plaintiffs have standing to pursue New York statutory damages in this action. *See Halperin v. Int'l Web Servs., LLC*, 70 F. Supp. 3d 893, 897 (N.D. Ill. 2014) ("Because standing is jurisdictional, the court must consider that issue before reaching the merits."). In limiting the jurisdiction of federal courts to cases and controversies, Article III requires a plaintiff to establish standing. *See Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022). To have standing, a plaintiff must have "(1) a concrete and particularized injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by judicial relief." *Id.* at 937. With respect to the injury requirement,

"named plaintiffs who represent a class 'must . . . show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Halperin*, 70 F. Supp. 3d at 898. Even so, "[t]he standing test can be easily met in most types of class suits so long as the class representative has incurred actual injury." *Id.* at 898.

Because Plaintiffs and the class members "sustained a substantially similar injury," which was traceable to Defendants and can be redressed by damages, Plaintiffs have standing to sue on behalf of the Multi-State Class. *Geske v. PNY Techs., Inc.*, 503 F.Supp.3d 687, 700 (N.D. Ill. 2020). In arguing to the contrary, Defendants rely on case law where the plaintiffs' claims fell short for failure to show injury in New York. But those cases are inapposite. For instance, the representation at issue in *SimplexGrinnell LP v. Integrated Systems & Power, Inc.*, 642 F. Supp. 2d 167 (S.D.N.Y. 2009), "was not broadly made." *Id.* at 203. Rather, it "was sent to a [single] potential customer in New Jersey and [was] thus outside the bailiwick of [§ 349]." *Id.* at 203 n.19. Here, however, Plaintiffs have shown that the "orthodontic" descriptor was advertised to thousands of consumers, including consumers in New York. Likewise, in *Murrin v. Ford Motor Co.*, 303 A.D.2d 475, 477 (N.Y. App. Div. 2003), the individual plaintiff did not adequately plead a violation of [§ 349] because "he failed to allege that the deceptive acts complained of took place within the State of New York." *Id.* at 477. By contrast, this action does not involve a single plaintiff who failed to adequately specify where the deception occurred. Rather, Plaintiffs bring this action on behalf of the Multi-State Class, which includes consumers who purchased Defendants' pacifiers in New York. Overall, the Court is satisfied that Plaintiffs have standing to bring this consumer-protection class action.

Turning to the question of waiver, this Court is not persuaded that Plaintiffs have waived any right to statutory damages. Indeed, Plaintiffs' state consumer protection claims are comprehensive in seeking relief and not limited to actual damages alone. (*See* Am. Compl. ¶ 154, Dkt. No. 31.) Despite arguing that they had no opportunity to oppose statutory damages at the class certification stage, Defendants' own submissions at that stage revealed their understanding that § 349 provides for the greater of actual or statutory damages. (*See* Defs.' Chart of Consumer Protection Laws at 9, Dkt. No. 155-14.) Therefore, any suggestion that Defendants were unaware of § 349's statutory relief is dubious.

Even where New York law permits Plaintiffs to recover the greater of actual or statutory damages, "[a]s a threshold matter, [Plaintiffs are] required to prove actual damages at trial." *Montera v. Premier Nutrition Corp.*, 2022 WL 1465044, at *2 (N.D. Cal. May 9, 2022). That statutory damages will be higher "does not obviate the need for Plaintiff to prove up the amount of actual damages" because "[a] determination of the amount of actual damages is necessary to ensure that the amount of statutory damages is indeed higher." *Id.* at *2. Here, Dubé determined that "[t]he dollar price premium is $2.79, or 40.17% of the actual price paid by Class Members," which is less than the $50 statutory damages provided by § 349. (Dubé's Expert Report ¶ 99.) Plaintiffs first needed to offer evidence of actual damages before they could invoke relief in the form of statutory damages. Should a jury find in Plaintiffs' favor, Plaintiffs would be entitled to statutory relief under § 349.

Having determined that the requirements of Rules 23(a) and 23(b)(3) remain satisfied, and that New York statutory damages are appropriate, the Court does not have a "strong and reasonable conviction" that the predecessor judge's class certification order was misguided. *See*

*Parish*, 2016 WL 1270400, at *2. Therefore, Defendants' motion to decertify the Multi-State Class is denied.

### III.    Motion for Summary Judgment

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Under Rule 56, "a party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "An issue is 'genuine' only if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). While inferences drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," those inferences must be supported by more than just "speculation or conjecture." *Matsushita Elec. Indus. Co., Ltd. v. Zenish Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. "The 'mere existence of a scintilla of evidence in support of the plaintiff's position' will not suffice." *Whitaker*, 144 F.4th at 916.

Plaintiffs' claims under the ICFA, under similar consumer protection statutes of nine other states,[5] and for unjust enrichment remain in this case. As noted above, there are five elements to an ICFA claim: "(1) the defendant must undertake a deceptive act or practice; (2) the

---

[5] Namely, California, Florida, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington. (*See* State Claims Chart at 1–11.)

defendant intended that consumers rely on the deception; (3) the deception occurred in trade or commerce; (4) damages ensued; and (5) the deception caused the damages." *Zarinebaf*, 2023 WL 2561613, at \*5. And as the predecessor judge observed, the consumer protection statutes of the other nine states share overlapping characteristics with the IFCA. (Class Certification Order at 14.) Namely, they (1) provide a private right of action, (2) apply a reasonable-consumer standard in determining whether a representation is deceptive and material, and (3) permit remedies in the form of actual damages or monetary relief. (*Id.* at 14; *see also* State Claims Chart at 1–11.) And previous courts have determined that the consumer protection statutes of these ten states have sufficient commonalities to warrant multi-state class treatment. *See, e.g.*, *Mullins v. Direct Digital, LLC*, No. 13 C 1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014) (certifying a multi-state consumer-protection class involving consumers from the same ten states), *aff'd*, 795 F.3d 654 (7th Cir. 2015); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 157 (N.D. Ill. 2017) (certifying a multi-state consumer-protection class involving consumers from Illinois, California, Missouri, New Jersey, and New York); *Suchanek v. Sturm Foods, Inc.* ("*Suchanek II*"), 311 F.R.D. 239, 264 (S.D. Ill. 2015) (certifying on remand a multi-state consumer-protection liability class that included purchasers in Illinois, California, New Jersey, and New York).

In seeking summary judgment on Plaintiffs' consumer protection claims, Defendants argue that: (1) Plaintiffs cannot establish that the "orthodontic" descriptor was deceptive, (2) Plaintiffs cannot demonstrate that the descriptor was material, (3) Plaintiffs have no admissible evidence of injury, and (4) Plaintiffs cannot show proximate cause. Defendants also argue that summary judgment is warranted for Plaintiffs' claims in Minnesota, Massachusetts, and New York based on state-specific issues. Lastly, Defendants maintain that Plaintiffs' unjust enrichment claims fail. The Court addresses each argument in turn.

### A. Deceptiveness

In moving for summary judgment, Defendants first argue that Plaintiffs cannot establish that the "orthodontic" descriptor was deceptive. Specifically, Defendants maintain that Plaintiffs cannot define what the "orthodontic" descriptor means to reasonable consumers, nor can they offer admissible evidence showing that the descriptor on NUK pacifiers was false.

"A label is deceptive if it is likely to mislead a reasonable consumer in a material respect, even if it is not literally false." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "This determination of the likelihood of deception is an impressionistic one more closely akin to a finding of fact than a conclusion of law." *Beardsall*, 953 F.3d at 973 (internal quotation marks omitted). Nonetheless, the Seventh Circuit has "rejected the argument that 'the issue of whether a label is misleading is a question of fact that *must* proceed to a jury.'" *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (quoting *Beardsall*, 953 F.3d at 976). Rather, "summary judgment is appropriate 'if no reasonable jury could find that defendants' labels are likely to mislead reasonable consumers.'" *Weaver*, 3 F.4th at 934–35 (quoting *Beardsall*, 953 F.3d at 976). While "extrinsic evidence in the form of consumer surveys or market research is [not] always needed for a plaintiff to survive summary judgment or judgment as a matter of law on a deceptive advertising claim . . . such evidence is necessary where the advertising is not clearly misleading on its face and materiality is in doubt." *Id.* at 935. Put another way, if "the representations at issue are not misleading on their face when taken in context," Plaintiffs "must [] offer[] evidence that a reasonable consumer would be materially misled." *Id.* at 939. To survive summary judgment, Plaintiffs must "identif[y] precisely how [Defendants'] advertising was misleading and provide[] evidence that the misrepresentation

mattered to consumers." *Beardsall*, 953 F.3d at 976. That is, Plaintiffs bear the burden "to produce evidence of what reasonable consumers believe the label to mean." *Id.* at 976.

Here, Plaintiffs Benson and Caparelli have offered their own sworn testimony that they purchased Defendants' "orthodontic" pacifiers based on their impression that that the pacifiers would promote healthy oral development. However, this is not a case where Plaintiffs offer their own testimony alone to advance their claims. *See Weaver*, 3 F.4th at 397 (finding that a plaintiff's "reli[ance] solely on his own testimony . . . falls short of evidence from which a reasonable jury could find that there is a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled"). Rather, Plaintiffs point to various forms of extrinsic evidence to support their theory that the "orthodontic" descriptor is deceptive to reasonable consumers: (1) publicly available information, including dictionary definitions; (3) Defendants' testimony; (4) Defendants' documents, including internal research and surveys; (5) Dean's opinion; and (6) Dennis's consumer surveys.

Although Plaintiffs first contend that the term "orthodontic" is misleading on its face and no additional proof of deceptiveness is necessary, they go on to offer Dennis's Consumer Perception Survey as evidence of a reasonable consumer's perception of the "orthodontic" descriptor. *See Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 980832, at *8 (N.D. Ill. Mar. 31, 2022) (explaining that "where the advertising is not clearly misleading on its face," "extrinsic evidence, as explained in *Weaver* and *Beardsall*, can include consumer surveys or market research"). Indeed, Dennis's Consumer Perception Survey supports that a reasonable consumer would understand the "orthodontic" descriptor to mean that the product would promote oral development and prevent malocclusions.

In further support of this consumer understanding, Plaintiffs point to Defendants'
testimony and internal documents. At the deposition of Defendants' corporate designee Melissa
Wolf, she testified that Defendants' intent in using the term "orthodontic" was, in part, to convey
that their pacifiers "cause fewer (irregularities), potentially, than other pacifiers." (DRPSAF ¶ 4.)
In other words, as Wolf testified, "if a baby chooses a pacifier, we intend 'orthodontic' to mean
that it's going to do potentially less damage to their teeth and jaw than an other [sic] shaped
pacifier." (*Id.*) Plaintiffs also direct the Court's attention to Defendants' internal documents,
namely Defendants' research and surveys. *See Al Haj v. Pfizer Inc.*, No. 17 C 6730, 2019 WL
3202807, at *3 (N.D. Ill. July 16, 2019) (considering the defendant's own "market research" as
evidence). When Defendants conducted a market research survey, they asked respondents which
of the following options came closest to their understanding of the "orthodontic" descriptor:
"[t]he pacifier perfectly adapts to the child's palate," "[t]he pacifier affects the growth of the jaw
and the teeth positively," "[t]he pacifier does not affect the growth of the jaw and the teeth at
all," "[t]he pacifier reduces the risk of tooth and jaw misalignment," and "[t]ooth misalignment is
prevented by the pacifier." (DRPSAF ¶ 7.) Defendants also asked respondents the open-ended
question of what the "orthodontic descriptor" meant to them, and then categorized those
responses into three categories: (1) "[n]o restriction of jaw / palate / tooth development" (41%),
(2) "[p]erfectly adapted to the jaw / palate / mouth" (28%), or (3) [p]romotes health and
development (27%). (*Id.* ¶ 8.)

The Court agrees with Plaintiffs' observation that the options offered for the first
question "limited the universe of answers to those directly relating to positive oral health
outcomes," and that the answers to the second question "overwhelmingly related to oral
development." (*Id.* ¶¶ 7–8.) Insofar as Defendants contend that these various interpretations of

47

the "orthodontic" descriptor imply a lack of common consumer understanding, their arguments lack merit. Rather, these interpretations are two sides of the same coin, and any variation is subtle and immaterial.

In support of deceptiveness, Plaintiffs rely on Dean's scientific opinion, which the Court has deemed admissible. By concluding that "no pacifier is orthodontic because they do not promote oral development or prevent bad bites," Dean's opinion supports Plaintiffs' position that the "orthodontic" descriptor is false. (Dean Expert Report ¶ 3.) Viewing the evidence in the light most favorable to Plaintiffs as the non-moving parties, the Court concludes that a reasonable jury could find that the "orthodontic" descriptor on Defendants' packaging is likely to mislead a reasonable consumer. As such, there is a genuine issue of material fact as to the deceptiveness of the "orthodontic" descriptor.

## B. Materiality

Defendants next contend that Plaintiffs cannot show that the "orthodontic" descriptor was material to a reasonable consumer's decision to purchase Defendants' pacifiers. "To be actionable under the ICFA, the misrepresentations must [] be material to reasonable consumers." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598 n.6 (7th Cir. 2024). "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Santiago*, 2024 WL 4871350, at *7 (quoting *Connick*, 675 N.E.2d at 595).

Defendants criticize Plaintiffs' reliance on Dennis's Materiality Survey. But the Court has deemed Dennis's survey admissible and relevant to the question of materiality. Tasked with determining whether the "orthodontic" descriptor is material to a reasonable consumer's purchasing decision, Dennis concluded that, for at least 9 in 10 consumers, the descriptor was

material. (Dennis Expert Report ¶ 65–66.) Thus, Dennis's expert opinion directly supports Plaintiffs' materiality claim. *See Beardsall*, 953 F.3d at 975 (explaining that the court previously relied on survey data to establish that the deception was material in *Kraft, Inc. v. F.T.C.*, 970 F.2d 311 (7th Cir. 1992)).

Beyond Dennis's Materiality Survey, Plaintiffs point to additional evidence, including Defendants' internal documents and consumer perception studies. Notably, Defendants' decision-making survey found that more than half the mothers surveyed agreed that a pacifier that supports healthy oral development was important when choosing their baby's first pacifier. (DRPSAF ¶ 26.) The mothers who chose Defendants' pacifiers over other brands expressed that "it was important to find a pacifier that supports healthy oral development." (*Id.* ¶ 27.) Of the mothers who reported a willingness to switch pacifier brands, over half claimed that they would likely switch if "another brand claimed to be better for oral development." (*Id.* ¶ 28.) Where, as here, Plaintiffs have offered evidence that a reasonable consumer would understand the "orthodontic" descriptor to signal positive oral development, such a descriptor would likely inform the purchasing decisions of everyday consumers like the mothers surveyed by Defendants.

Likewise, the named Plaintiffs offer their own testimony to show that they relied on the "orthodontic" descriptor when deciding to purchase NUK pacifiers. Benson testified that she chose NUK pacifiers because "on the packaging like it says like helps soothe baby, helps calm baby, orthodontic pacifier. So then I thought orthodontic, dental, its safe for her to use." (*Id.* ¶ 15.) Caparelli testified that she switched to NUK pacifiers as her son got older because she "saw the packaging and it led me to believe that this was the best pacifier. With many different pacifiers and the amounts of money and from what this packaging said, orthodontic and the

reasons, that it was orally better for him to have." (*Id.* ¶ 18.) Both Benson and Caparelli's testimonies reveal that the "orthodontic" descriptor drove their purchasing decisions.

Based on Plaintiffs' collective evidence in support of materiality, a reasonable jury could find that the orthodontic descriptor was material to a reasonable consumer's decision to purchase Defendants' pacifiers. In short, a genuine dispute of fact exists as to materiality.

## C. Injury

In further support of summary judgment, Defendants contend that Plaintiffs have failed to establish injury. According to Defendants, Plaintiffs' only evidence of injury is Dubé's price premium estimate, which Defendants challenge as irrelevant and unreliable. Having denied Defendants' *Daubert* motion, this Court refers to Dubé's opinion as admissible evidence of injury. To show injury, Dubé needed to isolate the price premium associated with the descriptor, which is precisely what he did. A price premium theory of injury is appropriate where Plaintiffs maintain that the descriptor alone deceived them and resulted in financial loss. *See Gorczyca v. Weber-Stephen Prods. LLC*, No. 22-cv-04623, 2023 WL 6141489, at *2 (N.D. Ill. Sept. 20, 2023) ("[The price premium] theory of harm is more commonly invoked in cases where the alleged deception goes to the nature of the product itself."); *cf. In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing."). Because Plaintiffs have offered evidence of injury through Dubé, injury remains a genuine issue of material fact for the jury.

## D. Proximate Cause

Relatedly, Defendants argue that Plaintiffs cannot show proximate cause. To prevail under the ICFA, Plaintiffs "must demonstrate that [Defendants] conduct is the proximate cause

of [their] injury." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). In doing so, Plaintiffs must "set forth sufficient evidence creating a genuine issue of material fact that 'but for' [D]efendants' unfair conduct, [Plaintiffs] would not have been damaged, i.e., [Plaintiffs] would not have purchased [D]efendants' [product]." *Id.* Put another way, this Court must consider "whether the injury [to Plaintiffs] would have occurred absent [Defendants'] conduct." *Garcia v. Wells Fargo Bank, N.A.*, 653 F. Supp. 3d 501, 520 (N.D. Ill. 2023) (citation omitted).

Looking to their testimonies, the Court is persuaded that a reasonable jury could find that Plaintiffs would not have purchased Defendants' pacifiers absent the "orthodontic" descriptor. Indeed, their testimonies reveal that the presence of the descriptor on the pacifier packaging was a substantial factor in their decisions to purchase Defendants' pacifiers. That Plaintiffs may have been influenced by other attributes of the pacifiers does not necessarily diminish the substantial influence of the "orthodontic" descriptor on their purchasing decisions. *See Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 719 (N.D. Ill. 2018) (observing that a proximate cause "need not be the sole cause or the last or nearest cause" (quoting *Benzakry v. Patel*, 77 N.E.3d 1116, 1129 (Ill. App. Ct. 2017)); *see also Garcia*, 653 F. Supp. 3d at 525 ("To the extent [the defendant] reads [prior case law] to suggest that a defendant's conduct must be the sole reason for a plaintiff's injury, that controverts binding Illinois Supreme Court precedent."). Further, the Court is guided by the principle that "proximate causation ordinarily is a question of fact for a jury." *Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 770 (S.D. Ill. 2010). Drawing all inferences in Plaintiffs' favor, this Court concludes that the trier of fact could find proximate causation, thereby precluding summary judgment for Defendant.[6]

---

[6] For other class members, individual issues of proximate causation can be addressed at later stages of the litigation. *See Suchanek I*, 764 F.3d at 760 ("At the back end, if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation. Indeed, if the class prevails, the case would probably be quickly settled." (internal quotation marks

### E. Individual State Issues

Finally, Defendants argue that individual state issues warrant summary judgment for Defendants. In particular, Defendants point to issues related to Plaintiffs' claims under the consumer protection statutes of Massachusetts, Minnesota, and New York.

#### i. Massachusetts

The Court turns first to the demand letter requirement pursuant to the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 1, *et seq.* In Massachusetts, "[i]t is well-settled that plaintiffs must submit a demand letter to defendants prior to filing a private action under chapter 93A, § 9(3)." *Ameral v. JPMorgan Chase Bank, N.A.*, No. 18-cv-12531-PBS, 2019 WL 5588905, at *7 (D. Mass. July 25, 2019). "At least thirty days prior to the filing of any such action," a plaintiff must mail or deliver to any prospective defendant a demand letter "identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." Mass. Gen. Laws ch. 93A, § 9(3). The demand letter requirement "is not merely a procedural nicety, but, rather a prerequisite to suit." *Ameral*, 2019 WL 5588905, at *7 (quoting *Rodi v. S. New Eng. Sch. of La*w, 389 F.3d 5, 19 (1st Cir. 2004)).

Plaintiffs have "the burden to prove the timely sending of a letter complying with the statutory specifications." *Lingis v. Waisbren*, 914 N.E.2d 976, 979 (Mass. App. Ct. 2009). "Where there is no evidence that the [demand] letter had been sent, received, or replied to, the [Plaintiffs'] Chapter 93A claim must fail." *In re Lacey*, 480 B.R. 13, 46 (Bankr. D. Mass. 2012) (citing *Lingis*, 914 N.E2d at 979). Nonetheless, a plaintiff is exempt from this requirement if the

---

omitted)); *see also Suchanek II*, 311 F.R.D. at 259–60 ("Proximate causation and reliance are simpler issues than the issue of liability, and the information needed to prove them is more accessible to individual litigants than the information needed to prove liability. . . . The individualized assessments can be conducted after liability is determined and damages are being considered." (citations omitted)).

defendant "does not maintain a place of business or does not keep assets within the commonwealth." Mass. Gen. Laws ch. 93A, § 9(3).

In moving for summary judgment on the Massachusetts claims, Defendants argue that Plaintiffs neither allege nor offer evidence that they complied with the demand letter requirement or that the statutory exception applies. Plaintiffs, however, assert that the statutory exception applies where Defendants themselves have failed to offer evidence of maintaining a place of business or keeping assets in Massachusetts. Pointing to the complaint, Plaintiffs also highlight their allegations that Defendants' principal place of business is in New Jersey and Wisconsin. (Am. Compl. ¶¶ 27–28.) The statutory exception aside, Plaintiffs claim in a footnote that they sent notice and demand letters to Defendants in May 2019, multiple months before bringing this action in October 2019, thereby putting Defendants on notice. (Pls.' Opp'n to Defs.' Mot. for Summ. J. at 27 n.21, Dkt. No. 254.)

To the extent the parties rely on the complaint's allegations, their approach is misguided. Because this case has reached the summary judgment stage, the Court looks not to the allegations but to the evidence. Despite maintaining that they provided notice, Plaintiffs fail to attach the notice and demand letters to their opposition brief or otherwise produce evidence of notice. Given their failure to provide such evidence, Plaintiffs' claims would fail where a demand letter was required. However, Plaintiffs primarily argue that the demand letter requirement does not apply to them because of the statutory exception. Yet, Plaintiffs do not offer evidence that Defendants lack a place of business or assets within the state, nor do Defendants offer evidence to the contrary. Where neither party has set forth evidence speaking to the statutory exception, the issue remains a genuine dispute of fact. Therefore, Defendants are not entitled to summary judgment on the Massachusetts claims.

ii.     *Minnesota*

Next, the Court considers the public benefit requirement under Minnesota law. Where a private plaintiff seeks remedies for violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et seq.*, they "must do so through Minnesota's private attorney general statute," namely, Minn. Stat. § 8.31, subd. 3a. *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 888–89 (D. Minn. 2021). However, a plaintiff may rely on the private attorney general statute "only if the plaintiff can demonstrate that the action serves a 'public benefit.'" *Id.* at 889 (*Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000)). Although not an "onerous" requirement," the public benefit requirement "is a necessary element of a plaintiff's cause of action under the [private attorney general statute]." *Id.* at 889 (citations omitted).

The issue here is whether Plaintiffs' claims benefit the public. While "Minnesota courts have not definitively delineated what factors are necessary to establish a public benefit," a court may consider "the degree to which the defendants' alleged misrepresentations affected the public; the form of the alleged misrepresentation; the kind of relief sought; and whether the alleged misrepresentations are ongoing." *Id.* (citations omitted). Generally, a public benefit is established "when the plaintiff seeks relief primarily aimed at altering the defendant's conduct (usually, but not always, through an injunction) rather than seeking remedies for past wrongs (typically through damages)." *Id.* (citations omitted).

Where a plaintiff only seeks damages, Minnesota courts "typically find no public benefit . . . because individual damages, generally speaking, merely enrich (or reimburse) the plaintiff to the defendant's detriment; they do not advance the public interest." *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1142 (D. Minn. 2016) (internal quotation marks omitted). But "the fact that a plaintiff requests no injunctive relief does not preclude [them] from satisfying the

public benefit requirement." *Id.* (internal quotations marks omitted). For instance, courts have found that claims for money damages benefit the public where such claims "would have a deterrent effect on the defendant" or where the defendant "made [the alleged misrepresentation] to a significant segment of the public." *Id.* (internal quotations marks omitted).

Because Plaintiffs seek only monetary damages for past harm, Defendants argue that Plaintiffs' claims do not benefit the public. However, Defendants overemphasize the monetary nature of Plaintiffs' requested relief. "Although federal courts in Minnesota have focused the public benefit inquiry on whether plaintiff is seeking only money damages[,] . . . it seems reasonable to infer that the Minnesota Supreme Court is as much if not more concerned with the degree to which defendants' alleged misrepresentations affect the public." *In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1078 (D. Minn. 2010). Notably, this is not a case where the alleged misrepresentation was "one-on-one" and "purely private." *Johnson*, 175 F. Supp. 3d at 1142. Rather, the "orthodontic descriptor" was "mass marketed to the public" and "included with every [product]." *In re Levaquin*, 752 F. Supp. at 1078. Unlike cases where only individual plaintiffs sought recovery, the class action here involves a Multi-State Class of thousands of consumers spanning ten states. *See Davis v. U.S. Bancorp*, 2003 WL 21730102, No. Civ. 02–505 PAMRLE, at *4 (D. Minn. July 23, 2003) (granting summary judgment for defendants "[b]ecause the damages that [the plaintiff] requests are for personal benefit only, [so the plaintiff] cannot meet [the public benefit] requirement"); *see also Wehner v. Linvatech Corp.*, No. 06–CV–1709 JMR/FLN, 2008 WL 495525, at * (D. Minn. Feb. 20, 2008) ("Where recovery is sought for the exclusive benefit of the plaintiff there is no public benefit." (internal quotation marks omitted)).

Moreover, Plaintiffs maintain that Defendants continue to advertise their pacifiers as "orthodontic," and Defendants do not suggest to the contrary. The ongoing nature of Defendants' sales further supports Plaintiff's position. *See Gisairo*, 516 F. Supp. 3d at 890 ("Courts in this District have found no public benefit when a product no longer is sold or the allegedly false advertisements have ceased.").

In this matter, Plaintiffs have offered evidence of the misleading nature of the "orthodontic" descriptor and set forth a class-wide damages model for the Multi-State Class. Consequently, a finding in Plaintiffs' favor would benefit the public by ensuring damages recovery to the thousands of class members and potentially having a deterrent effect on Defendants' advertising. Because Plaintiffs' claims benefit the public, their Minnesota claims survive summary judgment.

### iii.     New York

Lasty, Defendants move for summary judgment on the New York claims, repeating the same arguments raised in their motion for decertification. In sum, Defendants argue that Plaintiffs are not entitled to statutory damages pursuant to N.Y. Gen. Bus. Law § 349(h). Having rejected Defendants' arguments in denying decertification, the Court likewise rejects those arguments with respect to summary judgment.

### F.     Unjust Enrichment

Seeing as the predecessor judge denied class treatment of the unjust enrichment claims, those claims only apply to Plaintiffs Benson and Caparelli individually. Nonetheless, "[u]nder Illinois law, there is no stand-alone claim for unjust enrichment." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019). Rather, it is "a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or

undue influence." *Id.* at 648 (quoting *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 484 N.E.2d 349, 354 (1985)). Therefore, Plaintiffs' request for relief based on unjust enrichment is "tied to the fate of [their] claim[s] under the [IFCA]." *Benson*, 944 F.3d at 648 (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 740 (7th Cir. 2019)). Because Plaintiffs' IFCA claims survive summary judgment, their request for relief based on unjust enrichment survives as well. *See Vanzant*, 934 F.3d at 740 ("The statutory claim may move forward, and that revives the request for restitution based on unjust enrichment.").

## CONCLUSION

For the reasons stated, Defendants' motions to exclude Plaintiffs' experts (Dkt. Nos. 233, 236, 240), Plaintiffs' motions to exclude Defendants' experts (Dkt. Nos. 217, 223), Defendants' motion for decertification (Dkt. No. 244), and Defendants' motion for summary judgment (Dkt. No. 229) are denied.

ENTERED:

Dated: December 1, 2025

Andrea R. Wood
United States District Judge