IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHELLY BENSON and LISA CAPARELLI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NEWELL BRANDS INC. and GRACO CHILDREN'S PRODUCTS INC.,<br><br>Defendants. | ) | Case No. 19 C 6836<br><br><br><br><br><br><br>Chicago, Illinois<br>February 5, 2026<br>11:15 a.m. |

TRANSCRIPT OF PROCEEDINGS - STATUS HEARING
BEFORE THE HONORABLE ANDREA R. WOOD

APPEARANCES:

For the Plaintiffs:

WADE KILPELA SLADE LLP
BY: MR. EDWIN KILPELA, JR.
6425 Living Place, Suite 200
Pittsburgh, Pennsylvania 15206

PEARSON WARSHAW, LLP
BY: MS. MELISSA S. WEINER
328 Barry Avenue S., Suite 200
Wayzata, Minnesota 55391

DiCELLO LEVITT GUTZLER LLC
BY: MS. AMY E. KELLER
10 North Dearborn Street, 6th Floor
Chicago, Illinois 60602

DiCELLO LEVITT LLP
BY: MR. KENNETH P. ABBARNO
MR. ROBERT F. DiCELLO
8160 Norton Parkway, 3rd Floor
Mentor, Ohio 44060

Court Reporter:

BRENDA S. VARNEY, CSR, RDR, CRR
Official Court Reporter
219 South Dearborn Street, Suite 2342
Chicago, Illinois 60604
(312) 554-8931
*brenda_varney@ilnd.uscourts.gov*

APPEARANCES: (Continued)

For the Defendants: ARENT FOX SCHIFF LLP
BY: MR. MIR Y. ALI
MR. JOSEPH J. KRASOVEC, III
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606

* * * * * * * * * * * * * * * * *

PROCEEDINGS RECORDED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: Okay. I think, for today's discussion, it would probably make sense for counsel to maybe remain at the tables for the discussion if you're comfortable with that. I know some people prefer to approach the podiums, but I think this is going to be more of a discussion than an argument. And you can also keep your papers in front of you.

We'll go ahead and call the case, and then I can get appearances and put faces to names.

THE CLERK: Calling case 19 CV 6836, Benson, et al. versus Newell Brands, et al., for a status.

THE COURT: Okay. We'll start with the plaintiffs' side.

MR. KILPELA: Sure. Good morning, Your Honor. It's nice to meet you in person. This case has been going on for a while, but it's the first time anybody's been here in your courtroom.

My name is Ed Kilpela. I'm from Wade Kilpela Slade in Pittsburgh. And I'm joined by co-appointed class counsel Melissa Weiner of Pearson Warshaw. In addition, at counsel's table are our co-counsel from DiCello Levitt, Amy Keller, and our lead trial counsel, Ken Abbarno and Bobby DiCello.

THE COURT: Okay. Thank you.

Then on the defense side?

MR. ALI: Good morning, Your Honor. Nice to see you

in person after several telephonic conferences. Mir Ali from ArentFox Schiff on behalf of Defendants Newell and Graco. And I'm joined by my partner Joe Krasovec.

MR. KRASOVEC: Good morning, Your Honor.

THE COURT: Good morning.

Okay. So I guess we've got a few things to discuss this morning. I'd like to talk a little bit about the class notice issue. I appreciate the parties' efforts to get your disagreements narrowed down to just one line, from what I can tell, in the long form notice, though if there are other things that you want to talk about today for whatever reason, certainly do not hesitate to raise them.

So we can talk about that. I'd also like to target a trial date now that I have an idea of how long you think it's going to take to try this case and what's going to be needed in order to get through the pretrial preparations.

I appreciate the detail in your pretrial schedule which will help with setting some dates. There may be a couple of sort of minor things that I may want to move around a little bit; but, overall, I think your plan which kind of gets you from class notice to the trial in about five months seems reasonable and gets us with a jury trial completed before the end of the year. So we can talk about what dates might work for that so that you can leave here with a target range.

What I will want to do before confirming the jury

trial date is to have you talk with all of your essential team members and witnesses to make sure that there are no known significant conflicts.

My intent is once we set this trial date, this is the trial date. And then we'll all have to plan around it from that point forward absent a settlement. But I don't want to get too far into the nitty-gritty of the schedule because I think we can talk in a more concrete way initially about the class notice and hopefully I can get information.

I may need to look back at some things before I may issue a formal ruling on the motion, but I do have a couple of questions and will want to hear from the parties on your dispute.

Are there other things that counsel would want to put on the agenda for this morning that are not obvious from the status report?

MR. KILPELA: No. I think the issues you just laid out, Your Honor, were the issues we were hoping to discuss today, so nothing from Plaintiffs' side.

MR. ALI: Just to clarify, I believe there's two minor disputes on the notice plan, but other than that, I think you've covered everything, Your Honor.

THE COURT: Okay. There's a dispute regarding the sentence to be added to the long form notice. It actually shows up several places in the notice about there being no

claim for personal injuries as opposed to the defendant's proposal to specify that there's no claim that NUK orthodontic pacifiers are defective or unsafe for you or your baby to use.

And then what was the second issue?

MR. ALI: In the very next paragraph, Your Honor, Defendants wanted to include Defendants' contention describing the pacifiers as having a uniquely shaped nipple.

THE COURT: Yes. Okay.

So it all has to do with that same language?

MR. ALI: Yes, Your Honor.

THE COURT: Okay. And just so that I'm clear, we'll just jump in and talk a little bit about this notice issue.

So was this language prepared with the assistance of your proposed notice administrator?

MS. WEINER: Hi, Judge. Melissa Weiner. I will address all the notice issues this morning.

So, if we back up several years when we originally submitted the motion for approval of the notice plan, the admini -- I think this is a really important place to start. The administrator drafted the notice. We did not draft the notice, Plaintiffs' counsel's, as an advocacy piece. The administrator -- we provided the administrator with the documents for the case, the complaint, and they drafted the notice as intended to be a neutral piece of information for class members solely to understand whether they are or are not

a member of the class.

And that will lead into why we think the additional language is not appropriate or necessary in order for people to understand whether they are, in fact, a member of the class or if they desire to opt out. I'm happy to address the two sentences if Your Honor would like me to do that.

THE COURT: So the administrator drafted the language, proposed it to the parties.

Was it proposed first to Plaintiffs' side and you gave feedback?

MS. WEINER: So, when we had the class certification granted, Plaintiffs' counsel selected the administrator to administer the class certification notice. We submitted the original motion for approval of the class notice -- I think it was back in 2022. And, at that time, counsel opposed the approval of the class notice for a number of reasons, many of which were procedural, and also proposed some changes to the notice program.

We went back, we discussed some of those. Changes were made in the reply. We addressed some of their changes. These changes -- and Mr. Ali can speak to them -- I don't recall that we discussed these changes until this later round of discussions around the notice.

THE COURT: Okay. And so I appreciate your point about the primary purpose of the notice being to enable

potential class members to figure out if they are, in fact, class members.

It does seem to me that a secondary purpose would be also to prevent the sort of unrealistic and inaccurate expectations of what's going to happen as a result of this case. And so I do think making it clear that this is not a personal injury case where class member parents who purchased for their children should not be expecting that they're going to get some huge payout because, you know, they think that there is some issue with their child's mouth as a result of using the item. So I think that it is important that that concept is not here so that there's not a flood of inquiries and not people thinking that, you know, this is that kind of lawsuit.

I also think it's fair for Defendants to be concerned that somebody who knows about the lawsuit or hears about the lawsuit is going to get the impression that this case is about it being a really dangerous product and it's going to cause collateral damage to their clients. That is not really what this lawsuit is about.

So I do think that that issue is something that reasonably should be addressed, and I think the question in my mind is: Does the statement "There is no claim for personal injuries" accomplish any of that. And I do have the concern that a layperson reading that sentence will not know what that

means, there are no personal injuries.

MS. WEINER: So the addition of the sentence "There is no claim for personal injuries" was our attempt at a compromise because defense counsel wanted to include the blue line in Document 344-3 that has the language "defective or unsafe" which we felt -- and perhaps there is a universe, Your Honor, where there is a third set of language that we may both agree to.

We are concerned that the "defective or unsafe" is equally confusing to the layperson where this case is an economic injury case which is why we went the personal injury route. It is a case about economic injuries resulting from the use of pacifiers that claim to promote oral development where Plaintiffs' claim is that: One, they don't, and, in fact, they can cause dental problems.

So whether that is unsafe/defective, if we look that up in the dictionary, what would a reasonable person reading this take those words to mean versus what they mean legally, a defective, unsafe product in the legal sense versus a false advertising case. I understand those are different legal actions, but if you're a layperson reading that and you think, "Oh, defective, unsafe," to a layperson, we think that could be misinterpreted for the purposes of this case. So that is why we went the injury route.

We understand defense counsel's concern. We don't

want to mislead people that this is a claim for injuries, personal injuries, when it's an economic injury case. We just didn't think that language accomplished it, and we attempted to find language that we thought allowed people to get to the conclusion that Your Honor is focused on. We're just concerned that we would have to add more language if we went with that first sentence and we were trying to stop the bleeding.

THE COURT: Okay. So if I --

MS. WEINER: One more point, Your Honor.

Neither of those sentences existed in the original notice, and so to the extent that that matters or doesn't.

THE COURT: Your notice administrator obviously is very experienced, has done a lot of these, didn't feel the additional explanation was necessary.

Was there any effort to go back to the administrator once you sort of identified this dispute which I guess came up in the past few weeks and say, "Hey, based on your experience in these cases, what do you think about adding additional language"?

MS. WEINER: We had very -- these discussions were truncated, Your Honor, just because of the timeline. We didn't have time.

THE COURT: No, I appreciate that.

MS. WEINER: We can certainly do that.

I don't think the administrator -- we had very

brief conversations with the administrator. I don't think they felt terribly strongly either way. They didn't think, "Oh, this language is horrible, and we shouldn't include it." And I admittedly didn't ask them for alternative language because it was close to the date of filing.

THE COURT: Fair enough.

MS. WEINER: But we can do that if --

THE COURT: I mean, I don't know that that's necessary. It's not necessarily going to assuage any concerns I have, but I do appreciate that they probably have talked to more class notice recipients, regular people who call administrators all the time to ask questions about class notices, so they may have a feel for what sort of language creates more questions than it resolves.

Let me get a response from the defense side on the concerns raised by Ms. Weiner.

MR. ALI: Sure, Your Honor.

Just to go back, we have not had any communications with the notice administrator. Everything has been through Plaintiffs' counsel. Several years ago when the original notice plan was submitted to the Court, the objections were primarily because we had motions pending and there was a lot of procedural issues that -- we didn't do a deep dive into the notice itself.

Your Honor, I think you nailed it on the head with,

you know, causing public alarm. The notice itself -- this is a baby product, right, so the notice going out itself is going to cause some type of alarm, and the public is going to have questions. And so I think it's equally as important to state precisely and specifically what this case is about and also what it's not about.

And so you have the statement before: "Plaintiffs have alleged that the word 'orthodontic' leads consumers to believe that NUK orthodontic pacifiers promote healthy oral development better than other pacifiers, and Plaintiffs allege that this is not true." So that specifically says what the case is about.

What it doesn't do is alleviate the concern that Your Honor was talking about earlier. This isn't a product defect case; this product hasn't been subject to a recall; there haven't been complaints about malocclusions caused from this product from Plaintiffs or anyone else. So it's important to let the public know this product is still on the shelf, it's still being sold. There's no defect. You know, it's not unsafe in the sense that there's some type of hazard like a choking hazard like that for the baby to use it. They should feel comfortable continuing to use it.

Now, there's a clear statement there that says that Plaintiffs don't believe that it promotes healthy oral development better than other pacifiers. So the public will be

on notice if -- okay, so that's what this case is about, so if I want to stop using it because maybe it's not better than other pacifiers, then they'll know that based off of Plaintiffs' statement.

THE COURT: This language is going to sound perhaps a little bit colloquial, but I want to toss out an idea and hear from the parties why it's not the sort of thing that might address the concern.

What if alternative language were included along the lines of "This lawsuit does not involve any claim that NUK orthodontic pacifiers caused physical injuries to any users"?

And, again, I'm going to ask for your reaction somewhat conceptually because that's just off the top of my head, in particular.

So I inserted this term "physical injury" as opposed to "personal injuries" because I think the concern here is people are going to think: One, "This might damage my child's mouth," and that could cause collateral damage unnecessarily to the defendants; or two, they might think, "Oh, wow, I'm going to get lots of money by proving that there's damage," and, you know, people are going to be thinking that this is some huge personal injury lawsuit where they're going to claim that their child can't bite properly, and they're going to get lots of money.

The physical injury side of it seems to kind of get to

that point, but I appreciate that it's maybe not the most legalistic type word, less a term of art and more of just a regular person's understanding of what's going on.

What is the defense view?

MR. ALI: Your Honor, I think we're getting close there. So that kind of addresses the issues about physical injuries. The other concern is, you know, is there some type of choking hazard or -- so we would --

THE COURT: You wouldn't consider that to be a physical injury? That's something else?

MR. ALI: Yeah. So we just want to make sure that it's conveyed that it's not unsafe to use. And I appreciate Plaintiffs' counsel's statement that, you know, the risk of malocclusions, we view that as very different than a safety concern. And so we would either want something included about, you know, no claims of the product being hazardous or being unsafe as well as the physical injuries.

THE COURT: Okay.

MS. WEINER: If I may, Your Honor?

THE COURT: Sort of my language, what's Plaintiffs' response to that?

MS. WEINER: So I think the concern with the lawsuit does not involve a claim that they caused physical injuries. There actually are claims. We aren't seeking to recover damages for claims for personal injury, but there are

allegations that at least one of our clients' children did have dental issues. So we have a bit of a concern that it's equally confusing because, actually, the claim relates to "physical injuries" even if we're not seeking to recover, you know, from a legal standpoint for physical injuries.

So if we might, Your Honor, I think we've come up with a couple of good ideas. I'm getting a lot of notes. If we may caucus for, like, two minutes quickly at counsel table to talk about some of the language to try to resolve this, we have a few ideas.

I think I just heard "hazardous." We understand the concern. We certainly are equally concerned with misleading people about either the outcome or what this case is about. I just -- our concern is to not mislead people in the other direction.

THE COURT: And to the extent that my concerns didn't make this clear, I view this as also being an issue for Plaintiffs' side, that you don't want to create unrealistic expectations among class members or else you're going to get -- let's say you get a recovery after a trial and now you have a bunch of people coming forward expecting something very different than what they're actually going to get, and, you know, that can create a lot of headaches for the claims process, it can create a lot of headaches.

I mean, frankly, once this notice goes out, if there's

a settlement, it could create headaches for getting a settlement approved if you've got a bunch of people who now object because they thought one thing, and it's something that looks very different.

So I think clarity is important here. If giving you two minutes to caucus is likely to lead to some language that might make everybody happy, I'm happy to give you a minute. Or we could also do it after we talk about some other things and take a little bit of a break, however you want to handle it. I don't know if you want to have defense counsel involved.

MR. KILPELA: Your Honor, maybe just to not waste your time, maybe we turn to the schedule, and then if you would give us five minutes and then we can reconvene and maybe have this resolved?

THE COURT: Sure. That sounds like a great way to handle it.

While we're talking about the notice issue, so just so that I am clear about what we're accomplishing here, so this notice is going out well in advance of trial. It's letting class members know what's happening.

As I understand the instructions that class members get, they are being told to contact the administrator if they have any questions.

Are they being told not to contact Plaintiffs' counsel?

MS. WEINER: No, Your Honor. In fact, just from experience, we will probably receive the lion's share of the contacts.

Class counsel, we are -- I think it's in here somewhere who we are. Number 10, at Number 10 in the "Who are the lawyers representing me," it says who we are, and we will likely get contacts. Many of those either will be directed to the notice administrator for questions about mechanics, "How do I submit an opt-out." A lot of them will be "How do I file a claim," in which case we'll have to explain to them that this is just notice, "Here are your rights."

So they will either contact the administrator where there will be an automated line. Actually, Mr. Ali and I spoke about this. There's a little bit more work to be done here on the notice programs.

So there will be a website. The website will look a lot like the class notice. The language, which we will work through which will be based on the approved language in the notice, will also have an FAQ section probably. So if people have questions, there will be the answers here, but we'll agree on some language that will be very simple for class members.

They will have an automated line. If they call, you know, people will say, "How do I file a claim?" "There is no recovery, this is a notice, here are your options," lots of ways for people to be directed to understand what this is, but

they will also be able to contact us.

THE COURT: I'm not sure there would be any basis to include in the notice any statement that they shouldn't contact class counsel, but I just want to make sure that there's no expectation that all communications are going through the administrator and that there would be something potentially improper about doing it differently.

MR. KILPELA: Epiq's no different than most of them. There are some issues they can triage, but the second they think it needs to be elevated, we hear from them. Probably everybody -- defense counsel would be notified as well.

THE COURT: And despite the fact that you put this very helpful language in here about not contacting the clerk or the Court, we will undoubtedly get calls and messages, and we should be going to the claims administrator correctly.

I think what normally -- sometimes people file things. Sometimes people -- you know, I've had cases involving large class actions of this type where there's not sort of a relationship so it's not like you're my former employer. This is just, you know, a company that I bought a product from once upon a time. When that happens, we sometimes get emails. Sometimes they email my courtroom deputy or call my chambers, in which case we would usually have a standard, you know, "We cannot respond to any of your inquiries, please follow the instruction in the class notice and contact the administrator."

And if somebody sends an email or something else in writing, I think what I've done in the past is we forward it on to counsel or to the administrator. And it sounds like it would just go to the administrator.

Maybe this is in the notice and I just missed it, but is there some instruction for class members that they affirmatively should be or can consult the website for up-to-date information on the status of the case?

So this notice doesn't tell class members when the trial is. I think it says that the trial is going to take place at a later date. It doesn't give any time frame within which they should expect to have to do something in order to collect because, eventually, they will have to do something. This talks about doing nothing at all, but eventually, they will have to do something, and this notice doesn't really tell them when that might happen. And I would think somebody who's interested, they'd want to keep tabs on the website to see when procedures are available or what happens.

MS. WEINER: So we have not discussed how long the notice website for this purpose would be up, and we can certainly talk to Epiq about that.

THE COURT: "For this purpose" meaning there would be a different website -- they won't be going to the same URL when it's time to provide information to submit a claim?

MS. WEINER: Correct. So if there was a time some day

later to submit a claim, the website may look different and the instructions on there.

We always, in the context of providing a claim, provide constant updates on what's happening in the case. All the documents will be available on the website.

Here, we would certainly -- we haven't discussed it yet but agree upon certain core documents that would be available for people to access, but we have not discussed yet and I have not asked Epiq how long they typically leave the class notice for purposes of class certification notice up.

THE COURT: And so, "If you are a member of the ten-state class, you have to decide whether to stay in or exclude yourself," what is that date going to be by which they have to opt out?

MS. WEINER: I think that we decided they had 60 days, 60 days.

So the way we backed into the deadline for the notice program or the motion for notice to be entered was based upon the timeline we received from Epiq which was from the date that the Court issues the order, we need about four weeks to get everything up and running.

The notice banner ads will run for about -- I think it was 60-ish days. And then we want to give people at least 60 days to opt out. The USPS can be notoriously a little bit slow, so we wanted some extra time for the USPS mail to trickle

in, so we built out the 180 days based upon that timeline. 150 days? 150 days.

THE COURT: Okay. And the opt-outs are only done by US mail? Do we still do that?

MR. ALI: Opt-outs are regular US mail.

THE COURT: It pretty much has to be US mail.

MS. WEINER: It goes by US mail, and that's typically how all these are done for all sorts of fraud reasons. It seems archaic, but online kind of robo filers and things have made online opt-outs without many layers of security and codes which actually can sometimes be more difficult for class members to opt out.

MR. KILPELA: Particularly in a case like this where we don't -- in a car case, for example, you can figure out which VIN number is assigned to which person, and they can get some unique identifier that allows them to opt out, but it's difficult in a consumer packaged good case like this where the purchasers are unknown, so we're just doing broad public notice.

THE COURT: Okay.

MS. WEINER: Again, Your Honor, this was an Epiq-proposed --

THE COURT: Yeah, no.

MS. WEINER: Just so you know, we didn't say, "And please only" -- we asked them for their standard process, and

honestly, it's fraud reasons is what we end up having issues with.

THE COURT: Yeah. No, I appreciate that.

I think I feel like I ask these same questions usually about the best way to accomplish notice in just about every case, and I'm just thinking it through because I think I usually hear the fraud concern in connection with the claim process.

The fraud concern in connection with opting out before we even know if there's a recovery, I guess I'm a little less clear on what the concern is. Is that a thing, that there are -- to have mass opt-outs, fake opt-outs of a class?

It seems like it would be the other way around, that the fraudsters would be trying to have, you know, false claims submitted in order to collect on behalf of people who don't even know that they're a member of a class. So I guess what I'm hearing is that Epiq thinks it's also a concern that people will be falsely excluded from the class.

MS. WEINER: I think, just from an administrative standpoint, if you end up with a bunch of -- one, you get a lot of confused people. If they're able to do it online, it's either fraud or, I think, also confusion. People click to think they are filing a claim, and they are actually opting themselves out. That is an issue versus you have to do something and affirmatively opt yourself out of the class by

putting it in the mail.

The second issue is administratively, if you have people who are clicking things online to file opt-outs and then they file claims later or you get robo opt-outs, the admin required to match the claims and the filing, it creates additional admin on the back end.

So I think there's concern with a lot of clicking and how that works in the fraud world versus if people are actually putting something in the mail, they are more certain in how they are effectuating a claim or an opt-out.

Ms. Keller and I did -- in the Fairlife matter which was in this court, actually, in front of Judge Dow, we did a hybrid which is a possibility here. I give Ms. Keller all the credit for that. If you want to explain it because it was your brainchild.

MS. KELLER: Sure.

So one of the problems, as Ms. Weiner explained, that you have with the opt-out process is, again, if it's entirely online. Folks can have confusion with whether or not they're submitting a claim.

What we did in Fairlife was a two-step process. Someone went online and explained -- filled out a form on the settlement website: "I am a class member. I want to opt out. I don't want any judgment to apply to me. This is the product I bought. This is about when I purchased it," and click

"submit."

That then prompts an email to go to their inbox where they click on a confirmation link to confirm, "Okay, you are opting out of this. That means you can't participate in any claim, you can't participate in any judgment, you are opting out. Click on this link to confirm your selection."

And we had three or four people do that in the Fairlife case through the electronic process, and it was basically like a fail-safe.

THE COURT: Three or four, you said?

MS. KELLER: Yeah, three or four.

THE COURT: Out of how many?

MS. KELLER: Many. We had several million claims filed in that case. And that was with settlement. That wasn't a case that went to trial.

And that accomplishes quite a few things. Sometimes you could see a large-scale operation which is trying to syphon -- here's one of the concerns that you raised, the fraud issue. You could have a large-scale operation which tries to syphon people off into their own sort of massive claim-filing operation which then could result in a subsequent filing against the defendants on behalf of a chunk of thousands of people that they have automatically opted out through a mass opt-out process.

Having this two-step process connects the individual

with the confirmation. So it's not a bot, it's not a third-party operation; it is this person affirmatively opting out. And the two-step process makes sure that they really understand what they're doing as well.

THE COURT: And is that more expensive or does it require just more time on the administrator's part?

MS. KELLER: It does add some time and expense on the administrator side.

You know, we did this as part of a settlement because, you know, sometimes people do raise concerns with mail. Here, we have a lot of time built into our timeline here to enable for things to go through the mail, so that was another concern we had, you know, with everybody taking the time to go to the post office, drop something off in the mail.

So, you know, with Fairlife, we might have had a shorter time frame which is why we had sort of this online opt-out plus post office opt-out.

THE COURT: So, in the context of an action that's going to trial, I would think with paper mail in particular, there would be the concern that somebody might see the lawsuit, know about it, decide they're not going to opt out, there's a defense verdict at trial, and that person -- I mean, maybe there are other reasons, statute of limitations or otherwise. There are probably other reasons why the person maybe couldn't do anything about it, but maybe they would try later to say,

"Oh, that jury verdict doesn't apply to me. I opted out."

And you say, "Well, wait a minute. We didn't get anything by mail." And I think a lot of people would just say, "Oh, it must have gotten lost."

I don't know how realistic a scenario that is. I'm trying to think of scenarios where somebody might have an incentive to claim that they mailed something when they didn't which I think, unfortunately, happens quite a lot in other contexts.

And maybe there's not much that they could do about it for other reasons, and maybe it's nothing more than just a headache at that point; but I could imagine people waiting to see -- wanting to wait and see what happens with this case. And if they're unhappy with either a no-liability verdict or a dollar amount that's not going to get much and maybe somebody thinks they can do better some other way, they can always say, "Ah, I sent this in to opt out. I guess it got lost."

MR. KRASOVEC: I'm sorry. I don't mean to interrupt, but is there some mechanism by which they would have to preserve some record that they mailed the opt-out so that to prevent what you're talking about, Your Honor, which is somebody coming back after the fact and saying, "Wait a minute. I mailed something in. I didn't want to be part of this," they have to produce something that demonstrates that they actually mailed it other than just saying that that's what they did. I

don't know if there's a mechanism.

THE COURT: Maybe. Have I seen -- I don't want to say certified mail. That's expensive, among other things, and it's discouraging, but I do think sometimes there's some kind of receipt or something, depending on what method you use.

And I could be creating issues and this never comes up anymore. I have become so increasingly skeptical of relying on regular old First Class Mail for class notice or anything else that's really important when we're talking about, you know, due process type things in court that I almost feel obligated to at least consider other options because how many people use US mail for anything anymore? But maybe our expert administrator says this is the best way to prevent confusion and fraud, and they've done a lot of these.

MS. WEINER: Actually, Epiq was the administrator in the Fairlife case as well, and that was, again, in the settlement context, different defense counsel, but we grilled the administrator on "Please give us every option so that we can ensure that: One, we are avoiding fraudulent or missed opt-outs; two, that we are making sure we're giving people something that is alternative to the USPS, which people don't have a stamp, they don't want to put it in the mail. How do we find a hybrid that allows people to preserve their rights and also make sure we don't have too much fraud?" And this was the happiest medium that we could come up with.

I think, in this context, they still do heavily rely on USPS, again, because of this concern of robo filers and improper filers.

It's really hard to verify if there are a bunch of fraudulent opt-outs even if they're mass opt-outs for whatever -- I mean, it's crazy, the amount of fraud that goes on in a lot of these -- in these cases where there are not receipts required.

On the back end, it creates, you know, hardship for the administrator and additional cost if there is a verdict in the plaintiffs' favor, so, weighing all of those interests, I think that's why they continue to go with USPS, because we don't want to -- because in order to file an opt-out, you don't have to send anything, proof of purchase, so we'd have to figure out whether those people who opted out online are different from the same as people who file claims later, and that creates issues on the back end also.

And, to be honest, Your Honor, I don't think this is actually going to be a huge problem. We don't get a large number of opt-outs in these cases.

We always have blow provisions in settlements. I have personally in the years I've done it never reached it, and when I do, the defense counsel usually doesn't want to blow the settlement anyway.

So I think also, as Ms. Keller said, we had

hundreds -- a lot of settlement class members in that case. I think we ended up with just a small handful of opt-outs.

THE COURT: Okay. I don't know if --

MR. ALI: Your Honor, this may alleviate some of the Court's concerns.

This is a pacifier product, again. We're talking, just throwing out numbers, about five bucks a pacifier. And then at the maximum end, the damages are, like, 40 percent. I know the plaintiffs have a claim for statutory damages in New York, but we're talking about, like, a couple-bucks recovery maximum per person, so I don't think the opt-out is going to be that big of a concern here in this case.

THE COURT: That's probably true. And, again, if people have a clear understanding of what the case is about, hopefully, there won't be a lot of issues and not much confusion.

If somebody thinks they're going to get $2 million because their child now has an overbite and --

MR. KRASOVEC: Then it comes back to that issue.

THE COURT: -- that's where it becomes a problem when it's like, "Oh, we got a verdict in your favor, and everybody's going to get five bucks," it's like, "Well, wait a minute. I thought that I was going to get at least reimbursed for the braces or something." I don't know.

Okay. Yeah, given the purpose for notice at this

stage, I think USPS is probably fine. And I take it for the actual claims process, if there is a plaintiffs' verdict or a settlement that perhaps things may be done differently maybe as part of the claims, or will it still be --

MS. WEINER: For the claim process --

THE COURT: -- filling out --

MS. WEINER: No. Later when -- I say "when."

If there is a claim process later, it will be online, and we will have a whole separate set of security measures for the claim filing online.

THE COURT: Okay. That's fine.

Then I think those were the only questions or concerns that I had at this stage, and we can talk a little bit about the schedule, and then I'll give the parties a couple of minutes to see if you can reach some agreement on an alternative proposal for the language.

MR. ALI: Your Honor, did you want to talk about the second sentence?

THE COURT: Ah, yeah, the second sentence that I keep forgetting there, "the uniquely shaped nipple." Why is that additional language helpful for the recipient of the notice?

MR. ALI: So, again, Your Honor, this is important to educate the public about what this case is about, and this is Defendant's contention.

So Plaintiffs have their contention immediately

preceding that they don't think that pacifiers -- the use of the word "orthodontic" is appropriate because it conveys healthy oral developments that does exist. And so this is our contention, that it is appropriate to use "orthodontic." It's not misleading because the pacifiers have a uniquely shaped nipple. So it educates the public on what the plaintiffs are contending and also what the defendants are contending. It differentiates why this pacifier is orthodontic versus other pacifiers, because it has a uniquely shaped nipple.

THE COURT: So that's sort of a slightly different purpose to the notice than the ones I identified earlier because I mentioned we want people to figure out if they're a member of the class, and this additional language doesn't seem to help that. And then I want people to not be confused into thinking this case is a different type of case that's going to get them a different type of recovery or cause a health scare. I'm not sure how this additional language serves those purposes.

So you feel it's important for the notice to also advise class members of sort of what the defense theory of the case is?

MR. ALI: Right, Your Honor.

If Plaintiffs are allowed to include their theory of the case on why they think "orthodontic" is inappropriate, then I think it's appropriate for defense also to be allowed to

educate the public on what their position is on why it's appropriate to use "orthodontic."

THE COURT: And how does "it has a uniquely shaped nipple" do that? Because you could -- that doesn't really speak to whether it's representing certain specific health benefits that do not exist.

MR. ALI: Right. So, originally, we had "have an orthodontic shaped nipple," and as a compromise, because Plaintiffs didn't agree --

THE COURT: I know what that means.

MR. ALI: So we changed it to "uniquely shaped."

So the defendant's theory that "orthodontic" is appropriate because it's a uniquely shaped orthodontic nipple on the pacifier. That's what differentiates it. It's the shape of the nipple which conveys benefits because of the shape.

THE COURT: Okay. A response from Plaintiffs' counsel?

MS. WEINER: Sure, Judge.

This issue has been briefed in many contexts in this case, as I'm sure Your Honor knows.

This is a hotly disputed, I guess, defense for the defendants, and, frankly, we didn't include the language we'd want to include if the defendants have this language in the notice which is why -- which is essentially half of the

briefing on summary judgment, why the orthodontic shape is actually what is at issue here.

And whether it's a unique shape is certainly not agreed to. There are other alleged physiological "orthodontic pacifiers" on the market. I think it's confusing as to whether it's "unique" to NUK, whether -- I don't think it adds anything to the case.

And this is actually, again, not an advocacy piece. These are not our claims for trial. We have a certified class, and under the federal rules, we have to issue notice. So we did our best to make it as benign as possible as to what this case is about, what the Court has certified, and we actually don't think the purpose of the notice is to have Defendant's entire defenses in here.

And, again, this concept of the unique shape is confusing. We said no to "orthodontic shape," and "unique shape," I think, is equally confusing to the class member in terms of what does that mean.

And then I think we would want to go back and add language as to why, you know, if you have an orthodontic-shaped or unique-shaped pacifier versus a traditional pacifier, and that begs the question as to whether any of those pacifiers offer any oral health benefits which, of course, our case is that they don't. I think this goes down a rabbit hole in terms of additional language that we would like to add to respond to

this claim related to shape.

THE COURT: So what if the language were modified to state something like: "Defendants contend that the labeling on NUK orthodontic pacifiers accurately describes the product" or maybe "the labeling on the packaging accurately describes the NUK orthodontic pacifier," something like that? So instead of saying that it has a uniquely shaped nipple to simply say: "Defendants contend that the labeling accurately describes the pacifiers"?

MR. ALI: I think we'd be okay with that, Your Honor.

THE COURT: Is there any objection from --

MS. WEINER: I don't think so. So it would say, "Defendants contend that the labeling on NUK orthodontic pacifier" -- I'm sorry.

THE COURT: That the labeling accurately describes because we've already mentioned --

MS. WEINER: I think that's fine.

THE COURT: Skipping for a moment the other contested language, "Plaintiffs allege the NUK orthodontic pacifiers are misleadingly labeled to present oral health benefits that do not exist. Defendants contend that the labeling accurately describes the pacifiers."

MR. ALI: Yeah.

MS. WEINER: That's fine.

MR. ALI: "Defendants contend that the labeling

accurately describes the NUK orthodontic pacifiers and is not misleading in any way," right?

THE COURT: "And is not misleading in any way." How about that? We've solved that problem?

MS. WEINER: Yeah.

THE COURT: So we'll make the change. I'll memorialize that. I'll include it in the order.

I think that's a little better because I think the connection between whether or not the labeling is misleading and whether there is a uniquely shaped nipple, it means a lot to the parties. I don't think it has a lot of meaning to just a purchaser who hasn't, you know, read all of your briefs and isn't familiar with all the motion practice.

Okay. So that's one minor -- maybe not so minor -- issue resolved.

And then we'll still have to circle back to the defective or unsafe use and what the case is not about, right? So that language deals with what the case is about, Plaintiffs claim this, Defendants say, "No, that's not true, the packaging is accurate." This other issue that's been carved out deals with what the case is actually not about, so I think that's the way to think about it.

Okay. Let's talk a little bit about scheduling and take a break.

Somewhere in this proposed trial schedule, I saw a

reference to trial briefs. What are you expecting to put in a trial brief? Is that for the benefit of the Court, or are you referring to a traditional trial brief that's different than, you know, your motions in limine and other -- this thing that's called a memorandum of contentions of fact and law? How is that different from a trial brief?

MR. ABBARNO: So, Your Honor, Ken Abbarno.

THE COURT: Yes.

MR. ABBARNO: You're talking the top of page 3?

THE COURT: Yes. So I see that 45 days before trial, there are going to be submissions of memorandum of contentions of fact and law and oppositions to motions in limine, and the motions in limine have been filed 60 days out.

So that's a filing, and there are other filings, stipulations, all of those things happening between 65 and 20 days before trial. And then at 20 days before trial, I see something called a trial brief which is going to be submitted at the same time as the list of unusual words, phrases, and spellings. And that caused me alarm because it makes me think I'm going to get a lot of paper 20 days before trial, and I was like, "What is that? What is that trial brief thing that they want to submit shortly before trial?"

MR. ABBARNO: We would envision this perhaps to be kind of a catchall document as we're getting closer to trial to address any potential issues that have come up since the last

filings. So, in sum, we would identify everything that has been filed. If there's things that haven't been ruled upon, we'd want to just address those and know what issues are outstanding from our perspective.

THE COURT: Why isn't it a status report? "Trial brief" seems like it's going to invite a lot of new issues that will require rulings for the first time.

MR. ABBARNO: And if you'd like to rephrase it as a status report, we could absolutely do that.

And then there will be some words and phrases that will come up here. Our hope would be to provide notice to the Court on what those words and phrases might be as you may come to prepare a joint statement that you may ultimately want to read to the jury, what words matter, what words may not matter. We could insert that and make it a status report if Counsel would be agreeable to that.

THE COURT: And so heading back, so we've got motions in limine, witness lists, joint lists -- that's fine -- motions in limine. And for contentions of fact and law -- and this is something that's being submitted at the time that the parties respond to each other's motions in limine. And this is coming after you've submitted proposed jury instructions.

What should I expect to see in the memorandum of contentions of fact and law, and how is it different than the jury instruction submission and the motions in limine?

MR. ABBARNO: While we would like to have joint facts that we could submit to the Court for perhaps some of them to be read to the jury --

THE COURT: Stipulations, in essence?

MR. ABBARNO: Yes, stipulations. We may not have stipulations at that point in time, so we could provide the Court with some ideas as to where we tried to come together, where we haven't come together. Also, it could be used as an opportunity to do further briefing in advance of trial to the extent that there's things that would not --

THE COURT: It's the further briefing that gives me pause.

MR. ABBARNO: I get that, but stuff that would be handled outside of motions in limine. So if there's issues that could come up, legal issues that may come up, that are handled outside of motions in limine, that would be what we would add at that point in time.

THE COURT: Is that what defense counsel had in mind as well?

MR. ALI: I think, Your Honor, we may be able to simplify this a little bit. Like, for jury instructions, I'm assuming we'll come together on some and there's going to be a dispute. We'd probably submit competing jury instructions. I think we could do that in one document.

As far as a trial brief, I think the way we were

envisioning it is if the Court had questions or issues that needed briefing, then we would submit something. I don't think we were viewing that as something that we would automatically be doing unless it's something that the Court needed. I think the Court's gotten enough paper from us.

THE COURT: And maybe that date -- so I am likely going to want to have a two-part final pretrial conference, one as the parties sort of identify -- will likely also serve as argument on motions in limine and an opportunity to identify kind of the legal issues. And maybe these are the sorts of issues that counsel is suggesting would be identified in the memorandum of contentions of fact and law of places where you just weren't able to reach agreement.

And then closer to trial, I will likely want to have a final, final pretrial conference which will get into nitty-gritty things. And that's where we may talk in greater detail about what voir dire is really going to look like, the nuts and bolts of it, and, you know, some of the logistics and mechanics as well as dealing with outstanding substantive issues, of course. But I think sometimes, it makes sense to separate, you know, those two subject matters in preparation for trial.

So maybe I'm making too much of the use of the word "trial brief" and maybe this is really just a status report about standing issues.

Also, I think the list of unusual words, phrases, and spellings, always appreciated. I know the court reporters always appreciate that.

And then maybe that is -- if that's roughly 20 days before trial, that's still an opportunity for us to have that final, final pretrial conference, and so that status report almost ends up being an agenda where we can say, "Okay, here are the things that are still outstanding."

So my concerns are somewhat alleviated with the understanding that that final submission that's going to happen around 20 days before trial is sort of going to be our checklist of outstanding issues, things that have come up that need to be resolved before we get started in earnest and not new, substantive issues being raised for the first time or being briefed for the first time because, hopefully, all of those things have been exhausted well in advance of that time.

It's a minor thing, but it does jump out at me that I see that there's a notation about notifying the courtroom deputy clerk regarding need for use of the parties' own trial equipment.

So my expectation is that you'll be using the equipment that's installed in the courtroom.

Do you have something else in mind? Have counsel tried cases using the courtroom equipment in this building previously, and do you have some reason to think it will be

insufficient for your needs?

MR. ABBARNO: I have no reason to believe it would be insufficient. We would ask just for the permission to do a walk-through maybe with our tech.

THE COURT: You will, in fact, have a requirement to do a walk-through with your tech.

MR. ABBARNO: I figured.

So we would not envision necessarily a need to use our own trial equipment. Seeing everything that's in here, it's going --

THE COURT: It's pretty good. I will say it's no longer, I think, the cutting edge of courtroom technology. It was when it was installed. We were way ahead of a lot of places, but it's pretty good.

I mean, you see that the jury box, they have pretty much their own screens. There's sort of one screen for every two chairs.

The screen at the witness stand is a touch screen. It's great for expert witnesses who want to circle things on a diagram or indicate things. So it's pretty good.

You know, we are able to, if need be and if the parties are agreeable to it, have a witness testify remotely if need be using the screens. We have a couple of different ways of accomplishing it. So I think our technology is pretty good.

We also have electronic equipment in the jury room for

the jurors to review exhibits electronically. So one thing that -- we'll figure out a good place to build it into the schedule and sort of give you instructions on this sooner rather than later.

We have what's called the JERS system, the jury electronic -- I don't know what the "R" stands for. Laritza, do you know? But basically, I would assume that the parties are planning to display any document exhibits or things of that nature to the jury electronically rather than in paper. And if it's not the case, we can talk about that, but for the jury room, absent sort of an order to the contrary, the expectation is that exhibits will be submitted in electronic format.

And we have a particular format that we'll provide to you that will enable them to be loaded electronically into our JERS system which will enable the jurors in the jury room to view them on a big screen that's on the wall.

And, at some point, I'm happy to even show you what our jury room looks like so you can see what this is like. There's basically a large, big screen television on the wall and then a small console off to the side.

The exhibits are loaded electronically by the courtroom deputy who then sends them via a secure link directly to my jury room. So Laritza is able to load it from her computer and send it so that it's securely sent just to the jury room.

The monitor and the console off to the side actually has, like, a touch screen exhibit list, and jurors can select individual exhibits to pull up on the big screen and look at them all together.

We still have to have paper exhibits as backups because technology is great, but sometimes it fails us, but, you know, it usually works. We've been using it for a few years now. It's great.

Most people are so used to looking at things on screen that they're almost more comfortable with it. There may be some documents where they just have to have something to flip through for whatever reason, and I will require a backup set if the jurors need it.

Some jurors may need it as an accommodation. There may be a limitation that doesn't prevent them from sitting as a juror but just would make it difficult for them to make use of that.

But, in general, well in advance of trial, you'll get some instructions to make sure that you can prepare your electronic exhibits to go into our JERS system. And I think it's great because you don't have a situation where jurors want to talk about a diagram, for example, and so they're passing around a binder. Instead, they can all look at the same image at the same time and point to it and say, "Look here. Look at what the shape is right there. I remember that witness talked

about this little curve," and they can all be looking at it at the same time. So it's great technology. It does require some advance work.

I assume that there will be a lot of documents in this case.

MR. ABBARNO: We do our best to limit them, but that sounds great. We plan on having everything electronically but for we may have a pacifier, sample pacifier, that we would be looking at. Obviously, that won't be electronic.

THE COURT: Yeah, if there's a pacifier, if there's -- is it, like, an actual package?

MR. ABBARNO: Packaging, yep.

And I see one of the things that we not so much anymore have to bring in is an ELMO. You have an ELMO, so that takes care of that.

THE COURT: We do, yes. So we have the ability to show it as an overhead, which is great. We have the ability to load it. You have connections at counsel table, so you have the option of having your IT person sit with their laptop at counsel table, and you can direct them to bring up images, or you can connect your laptop directly to this podium which is the one that's wired up and you can do things yourself. So it's actually not a bad system.

MR. ABBARNO: Do you have a requirement to deliver to the Court paper copies of all the exhibits, or do you want them

electronically?

THE COURT: I want them for my use electronically as a courtesy copy. I will want a backup copy delivered to the court. I will probably not use it. I guess it's possible, but it's one that I will want to have kind of stashed off so that if our technology fails us, we can still push forward.

MR. ABBARNO: And okay if we just exchange electronically with each other as opposed to paper?

THE COURT: If you're comfortable with that.

MR. KRASOVEC: Sure, yeah.

And no prohibition against using boards if we want?

THE COURT: So I talked about all this technology. You can bring in a poster board. You can bring in an easel. You can bring in a white board.

Anything that you're bringing from outside that might get caught at security I would suggest that you give me a heads up on and describe it in a way that I can issue an order, give you a note saying it's okay to bring in a white board and things like that. Yes, we still have folks that do that.

MR. ABBARNO: You mentioned, Your Honor, your jury and the jury room. If we may maybe just jump to a jury question, do you permit notes by the jurors, or is it no notes?

THE COURT: No notes during the trial.

You mean questions that they want to ask?

MR. ABBARNO: Questions, or do you give them notepads

to take notes?

THE COURT: Oh, no, they can take notes. I didn't know if you meant taking notes or asking questions because I know there are some judges that do allow jurors to send questions during a trial which I do not do, but they will be given notepads and pens.

And I think our standard jury instruction regarding note taking would probably apply here which is basically that they may take notes; they're not required to take notes. I would typically advise them that they should not expect to have transcripts available to them during their deliberations. Exhibits that are admitted into evidence will be available.

I think it can be difficult. One of the most common questions I get from jurors after trials is why they couldn't just have transcripts in the jury room, and, you know, I think it's helpful for them to know in advance that that's not going to be the case, speaking of which, I do not know if counsel on this case will be making requests of our court reporters.

You don't need to make this decision now, but since we're talking about -- I'm going to set aside a four-week period, I think, for this trial to make sure we have a little bit of a buffer. I don't know if counsel were thinking that you're going to want daily transcripts or realtime services or anything like that. That's just something to consult with your clients on.

MR. KRASOVEC: Is that something we can do, I would say, sort of a la carte, in other words, witness by witness, if we want dailies on a particular day and not on other days, or do we have --

THE COURT: I believe you can do dailies on a day-by-day basis.

Brenda, how far in advance would they need to make a request for, let's say, realtime services or even daily transcripts?

THE COURT REPORTER: I would say two weeks before so we can set up a team of people.

THE COURT: Again, we're, like, five months out, but I know for costs and budgeting, sometimes parties will even agree to share some of the costs of making transcripts available sooner.

And speaking of the time frame that we're talking about, so the parties have suggested that the trial can be accomplished in 14 trial days. I'm going to add sort of an extra day, but I'm assuming that jury selection may take a little longer given the length of the trial. And I'm going to call that 15 trial days which is three weeks.

For my schedule, I'm going to be in a position where if we go over that I'm pretty clear for an additional week after that. So I'm not going to schedule another trial right behind this one, and I would encourage all of you to think of

it that way as well.

One of the things that I will probably build into a schedule -- and I'm envisioning taking what you've done in putting together a bit of a pretrial scheduling order, particularly once we have a trial date selected, I will consider whether or not to have a written jury questionnaire in addition to questioning that's going to happen in court.

I don't always use written jury questionnaires in civil cases, but I always consider it, whether I think it's helpful. It does sometimes add a little bit more time particularly on the front end of the jury selection process because we're not able to give questionnaires to the jurors until they get here on the day that they report for jury duty, so there's extra time on the front end while our potential jurors are filling out things, but it can be very helpful.

I'll give some thought to that. And we don't need to make a decision there, but I would be -- you know, potentially around the time that you're proposing voir dire questions, maybe that also becomes an opportunity to consider a proposed questionnaire for jurors.

And I can provide examples of what that might look like. Again, I don't know that it's necessary, but -- and I'm not sure what types of questions the parties think will be useful.

Now that I'm thinking about it, it may be useful for

me to see some of your proposed voir dire questions just presented before I make a decision on whether a questionnaire is needed; but, for example, if you think it is relevant to get information from potential jurors about experience with child development issues or "Do you have a child -- has your child or a child of someone close to you" or something like that "ever been harmed by a product or birth defect," anything that you think may get to the types of issues that you would want to have screened and it might be something that you think jurors would at least initially respond more readily to putting in writing rather than answering a question in open court, those are certainly issues that would weigh in favor of a written questionnaire. So we'll build some of those things in.

So I'm going to be looking at a trial no sooner than 150 days from when we can get notice out where I can set aside on my schedule a four-week period and for this to happen before the end of the year.

So I think what I will do is maybe suggest a window and then kind of let you all go back to your respective offices, consult with your teams to identify potential conflicts and see if we can come up with a date.

Laritza can correspond with the parties by email sort of after the hearing to confirm our availability for a trial and, you know, get information from you on your potential conflicts.

I assume the parties were thinking that this trial is going to happen in 2026, correct?

MR. KILPELA: That's certainly our desire.

THE COURT: I hope so, with a 2019 case.

MR. ALI: Your Honor, we did do a lot of that discussion about witness availabilities and things.

THE COURT: So do you have a target span in mind?

MR. ALI: I think we were looking at the first of December. Now, I think we were envisioning a two-week trial on the top end, and then I know Your Honor built in some buffer there.

THE COURT: I see 14 trial days, so five days a week, two weeks seems like less than 14 trial days.

MR. ALI: Okay. So we weren't sure. Do you run full trial days?

THE COURT: Yes, let's talk about that.

So how many hours a day is your 14-day estimate based on?

MR. ABBARNO: Probably five hours a day.

THE COURT: Of actual testimony or in court?

MR. ABBARNO: Of testimony.

THE COURT: What I would expect -- and my breaking point is usually about three weeks, so for a trial that is going to be three weeks or longer, I will go to a four-day trial week. For a trial that's going to be less than three

weeks, I would probably stick with a five-day trial week.

It sounds like this is a five-day-trial-week trial. With that schedule, I would expect that I would probably have the jurors report by 9:30 each morning, and I would tell the jurors that they will be dismissed by 4:30 each day.

I usually would do a very short civil status call first thing in the morning around 8:45 or 9:00, to be finished hopefully by about 9:15 or so so that I can call the case and meet with the parties by about 9:30 as well. The jurors will be here.

I would hope that absent issues that need to be discussed each day that we would be in a position to get started by about 9:45, take a short stretch break mid-morning at about 11:00, take a lunch break at 12:30, have a 15-minute break midafternoon at 3:00 until 3:15, let the jury go at 4:30, address any final issues with the parties so that you're out of here shortly thereafter. That does get you at about five hours with the jury in the courtroom for testimony and argument which I think is about the most that you can really expect.

I try to get as much done with the parties when the jurors are not in the courtroom to take care of, you know, other things and also get a heads-up from the parties of issues that are likely to arise based on witness order and rulings on motions in limine so that if we need to get started a few minutes later in the morning to take care of issues first

thing, I'd rather do that than have the jury going in and out of the courtroom or having a lot of sidebars.

So, with all of that information, does that change the parties' estimate for how long we're going to need?

MR. ABBARNO: No.

THE COURT: If we can get it done in two weeks, great.

I saw 14 trial days, so I figured this was going to be a three-week trial which gives me some pause with starting -- what would it be? November 30th maybe would be the day?

Let me take a look here.

MR. KRASOVEC: That's that Monday, Your Honor.

MR. KILPELA: Our thought, Your Honor, was just to accommodate everybody's holiday schedule, including potential jurors, probably everybody come to Chicago on the 30th but begin on the Tuesday which is the 1st. But, obviously, if the Court would prefer to start on the 30th, we'll be here on Sunday.

THE COURT: And in proposing that start date, did you take into account the possibility that if we do run long for some reason, we very quickly get into the week of Christmas?

MR. KILPELA: We had probably about a 5-or-10-minute discussion out in the hallway, Your Honor, and we laid on the table the various conflicts that counsel, expert witnesses, the client for the defendant who's coming in from Germany, sort of the availability matrices that we have, and that looks like

maybe the best time. Maybe November --

MR. ABBARNO: The only other potential window would be tough. It was the 16th of November, but that would run us into Thanksgiving. We'd have a Thanksgiving break for the trial, but that would be the only -- and we would really only probably get seven good days of trial in there because the Wednesday before Thanksgiving, I don't know if you'd want to have people in trial.

We talked about doing maybe pick a jury on Friday, the 13th, and try and get it in quickly then, give us the weekend to get ready, kick start with opening statement on Monday and could probably accomplish a lot that Monday but don't know -- we kicked that around, too. We were trying to figure out how we slot it in, Your Honor.

MR. KRASOVEC: I don't know that it would be ideal to take a break for Thanksgiving.

I do think, Your Honor, hearing what you're saying about your trial days and about going five days, I really think we have -- I'm not going to say 100 percent but a high degree of confidence we could get this done in two full weeks. So even if I'm wrong and we spill over a little bit, we're still that week before Christmas.

MR. ABBARNO: You may be the 14th or 15th, that Monday or Tuesday.

MR. KRASOVEC: Yeah. It's hard to see it going much

beyond that, Your Honor. If we're getting good trial days that it sounds like that's exactly what we're going to get, then I think we can get it done.

MR. ABBARNO: With that, do you put time limits on voir dire, openings? You're smiling. That tells us yes.

THE COURT: I was actually just pondering actually whether this is a case that might benefit from time limits on your respective cases in chief in terms of testimony.

There will definitely be time limits on openings and closings, and we'll discuss that in advance. Voir dire I don't put a time limit on.

And I am going to confess that I am -- I'm going to use the word "deliberate" -- in my voir dire, so I always assume that I'm going to take a little bit longer than I expect to take. I also like to think I don't have a lot of jury issues. I don't have a lot of people who, you know, bail, for want of a better word, on jury service afterwards. I think we tend to get good, solid groups of jurors, not a lot of issues, not a lot of surprises in terms of conflicts or people not showing up or, you know, the other sorts of issues that can happen, but I am not speedy, I will readily acknowledge, with jury selection.

I am going to hold your feet to the fire once we get going with testimony a lot more, but I do think it's important to get off on the right foot in jury selection.

That said, a civil case, I wouldn't expect it to -- I don't think it's going to eat up a lot of time. And if the parties are also open to the possibility of doing time limits on the cases -- and my approach when I have done that is I start from an assumption that each side will have the same number of testimony hours, and then sometimes I'm persuaded that the plaintiff should get more because they have the burden or the defendant should get more because -- or, you know, a shift back because of defenses that are going to require special consideration, and we kind of go from there.

Okay. My month of December, I believe, is clear for trial, Laritza? It looks like on our calendar, we could start a trial November 30th or December 1st?

THE CLERK: Yes, Judge.

THE COURT: And I think the courthouse is -- all other things being equal apart from whatever the parties might be willing to do, apart from what the jurors might be willing to do, the courthouse is going to close early on the 24th. I'm sure the courthouse might actually be closed on the 24th altogether. I wouldn't want to have jurors here on the 24th of December in any case, so I think we would need to come up with a trial plan that gets the parties to closing arguments by about December 17th because we do have to allow time for deliberations, and I think that may carry over into the beginning of the week of Christmas.

MR. ABBARNO: If we're still in this on the 24th, I think we'll all get coal in our stocking, so we would probably -- we think that we would be able to have this done and closings aiming for the 17th even without time limits, which I don't know that we would need it. We would be really good on that.

MR. KRASOVEC: I 100 percent agree, Your Honor.

THE COURT: And have you already checked with your witnesses, expert witnesses, the plaintiffs and others?

MR. ABBARNO: So we need to check with the plaintiffs, but we think that we'll know in 24, 48 hours.

THE COURT: Do counsel have conflicts on November 30th? You had mentioned that you'd run through your schedules. Were you concerned about bringing jurors in or something else?

MR. ABBARNO: We didn't know if from a juror perspective whether starting on the 1st would be better, but if they have to be here, they have to be here.

THE COURT: Okay. So, for our purposes leaving here today, let's tentatively pencil in a jury trial to start November 30th. Even if we're not working with jurors, it might make sense to have counsel here to go over any last-minute things. And I'll probably want to have a pretrial conference early in November, but to the extent we can do any troubleshooting that might need to be done on November 30th,

even if we're picking the jury on the 1st, I think that will give me some comfort that we would be able to get things completed and allow time for jury deliberations because these are complicated issues for the jurors.

So I think sometimes from counsel's perspective, you may think, "Oh, we'll be done in two weeks," but the jury might be deliberating for a couple of days.

I have never had an experience with a jury where I felt they rushed to get to a verdict because of a weekend or a holiday. I think, fortunately, it's not something that I think I see, but I think jurors do the work, particularly on a case that I think is going to be interesting and they're going to understand why this matters to the parties involved, but I don't want to ruin anybody's year-end holidays.

MR. ABBARNO: Your Honor, we were talking about voir dire. Do you mind if we just circle back to that for a second?

THE COURT: Yes.

MR. ABBARNO: I know you said you have a process that you go through that's rather lengthy, and that's very much appreciated.

Do you allow counsel also to inquire of the panel?

THE COURT: So I'll kind of briefly describe that, and we can talk about that more as we get into the pretrial area. And I don't want to keep everybody here super long, and I know the parties want to have a chance to talk about the class

notice which is a more pressing thing to get finalized.

For voir dire, if there is a jury questionnaire, that usually covers all of the basic background information. People are asked to fill out their education, where they live, what folks live with them, prior jury service, have they ever worked for the defendants, things like that.

Most of the questions on the questionnaire aside from background like "What is your educational background" are actually yes/no questions with some space where they can explain. And I use that as a starting point for the oral voir dire in court to kind of follow up and get further explanations on the issues that people indicate might apply to them.

Regardless of whether I use a questionnaire, in open court, in front of the jury, I will conduct the questioning. We will do it in groups, panels. I usually do it in groups of 12 or 14 panels at a time. After I do the oral questioning and some follow-up, we'll have an opportunity for a sidebar. I will discuss with counsel which of the jurors you think require additional consideration and questioning.

For sidebar questioning, meaning questioning that takes place outside the presence or hearing of the other jurors, I will allow attorneys to ask follow-up questions.

The goal is to make sure that whatever your specific concern is, you have the information that you need. It's not an opportunity to try to argue your case to that juror to see

how they respond, but it's an opportunity to kind of make sure that if there's a specific question that you feel is important, you'll get that addressed.

So the short answer to the question is in open court, in front of the full panel, I will do the questioning. At sidebar, I do give counsel an opportunity to follow up, but that would be outside the hearing of the full panel of jurors.

MR. ABBARNO: Thank you.

THE COURT: Okay. So we'll pencil it in for the 30th.

I'll give counsel an opportunity to speak for a few minutes to see if you can work on that last bit of language, and then I'll hear what you decide.

Officially today, I'm going to take under advisement the motion for approval of the class notice. I'm going to just look at a couple of things, but subject to reaching agreement on the last bit of language, I expect I'll issue an order on that.

And once that happens, how soon are you intending to send the notice?

MS. WEINER: I think, Your Honor -- sorry. That was louder than I was expecting.

I think it's about four weeks.

THE COURT: And that allows time for the website and the phone number to get up and running?

MS. WEINER: That's exactly right, Your Honor.

And we can add hopefully by then, Your Honor, the trial date. We'll fill in all these blanks. There are holes, and we saw one formatting issue that is cringy, so we'll make sure it's perfect. And then, of course, getting the website up and running, making sure that we work with defense counsel to agree on all the language for the class website.

THE COURT: Okay. So that's going to happen in about four weeks. And then the next big date after -- so that's your 150-day date on your schedule, and then you get into jury instructions and special verdict forms.

So looking at a December trial date, and we're going to be working backwards, so not 150 days from when the class notice goes out. So there will be, hopefully, more than enough time. You're going to be well in advance of 150 days before trial when this notice goes out.

MR. ALI: Just a point of clarification, Your Honor.

My understanding from the order was that the notice plan would go out 150 days before trial, so with the trial starting on November 30th, then the notice plan would go out --

THE COURT: Is it? I don't know because the plan says "deadline."

MS. WEINER: That was the last day by which we needed the Court to enter an order on the class notice in order to stay on the deadlines for the remainder of the trial plan.

MR. ALI: Okay. Because I think there's still a

lot -- like, we haven't seen the website. That all needs to get built. There's a lot of issues that still need to be resolved before the notice plan goes out.

MS. WEINER: And we can certainly start all of that now before -- I mean, if the Court is going to issue an order sometime soon. I don't anticipate the website or any of the remaining issues -- once we have this language sorted out, it won't stray from this language.

THE COURT: So one of the things that I wanted to do is figure out the best time for us to have a next status to check in on everything, and it sounds like perhaps something in around maybe the four-week period, so slightly before everything goes live, so to speak, and the class notice goes out to make sure there are no issues because what I'm hearing is that defense counsel would like to see the website, and, you know, I don't know what other little issues may come up. That would be well before any of these other deadlines come in.

So assuming that we reach some sort of agreement on the language of the class notice, I expect I'll be able to approve the language sometime next week. I'm going to read through it again. Sometimes I notice something when I re-read it, whether it's punctuation or just something that's off that the parties may have plowed over, so I just want to make sure everything is good.

Don't worry. I'm not going to micromanage or edit

your notice, but I just like to read through it to make sure that it all kind of makes sense.

MS. WEINER: We actually see a couple of things as well, Your Honor, so it may be helpful if we do agree upon the language that we submit a Word version to the Court with the language hopefully that we agree to that fixes what ran on to the next paragraph here with the addition of the red line. There are just a couple of things.

THE COURT: That sounds great.

So I will get that to the parties. And then I don't know that there's a need for us to have another touch base until, I guess, maybe when class notice is ready to go out or when it goes out. It sounds like we're talking about a four-week lead time. We could do a telephonic status then.

By that point, I will have issued a scheduling order with all of these dates. I'll try to do that next week as well. And yeah, the next time we'll likely need to check in will probably be shortly before trial, a 100-day date. So another status date in four weeks which will also give us a chance to confirm the start date of the trial.

I'll propose two dates for that two-part final pretrial conference that I mentioned, and then we'll just be off and running.

The last thing I'll mention before we take a short break, settlement.

Do the parties have a plan to revisit settlement between now and the trial? I saw there was actually a date built into the schedule: "Notify the Court of any settlement 10 days before trial." Is that based on a plan to actually have a settlement discussion around that time?

MR. ABBARNO: That's based on a catchall, Your Honor. We're not aware of any desire by the defendants to enter into any settlement negotiations.

THE COURT: Okay. If something changes, if there's something that I can do to help facilitate or you want to talk to the magistrate judge, whatever it is, you can always notify my chambers, and I'm happy to help you go on parallel tracks.

Once the trial date's on the calendar, it's on the calendar, though. I only set real trial dates, and particularly with the number of moving parts involved in a multi-week trial, I'll want to keep this December date.

That's all I have for the parties.

Oh, a telephonic status in about four weeks so that we can confirm all the notice stuff, Laritza.

THE CLERK: Yes, Judge. We can do March 10th at 10:30 -- I'm sorry -- 10:45.

THE COURT: Does that work for Plaintiff's counsel?

MS. WEINER: Yes. Thank you.

THE COURT: And defense counsel?

MR. ALI: Yes, Your Honor.

MR. KRASOVEC: This is telephonic?

THE COURT: Yes, we'll do telephonic because, hopefully, we'll have all the issues ironed out.

And my expectation is notwithstanding the fact that the notice is going to be approved and the plan is going to be approved that because of all of the moving parts, including getting the website up and running, et cetera, that the notice is not actually going to go out until after that date just so that there's no confusion. That's still well in advance of the 150 days to trial. So this is an opportunity if there are any last issues before all of this gets in motion because the notice is going to have that trial date as well as other issues. This will be our check date on -- that was the 10th, Laritza?

THE CLERK: Yes.

THE COURT: On the 10th will be our check date. And then after that, I assume notice will go out promptly. So you can let your administrator know that that's the timeline.

MS. WEINER: Judge, on that last remaining issue and subject to defense counsel's agreement, I think we hear Your Honor on the concern with respect to what is this case about, what is it not about. We've been playing with some language that we think may be more palatable. May we have one week to hopefully come to an agreement on language that we both hate and submit it to the Court?

THE COURT: That's fine. If you think it would be easier because you may have to go back to your clients.

MR. KRASOVEC: Yeah.

MS. WEINER: We have a few ideas about how we may resolve it, so I think we've come very far in making a lot of agreements, so if we can just have a week, maybe we can --

THE COURT: So, in connection with this, you're going to reach agreement on this language hopefully, you're going to give it another read. And can you submit a Word version then to chambers that highlights what the new language is and any other changes that come out of your final review?

If you can send that to my proposed order email box with a separate CC to Laritza by a week from today.

MR. ABBARNO: Yes, Your Honor.

MS. WEINER: Just to be clear, Your Honor, only submit it to the proposed order with a copy to Laritza?

THE COURT: As opposed to filing it.

MS. WEINER: We don't need to file anything?

THE COURT: Do you feel that it's important to have it as part of the docket? I don't know that it needs to be.

MR. KILPELA: It will be part of the order.

MS. WEINER: It will be part of the order.

THE COURT: Yeah.

MR. KRASOVEC: Yeah, this would just be submitting it to you, you would give a final read, and then whatever is

submitted would be the order? Yeah, that should be fine.

THE COURT: That's fine. It doesn't need to be filed. Just submit it and make sure it's a Word version that we have. And if you separately CC Laritza, we'll make sure that it gets to my desk fastest.

Then I don't need to talk to the parties after this. Thank you for a good discussion. I'm looking forward to all of this coming together.

I think we're adjourned.

(Concluded at 12:58 p.m.)

* * * * * *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ Brenda S. Varney* March 19, 2026
Brenda S. Varney, CSR, RDR, CRR
Official Court Reporter